**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 18 2017

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GARRY STEWART, M.D.                                    **PLAINTIFFS**

VS.                                    CASE NO. ___4:17-cv-338-BSM___

ADVANCED MEDICAL REVIEWS, INC.;
EXAMWORKS, INC.;                    This case assigned to District Judge _Miller_
J.D. HAINES, M.D.;                  and to Magistrate Judge _Harris_
GARY GRAMM, D.O.;
DAVID CHEN, M.D.; and
WSANNA BELMAN, M.D.                                    **DEFENDANTS**

## COMPLAINT

Plaintiff, Garry Stewart, M.D., by and through his counsel, respectfully comes before this court and for his Complaint states:

### I. NATURE OF THE CASE

1.     This case involves a "professional review action," more commonly called peer review, involving Dr. Garry Stewart, a member of the Conway Regional Medical Center staff in Conway, Arkansas.

2.     The peer review has been marked by bad faith, deception and manipulation from its inception. The abuse reached an extreme point when Defendant Advanced Medical Records, Inc. (AMR) and its physician reviewers colluded with Conway Regional by changing their external peer reviews on Dr. Stewart from favorable to unfavorable, and in the course of doing so defamed him and accused him of euthanasia.

3.     This case represents abuse and manipulation of the peer review process and malicious conduct toward Dr. Stewart that has damaged his reputation and livelihood, interfered

1

with his physician-patient relationships, and placed his career in jeopardy. Without redress, this case also is likely to have a chilling effect on other physicians who provide palliative care in this state if they were to see a fellow physician's career ruined over how he chose to provide the comfort and compassion patients deserve at the end of life.

## II.    JURISDICTION AND VENUE

4.    The United States District Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332. There is diversity of citizenship among the parties, and the amount in controversy far exceeds $75,000.00, exclusive of interest and costs.

5.    Venue is proper in the United States District Court, Eastern District of Arkansas, Western Division, pursuant to 28 U.S.C. § 1391.

## III.    THE PARTIES

6.    Plaintiff **Garry Stewart, M.D.,** is a resident of Conway, Faulkner County, Arkansas, and practices medicine in Faulkner County. Dr. Stewart is a board-certified family physician, with 10 years of experience in palliative medicine. He has been licensed as a physician since graduating from the University of Arkansas for Medical Sciences in 2001.

7.    **Advanced Medical Reviews, Inc.** (AMR) is a California for-profit corporation. It provides external peer review and other services to hospitals, insurers and other healthcare clients across the nation.

8.    **ExamWorks, Inc.** is a for-profit Delaware corporation that provides external peer review and other services to hospitals, insurers, and other healthcare clients across the nation. ExamWorks acquired AMR on or about January 19, 2016, for a cash purchase price of $30 million and is liable for all conduct of AMR and its network physicians during the time period described in this Complaint.

2

9.    **J.D. Haines, M.D.,** is a licensed physician residing in Coleville, California. Upon information and belief, he is no longer found to be board certified on the American Board of Family Medicine or American Board of Medical Specialties websites, with his American Board of Family Medicine Board Certification apparently expiring on December 31, 2016. He is a professional expert witness in family practice and urgent care medicine for plaintiff and defense lawyers. Dr. Haines conducted the external reviews of Patients D, E, F and G as a network physician of AMR.

10.    **Gary Gramm, D.O.,** is a licensed physician residing in Loomis, California. His curriculum vitae states that he is board certified. However, upon information and belief, he is not found to be board certified by the American Board of Medical Specialties. The American Osteopathic Association indicates that he is certified by that organization, but not board certified. He practices general family medicine, laser and cosmetics, and performs physicals for employees under Department of Transportation rules and FAA rules for airline pilots. Dr. Gramm wrote the review of Patient A as a network physician of AMR.

11.    **David Chen, M.D.,** is a licensed physician residing in Livingston, New Jersey. He is board certified in family medicine. He works as a part time medical director for a minute clinic, two family practice clinics, and an occupational health center. Dr. Chen conducted the external review of Patient B as a network physician of AMR.

12.    **WSAnna Belman, M.D.,** is a licensed physician residing in Forrest Hills, New York. She is board certified in internal medicine and a full time hospitalist. Dr. Belman conducted the external review of Patient C as a network physician of AMR.

3

## IV.  CO-CONSPIRATORS

13.  **Conway Regional Medical Center** ("Conway Regional" or "Hospital") is an Arkansas nonprofit corporation with its principal place of business in Conway, Faulkner County, Arkansas.

14.  **Tonya Gierke** is a registered nurse and attorney who worked for Conway Regional as a compliance officer and is now employed as an attorney in Little Rock, Pulaski County, Arkansas. She resides in Conway, Arkansas.

15.  **Matt Troup** is the Chief Executive Officer of Conway Regional, employed by CHI St. Vincent under a management agreement between CHI St. Vincent and Conway Regional. He resides in Little Rock, Arkansas.

16.  **Catholic Health Initiatives (CHI)** is a nonprofit corporation headquartered in Englewood, Colorado, doing business in Arkansas and other states.

17.  **CHI St. Vincent** is a regional health network serving Arkansas and is part of Catholic Health Initiatives. It had a contractual agreement with Conway Regional to manage the Hospital and employ its top executives, including Matt Troup, CEO, at all times relevant to this action.

## V.  FACTS

### A.  Dr. Stewart

18.  Dr. Stewart has held medical staff privileges at Conway Regional for 12 years.

19.  Dr. Stewart owns and operates Valley Health Services, a family practice clinic in Conway.

20.     Dr. Stewart is a staff physician for the Conway Human Development Center, responsible for after-hours medical care and hospital admissions for the 500-bed state-run facility for individuals with severe developmental disabilities.

21.     Dr. Stewart is the Medical Director for the Faulkner County Detention Center, which provides institutional care for over 300 inmates.

22.     Through his clinic, the Conway Human Development Center, and the jail, Dr. Stewart sees approximately 9,800 patients a year.

23.     Dr. Stewart has longstanding and ongoing physician-patient relationships with many of these individuals.

24.     In addition to his end of life treatment for patients at Conway Regional and other hospitals, Dr. Stewart has extensive specialized experience in palliative medicine and end of life care. He served for six years as Medical Director for a hospice facility in Arkansas where he was in charge of a "general inpatient" unit, which is hospice care for the most medically complex patients who cannot be cared for at home.

25.     Dr. Stewart and Conway Regional have a long history of disagreements over matters of public policy, including the role of advanced nurse practitioners and the corporate practice of medicine by hospitals, as well as his continued efforts to protect the role of the medical staff from encroachment by hospital administration and business interests.

## B.     Peer Review Laws

26.     The federal Health Care Quality Improvement Act, 42 U.S.C. 11111 through 11115, and the Arkansas Peer Review Fairness Act, 20-9-1301 through 1313, govern "professional review activities," commonly called peer review, of physicians in hospital settings.

5

27.     Under both statutes, "professional review activity" means any activity to determine whether an individual physician may have clinical privileges at a particular hospital, to determine the scope of conditions of such privileges, or to change or modify such privileges.

28.     A "professional review action" means an action or recommendation of a professional review body that is taken or made in the course of a professional review activity.

29.     These activities and actions are commonly called peer review.

30.     In medicine, peer review is intended to be the objective evaluation of the quality of a physician's performance by physician colleagues, sometimes by colleagues within the same hospital, sometimes by external colleagues.

31.     The usual and customary standards for physician peer reviewers are distinguishable from the medical-legal method of identifying negligence and assessing liability. Physician peer reviewers are to examine only the variance from accepted clinical standards. They are to provide an objective clinical evaluation. The reviewer's credentials should be disclosed, and they should be at least equal to or superior to that of the physician reviewed.

32.     A sham or malicious peer review occurs when other physicians or hospital administrators use peer review to harm a doctor for personal, economic or other non-medical reasons.

### C.     Patient A

33.     The peer review in this case was initiated by Conway Regional to review end of life care provided by Dr. Stewart to Patient A.

34.     Patient A was a long-time patient of Dr. Stewart's.  Patient A had multiple and serious chronic medical conditions. Patient A was admitted to Conway Regional in May 2016, and transferred to the Critical Care Unit.

6

35.    Despite aggressive treatment from the care team under the direction of a pulmonologist, Patient A could not be weaned from life support.

36.    Patient A's family made the difficult decision to remove artificial ventilator support and allow Patient A to die, specifically stating that they did not want Patient A to suffer and struggle to breathe.

37.    Patient A passed away with Dr. Stewart and family at her bedside.

### D.    Palliative Medicine and End of Life Care

38.    "Palliative care" or "palliative medicine" is care that anticipates, prevents and relieves suffering for patients at any age and at any stage in a serious illness or condition, whether that illness is curable, chronic or life-threatening.

39.    Palliative care is provided through hospice, but is also provided in other settings, including an intensive or critical care unit, as in the case of Patient A.

40.    Dr. Stewart is not board-certified in hospice and palliative medicine, which is a subspecialty, but he started practicing palliative care in a hospice facility before the American Board of Medical Specialties recognized hospice and palliative medicine as a subspecialty in 2006 and has extensive experience in that area.

41.    Palliative care is still evolving with no clear guidelines on the administration of end of life medications.

42.    Palliative care is required for patients when they or their families choose to discontinue life support and remove them from a mechanical ventilator.

43.    Patients who cannot breathe on their own rely on life support provided by the ventilator through an endotracheal tube that is inserted through the mouth into the lungs.

44.    Extubation refers to removal of the endotracheal tube.

7

45.     Extubation is the final step in liberating a patient from mechanical ventilation.

46.     When a patient has failed attempts to wean from the ventilator and breathe on his/her own, the patient or family may choose to have the endotracheal tube removed and allow the process of dying to take place.

47.     Without medication, the patient will suffer an agonizing and horrific death, gasping for air, experiencing unmanageable pain and distress.

48.     The standard of care is the use of medications, including opioids and benzodiazepines, to anticipate and prevent suffering from the ventilator withdrawal.

49.     There are considerable discrepancies and variations among health-care professionals in the way that life-sustaining therapy is withheld or withdrawn.

50.     Each patient is different. There is no "one size fits all" dosage recommendation.

51.     The maximum dose is the amount it takes to ensure the patient does not experience pain or suffering.

52.     The Principle of Double Effect states that it is acceptable for medications to be used that may have the potential to hasten death in the setting of terminal illness, provided that the physician's purpose in using the medications is to address pain or suffering. This principle has been adopted by the American Medical Association and Arkansas statutory law.

53.     For a patient who is terminally ill, the physician has an obligation to provide effective palliative care, including pain control, although it may foreseeably hasten death.

### E.     The Summary Suspension

54.     The summary suspension was initiated on May 18, 2016, when Conway Regional pharmacists Nicole Dyess and Melissa Thomas questioned medications being prescribed that morning by Dr. Stewart for Patient A.

55.     Later that day, Conway Regional summarily suspended Dr. Stewart's medical staff privileges over the telephone, invoking Section 6.3 of the Medical Staff Policies and Procedures.

56.     Dr. Stewart was given no advance warning before the call suspending him.

57.     When asked for clarification of the concerns, he was repeatedly told his questions were not germane.

58.     At the time of his summary suspension, Dr. Stewart had not been allowed to finish his own documentation on Patient A's care and has not been afforded that opportunity as of the date of this filing.

59.     The suspension related to all aspects of his privileges: "admitting patients, consulting on patients, and ordering any Outpatient Tests, such as labs or imaging," as stated in a May 19, 2016 letter.

### F.     First Credentials Committee Meeting

60.     Under the Medical Staff Bylaws, a summary suspension must be ratified by the Credentials Committee within ten days.

61.     On May 25, 2016, one week after the summary suspension, a meeting of the Credentials Committee was called under Section 6.3.1.

62.     At Conway Regional, the Chief of Staff appoints members of the committee. The committee reviews physician credentials and is charged with acting as an investigative body that reports and makes recommendations to the Medical Executive Committee.

63.     The minutes reflect that 11 people attended the meeting: Five of the six members of the Medical Staff Credentials Committee, along with: Mr. Troup, the Hospital CEO; Dr. France, Chief of Staff; and   Dr. Hardin, Chairman Primary Care (the three who made the

9

decision to suspend Dr. Stewart); and the following Hospital administrators: Rebeka Fincher, Corporate Director of Physician Relations and Business Development; Margaret Corbett, Corporate Director of Quality Resources; and Tonya Gierke, the Compliance Officer.

64.    A memo that Dr. Stewart had not seen containing the Hospital's version of events was provided to the committee. It did not identify the author, and Matt Troup, CEO, would not identify the author when later requested by Dr. Stewart, but it has since been revealed to be Tonya Gierke, the Compliance Officer at the time.

65.    Mr. Troup and Drs. France and Hardin gave their version of events, and Ms. Gierke discussed events and went over the memo, all outside the presence of Dr. Stewart.

66.    The meeting had been in progress for some time when Dr. Stewart was allowed an informal "interview."

67.    Dr. Stewart had been afforded only 30 minutes time in the presence of the Hospital Pharmacy Director, and simultaneous to the time of the Credentials Committee meeting, in which to review Patient A's records.

68.    The only portion of the Credentials Committee meeting that was recorded and transcribed by a court reporter was Dr. Stewart's interview. The remainder of the meeting was held outside Dr. Stewart's presence with only minutes to reflect what was discussed.

69.    During Dr. Stewart's interview, at no time did any member of the Credentials Committee articulate the accepted clinical standards for medication administration during ventilator withdrawal or what Dr. Stewart should have done differently in this case.

70.    Conway Regional has no Critical Care or Palliative Care Committee and no protocols for end of life treatment, and none of the members of the Credentials Committee had expertise in this area.

10

71.     After Dr. Stewart's interview, the other attendees continued to discuss the case outside of Dr. Stewart's presence.

72.     The minutes reflect that despite two calls by the Hospital administration to the family of Patient A, the family had no complaint regarding Dr. Stewart's care for Patient A

73.     Invoking, Bylaws Section 6.3.6 (Deferral), the Credentials Committee voted to continue the summary suspension pending "external review of Dr. Stewart's patients who have died in the past 90 days."

### G.     Second Credentials Committee Meeting

74.     On June 1, 2016, the Credentials Committee met again and ratified the summary suspension "pending further proceedings," specifically an external review for all of Dr. Stewart's patients who had died within the previous 90 days.

75.     By that time, however, Conway Regional administration had already contracted with AMR for an external review, and they knew that that the opinions had come back in Dr. Stewart's favor, which they hid from the Credentials Committee. (See Section H).

76.     On June 1 and 2, 2016, Mr. Troup, the CEO, sent Dr. Stewart letters stating that the decision of the Credentials Committee constituted an "adverse action," triggering Dr. Stewart to rights under Section 7: Fair Hearing Procedures.

77.     In a letter dated June 23, 2016, Mr. Troup sent Dr. Stewart a notice that a hearing was to be held August 3, 2016.

78.     The Hospital's June 23 letter also reminded Dr. Stewart of the pending external review, stating that they would send him copies of the reports after they had "received and evaluated the results," and that the reports "may" be introduced at his hearing.

11

79.    Dr. Stewart objected to the use of the external review for a number of reasons and stated: "We cannot adequately prepare for a hearing not knowing which if any other cases will be presented to the committee." He requested that the August 3 hearing be confined to Patient A and exclude the AMR reports, but the Hospital refused.

### H.    The External Review by AMR

80.    On July 8, 2016, Mr. Troup sent Dr. Stewart the external review reports.

81.    The review was conducted by physicians employed or contracted by Defendant Advanced Medical Review, Inc. ("AMR"), which entered into a contract with the Hospital (Exhibit A) to review Dr. Stewart.

82.    Contrary to Conway Regional's standard practice, the Hospital administration did not permit Dr. Stewart to participate in the selection of an external reviewer or even to object to the reviewers chosen.

83.    The Hospital did not provide Dr. Stewart with a copy of what it provided the reviewers.

84.    Ms. Gierke informed AMR that the reviews were for purposes of "an investigation by the credentialing committee," thus AMR had full knowledge of the impact its review would cause.

85.    Contrary to the Credentials Committee's decision, the reviews the Hospital requested of AMR were not on the 12 patient deaths within the last 90 days.

86.    Nor were the patients randomly selected to achieve a representative sample.

87.    Instead, in addition to Patient A, the Hospital administration, led by Tonya Gierke, Compliance Officer, selected 13 more cases dating as far back as January 2014 without consulting the Credentials Committee or asking for selection criteria.

88.    All the patients had been in the Critical Care Unit (CCU) at Conway Regional, and they or their family members had chosen to withdraw ventilator life support under the care of Dr. Stewart.

89.    The Hospital first entered the patient medical records for 12 of the 14 cases into the AMR portal on May 27, 2016, and the reviewers rendered their reports May 30 and 31, 2016 except for one finished on June 3,2016.

90.    In an email dated May 26, 2016, Ms. Gierke apprised AMR before the reviews were done that she had written a note asking the physicians to be "reviewing in particular the treatments/meds given in the 24 hours leading up to death."

91.    In addition, the peer review request that Ms. Gierke submitted to AMR asked each reviewer to address medications with the following question: "Did the type, amount, and frequency of medications given within the 24 hours prior to the time of death, hasten and/or cause the patient's demise?"

92.    All 12 reviews came back in Dr. Stewart's favor.

93.    On May 31, 2016, as soon as Ms. Gierke saw that the reports were favorable, she contacted AMR in an email labeled "IMPORTANT," stating: "I do not think that the reviewer read our medical records correctly."

94.    Ms. Gierke told AMR in a subsequent May 31, 2016 email that "What's obvious is that they [the reviewers] said 'no medications were given' and there were LOTS of medications given."

95.    Ms. Gierke's statement to AMR was false in that no reviewer said that no medications were given nor any words to that effect.

13

96.     All of the reviewers answered no to the question Ms. Gierke submitted about the medications hastening or causing death.

97.     Ms. Gierke is a nurse and not a physician and is not qualified to evaluate Dr. Stewart's care or determine what is too much or too little medication in this situation.

98.     During May and June 2016, Ms. Gierke engaged in emails, phone calls and other communications with AMR executives and physicians to convince them to revise the opinions.

99.     AMR and Ms. Gierke conducted Go2Meeting sessions, using "screen sharing" to jointly access the AMR portal and discuss the cases, all without the knowledge of Dr. Stewart or the Credentials Committee.

100.    Mr. Troup, the Hospital CEO, participated and furthered the effort to change the AMR reports, as evidence by a June 8, 2016, email in which Ms. Gierke told AMR: "I spoke with our CEO this morning and I was wondering if we can chat today about the reviewer/process. We have some of the cases re-loaded but I want to give you some more background."

101.    Ms. Gierke stated falsely in an email to AMR that the reviewers said no medications were given, and she told AMR staff she was sending "screenshots to assist the reviewers."

102.    Ms. Gierke proceeded to write memos to five AMR reviewers who wrote reports on six of the cases, asking them to "re-open" their reviews.

103.    Ms. Gierke's memos contained factual misrepresentations including an erroneous medication timeline for at least two patients, attached "screenshots" of selected pages from the medical records, and were full of subjective language and conclusory statements.

104. Ms. Gierke sent the "screenshots" even though she had previously sent the entire medical record for each patient.

105. Ms. Gierke personally spoke by telephone with at least two of the AMR reviewers, including Dr. J.D. Haines.

106. Ms. Gierke went a step further and withheld payment from AMR until the opinions were revised.

107. Specifically, on June 2, 2016, she stated in an email to AMR, "I would like to put a hold on this invoice until we are mutually agreeable that the review was properly done."

108. Ms. Gierke stated that she expected the revised reviews to be completed before AMR's invoice was due on June 30.

109. Four of the five AMR reviewers then amended their previously favorable opinions to unfavorable. One reviewer apparently declined to participate in the "re-opening."

110. The AMR reviewers used words such as "addendum following additional clinical information" in their revised reports when in fact there was no additional clinical information provided. All of the records had been provided the first time.

111. The only new information provided to the reviewers was Ms. Gierke's communications.

112. On June 22, 2016, Ms. Gierke obtained special permission from AMR to solicit Dr. J.D. Haines to review two additional cases on patients whose deaths occurred in January 2014 and January 2015.

113. Upon information and belief, Gierke selected Haines because his revised opinions were the most critical of Dr. Stewart. She also had spoken with Dr. Haines by phone and described him in an email as "very vocal" about his concerns.

15

114. Through Ms. Gierke's contacts with Dr. Haines and AMR, the Hospital secured two more unfavorable reviews of Dr. Stewart.

115. Dr. Haines turned the two additional reports around in one day's time and two days' time respectively, despite the existence of voluminous medical records.

116. AMR billed the Hospital for $24,078 for the reviews on two separate invoices.

117. The first invoice (#107569160531) dated May 31, 2016, for $16,090 was held and not paid until after AMR's physicians revised the reviews to unfavorable opinions. Another invoice (#107569160630) for $7,988.00 was billed by AMR for what appears to be additional charges on the revised reviews as well as the two additional submissions to Dr. Haines.

118. All of this activity was kept secret from Dr. Stewart and the Credentials Committee, and most of it was obtained only after a Motion to Compel was granted by Faulkner County Circuit Court in connection with a Motion for Preliminary Injunction that Dr. Stewart filed against Conway Regional.

119. The revised reports included misrepresentations and arguments made by Ms. Gierke, and in the case of reviewer Haines, also included defamatory statements accusing Dr. Stewart of euthanasia.

120. The Hospital administration provided only the seven unfavorable reports to the Credentials Committee. It did not provide the favorable reports to the Committee.

121. In a July 6, 2016, memo to the Credentials Committee, Ms. Gierke stated that "The initial reports were returned with conflicting information. (Reports stated that the patients didn't receive any medications prior to death when the medical records indicate that opioids and sedatives were administered.)" This statement was false. The initial opinions all found that there was no harm caused by the type, amount, or frequency of medications given.

16

122.   Ms. Gierke knew such statements were false, as evidenced by the fact that in her memos to the reviewers themselves asking them to "re-open" their reviews, she did not assert that they had stated no medications were given, but instead stated that she believed they had a "misperception" about the medications.

123.   Contrary to professional medical review standards, AMR did not identify the reviewers; they were anonymous, identified to Dr. Stewart only by their state, specifically "NC," "NY," "NJ" and "CA."

124.   The reports provided no credentials for the reviewers other than specialty.

125.   Even a cursory review of the reports reveals that Dr. Haines provided opinions and made statements that breach the standards of professional reviewers, with multiple false, malicious and defamatory statements, including inferences to Dr. Stewart's state of mind and outrageous accusations of criminal intent.

126.   The negative reports from AMR and its physicians reflect a deliberate effort to make the opinions match what Conway Regional wanted them to say without regard to the facts. The reports directly contradict their initial reports even though no additional information was provided other than Ms. Gierke's memos and "screenshots." They also repeat Ms. Gierke's misrepresentations and mischaracterizations, indicating that the goal was to match what Conway Regional wanted them to say, not the facts.

127.   The key question Ms. Gierke sent each reviewer was: "Did the type, amount, and frequency of medications given within the 24 hours prior to the time of death, hasten and/or cause the patient's demise?"

128.   Dr. Gramm answered that the medications administered by Dr. Stewart "had the potential to" hasten death, and Dr. Chen said they "may have contributed" to hastening.  Dr.

Haines and Dr. Belman went further and said that Dr. Stewart hastened and/or caused the deaths, and therefore fell below the standard of care.

129.   The standard of care is not whether the physician hastened death. Instead, the standard is whether the physician fulfilled his "obligation to relieve pain and suffering and to promote the dignity and autonomy of dying patients ... *even though it may foreseeably hasten death.*" American Medical Association (AMA) Code of Medical Ethics Opinion 2.20.

130.   This is known as the Principle of Double Effect and is supported consistently by major medical organizations including the AMA and the American Academy of Hospice and Palliative Medicine.

131.   In addition, several studies have shown that opioids used in end of life care do not hasten death, and in fact, studies show that they actually prolong death.

132.   Dr. Haines in particular lost all semblance of professionalism or objectivity, using terminology such as "negligent and potentially criminal administration," "negligent administration," "grossly negligent," "fatal doses," "reckless," "intentional drug overdose," and "fatal cocktail." He went beyond all bounds when he accused Dr. Stewart of "euthanasia" and stating that he "caused" the death or demise of patients.

133.   Dr. Belman also represented that the medications Dr. Stewart prescribed "poses the risk ... of questionable euthanasia."

134.   Dr. Haines and Dr. Belman have never spoken to Dr. Stewart, were not present when the patients were taken off the ventilator, and had no basis on which to represent his intentions.

18

135.   Contrary to the statement and inferences by the AMR reviewers, opioids and benzodiazepines are NOT recommended for use in countries that allow euthanasia because they are not effective for that purpose.

136.   Dr. Stewart acted at all times with the best interests of his patients in mind. He had longstanding connections with all seven patients.

137.   Each patient had a unique relationship with Dr. Stewart as their physician. He treated them, joked with them, and knew their insecurities, preferences, and life goals. He interacted with their family members and honored their wishes when it came time for the difficult decision of whether to let their desperately ill family member go or keep them alive on a ventilator.

## I.   Events After the External Review

138.   After receiving the external review reports, Dr. Stewart, through his counsel in a letter dated July 11, 2016, immediately notified Mr. Troup of serious concerns about the AMR external review, including the secretive process, the departure from past practice at Conway Regional, the use of cases outside the 90 days ordered by the Credentials Committee, and the unprofessional nature of the AMR reports.

139.   In his July 11 letter, Dr. Stewart requested that the external review be destroyed and the process begin anew, but the Hospital refused.

140.   Dr. Stewart and the Hospital postponed the August 3 hearing date, and Dr. Stewart filed his original Complaint and Motion for Preliminary Injunction against Conway Regional in Faulkner County Circuit Court on July 1, 2016.

### J.      National Practitioner Data Bank

141.   The minutes of the Credentials Committee's May 25, 2016 meeting reflect that the Committee was informed that any disciplinary action extending beyond 30 days must be reported to the National Practitioner Data Bank ("NPDB" or "Data Bank").

142.   As a professional peer review entity, AMR certainly knew this as well.

143.   By refusing to accept the initial favorable reviews from AMR that were provided within the initial 30 days, the Committee's actions ensured that Dr. Stewart would be reported to the Data Bank, which the Hospital did on July 1, 2016

### K.      Arkansas State Medical Board

144.   The report to the Data Bank then triggered a report to the state Medical Board, which began an inquiry.

145.   The inquiry was placed on hold pending further developments in the state court proceeding by Dr. Stewart against Conway Regional.

### L.      Healthcare Insurer Provider Networks

146.   The report to the National Practitioner Data Bank also affects a physician's privileges with healthcare insurers.

147.   One insurer sent Dr. Stewart a notice to terminate him from its networks effective August 5, 2016, affecting approximately 25 percent of Dr. Stewart's income.

148.   Dr. Stewart is still working to defend his status with that insurer, which is requiring ongoing reporting at this time.

## V.    CLAIMS FOR RELIEF

149.   The Defendants' actions constitute civil conspiracy, defamation, and tortious interference, as described in more detail below.

150.   The Defendants intentionally and with malice pursued a course of conduct for the purpose of causing damage to Dr. Stewart.

151.   If Defendants had not revised their opinions at the behest of Conway Regional, Dr. Stewart's suspension would have been lifted on or about June 1, 2016, well within 30 days of the initiation of the suspension on May 18, 2016, which means that he would not have been reported to the National Practitioner Data Bank.

152.   If he had not been reported to the Data Bank, he would not be defending himself over the peer review with insurers and the Medical Board.

153.   All of this was entirely foreseeable by Defendants as a natural and probable result of their conduct in issuing extreme, malicious, and defamatory statements about a physician under peer review.

154.   The harm to Dr. Stewart's career, earnings, reputation and relationships with his patients is continuing to this day and will continue to worsen unless this court orders relief.

## CIVIL CONSPIRACY

155.   Under Arkansas law, the tort of civil conspiracy occurs when a combination of two or more persons act to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful or oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another.

156.   The facts described above establish AMR and the four AMR reviewers conspired with Conway Regional, Tonya Gierke and Matt Troup for unlawful, oppressive and immoral *purposes.*

157.   Specifically, they conspired to deprive Dr. Stewart of his staff privileges, reputation, and medical license through a bad faith peer review conducted in violation of the

federal Health Care Quality Improvement Act and the Arkansas Peer Review Fairness Act; to defame him with allegations that he euthanized and "caused the death" of multiple patients; and to interfere with his physician-patient relationships.

158.   In addition to the purposes being unlawful, oppressive and immoral, the *means* by which the Defendants acted was oppressive and immoral.  Among other facts, co-conspirators Conway Regional, Ms. Gierke and Mr. Troup withheld the favorable external reviews from the Credentials Committee and Dr. Stewart, misrepresented the contents of the external reviews, coerced and worked with AMR to re-open the reviews, engaged in a strategic campaign of emails, web sessions and phone calls to orchestrate a change in the AMR physicians' reviews, and held up payment to AMR until the reviews came back unfavorable.

159.   AMR and four of its network physicians participated in the conspiracy by engaging in numerous and extensive communications with Conway Regional administrators outside the presence or knowledge of Dr. Stewart, revising their physician opinions to match what Conway Regional wanted, and by making false statements about Dr. Stewart.

160.   AMR had full knowledge of the purpose for which Conway Regional wanted the external review, how the reports would be used, and the inevitable impact they would have.

161.   The conspirators' actions have damaged Dr. Stewart's reputation by causing the Credentials Committee to have concerns about his professional competence and creating doubt as to his professional competence among those who have read or heard about the reports or suspension.

162.   As a result of the conspirators' actions, the Credentials Committee has refused to lift the suspension and allow Dr. Stewart to practice at Conway Regional, fueling speculation

among members of the Hospital staff, members of the community and others that he euthanized or killed patients.

163.   Dr. Stewart has been damaged further in that the continued suspension means he cannot admit or treat patients in the Hospital or even order tests to be performed there, causing significant lost income far in excess of the amount required for diversity, and disruption of physician-patient relationships.

164.   The ongoing suspension also has cost him extraordinary fees and ongoing legal expenses as he works to defend himself with insurers and with the Medical Board, which was a natural and probable result of the conspiracy.

165.   The harm caused to Dr. Stewart's reputation, career, earnings and relationships is ongoing.

## DEFAMATION

166.   Above and beyond the lost income, Dr. Stewart has suffered particular reputational damage through defamation.

167.   According to the Arkansas Medical Practices Act, a physician may "administer a large dose of a dangerous or controlled drug even if its use may increase the risk of death if the purpose is not to cause or assist in a patient's death." Ark. Code Ann. 17-95-704(d)(5).

168.   According to the Arkansas Medical Practices Act, euthanasia does *not* include "prescribing, dispensing, or administering medical treatment for the purpose of alleviating pain or discomfort even if that use may increase the risk of death so long as the treatment is not furnished for the purpose of causing or assisting in causing the death of the individual." Ark. Code Ann. 17-95-704(e)(4)(B).

169.   According to the American Medical Association Ethical Opinion 2.20 (Withholding or Withdrawing Life-Sustaining Medical Treatment), "Physicians have an obligation to relieve pain and suffering and to promote the dignity and autonomy of dying patients in their care. This includes providing effective palliative treatment even though it may foreseeably hasten death."

170.   In all of the cases reviewed by AMR physicians, Dr. Stewart acted within these legal and ethical boundaries.

171.   The statements made by the AMR reviewers and in particular, J.D. Haines, M.D., deliberately ignore the standard of care and the ethical duties of physicians providing such care.

### A.     Defamation regarding Dr. Stewart's care of Patient D

172.   On or about May 27, 2016, Conway Regional referred patient D to AMR for review.

173.   Defendant Haines, on behalf of AMR, performed the external review of patient D.

174.   On May 30, 2016, Dr. Haines provided a favorable review of Dr. Stewart's care.

175.   Subsequently, on or about June 6, 2016, Tonya Gierke, the Conway Regional compliance officer, requested in a memo that Dr. Haines "re-open" the review.

176.   Ms. Gierke's memo to Dr. Haines contained misrepresentations, subjective, opinionated statements and attached "screenshots" from selected parts of the medical record, all signaling the result she wanted Dr. Haines to reach. The memo also contained a crucial factual misrepresentation about the timeline of medication administration.

177.   In response to Ms. Gierke's memo, telephone calls and other actions described in the Facts section above, Dr. Haines changed his favorable review to one critical of Dr. Stewart's care, including using the crucial factual misrepresentation in Ms. Gierke's memo.

178.   Dr. Haines' report is full of misstatements and inaccuracies.

179.   The report contains multiple false and defamatory statements, which include the following:

a.   "The deviation in the standard of care occurred on 2/3/2016 when Dr. Stewart inappropriately ordered multiple IV medications which *caused the patient's death. ...* "

b.   "This [16mg of Dilaudid over less than two hours] *undoubtedly led to respiratory depression resulting in his demise.*"

c.   "The Valium also contributed to respiratory depression *which led to the patient's death...*"

d.   "The additional orders for Lopressor, Morphine and Cardizem that were not given *raise the very possibility that Dr. Stewart intended to commit euthanasia.*"

e.   "The *negligent and potentially criminal administration* of the combination of Dilaudid, Valium and Lopressor in the 1 hour and 39 minutes before the patient's death *directly contributed to his death due to respiratory depression.*"

f.   The deviation from the current best standard of care *resulted in the death of the patient.*"

g.   "The type, amount, and frequency of medications .... *hastened and/or caused the patient's demise.*"

**B.   Defamation regarding Dr. Stewart's care of Patient E**

180.   On or about May 27, 2016, Conway Regional referred Patient E to AMR for review.

181.   Defendant Haines, on behalf of AMR, performed the external review of Patient E.

25

182. On May 31, 2016, Dr. Haines provided a favorable review of Dr. Stewart's care.

183. Subsequently, on or about June 8, 2016, Tonya Gierke, the Conway Regional compliance officer, requested in a memo that Dr. Haines "re-open" the review.

184. Ms. Gierke's memo to Dr. Haines contained misrepresentations, subjective, opinionated statements and attached "screenshots" from selected parts of the medical record, all signaling the result she wanted Dr. Haines to reach. The memo also contained a factual misrepresentation about the amount of medication administered.

185. In response to Ms. Gierke's memo, telephone calls and other actions described in the Facts section above, Dr. Haines changed his favorable review to one critical of Dr. Stewart's care, including using the crucial factual misrepresentation in Ms. Gierke's memo.

186. Dr. Haines' report is full of misstatements and inaccuracies.

187. The report contains the following false and defamatory statements:

a.    The combination of high dose Dilaudid and Versed *resulted in respiratory depression and arrest*."

b.    *The patient's death was caused by negligent administration* of high dosages of Versed and Dilaudid, *resulting in respiratory depression and cardiopulmonary arrest*."

### C.    Defamation regarding Dr. Stewart's care of Patient F

188. On or about June 22, 2016, Conway Regional referred Patient F to AMR for review.

189. Defendant Haines, on behalf of AMR, performed the external review of Patient F.

190. On or about June 21, 2016, Conway Regional compliance officer, Tonya Gierke, sent a memo to Dr. Haines.

191. Ms. Gierke's memo to Dr. Haines contained subjective, opinionated statements and attached "screenshots" from selected parts of the medical record, all signaling the result she wanted Dr. Haines to reach. The memo also contained a significant misrepresentation about the timeline of medication administration.

192. In response to Ms. Gierke's memo, telephone calls and other actions described in the Facts section above, Dr. Haines issues an unfavorable report with multiple false statements about Dr. Stewart's care, including using the misrepresentation in Ms. Gierke's memo and even adopting her use of quote marks around the words "comfort care."

193. Dr. Haines' report is full of misstatement and inaccuracies.

194. The report includes the following false and defamatory statements:

a. "The medical care provided was *grossly negligent and resulted in the death of the patient.* In this reviewer's opinion, the so-called 'comfort measures' were merely a euphemism for *euthanasia.* There can be no clinical rationale that would support the administration of *fatal doses of medication* over such a short period of time."

b. "The combination of *wildly reckless types, amounts and frequencies of medications* given in the 3 hours prior to the patient's death undoubtedly hastened and *caused his demise.*"

c. "*The patient died secondary to intentional drug overdose* from high-dose Versed, Dilaudid and Lopressor secondary to respiratory depression and cardiorespiratory arrest. The *fatal cocktail* of medications required about 3 hours and 35 minutes before the patient expired."

d. "Deviations from the current best standard of care resulted in the patient's death. The standard of care was breached in the administration of Dilaudid, Morphine

27

Sulfate, Versed and Lopressor. *None of these medications were indicated in this patient and directly led to his demise secondary to respiratory depression and arrest.*"

### D.   Defamation regarding Dr. Stewart's care of Patient G

195.   On or about June 22, 2016, Conway Regional referred patient G to AMR for review.

196.   Defendant Haines, on behalf of AMR, performed the external review of Patient G.

197.   On or about June 21, 2016, Conway Regional compliance officer, Tonya Gierke, sent a memo to Dr. Haines.

198.   Ms. Gierke's memo to Dr. Haines contained misrepresentations, subjective, opinionated statements and attached "screenshots" from selected parts of the medical record, all signaling the result she wanted Dr. Haines to reach. The memo also contained crucial factual misrepresentations about the timeline of medication administration.

199.   In response to Ms. Gierke's memo, telephone calls and other actions described in the Facts section above, Dr. Haines issued an unfavorable review of Dr. Stewart's care, including using the crucial factual misrepresentation in Ms. Gierke's memo.

200.   Dr. Haines' report is full of misstatements and inaccuracies.

201.   The report includes the following false and defamatory statements:

a.   "[T]he combination of these medications produced *an overwhelming adverse effect of respiratory suppression, resulting in his rapid death.*"

b.   "*Inappropriate and negligent administration* of Versed, Ativan and Morphine *directly led to* the adverse outcome of suppression of the patient's respiratory drive and *his death.*"

      c.     The type, amount, and frequency of medications (Versed, Ativan, and Morphine sulfate) given with the 24 hours prior to the time of death hastened and/or *caused the patient's death.*"

### E.    Additional Evidence of Defamation

202.  Dr. Haines was provided or had access to hundreds of pages of the complete medical records, but his review indicates he instead relied on the selected facts and opinions of Tonya Gierke, a non-physician compliance officer at the hospital.

203.  Dr. Haines cited and relied upon published articles with either no relevance to the care provided in these cases or actually supporting the care provided in these cases.

204.  Dr. Haines acted contrary to the standard of external medical reviewers. Rather than opining on whether Dr. Stewart met the standard of care, he instead engaged in unprofessional, speculative and baseless rhetoric with multiple defamatory statements.

205.  Dr. Haines never spoke to Dr. Stewart or asked him any questions, yet stated that Dr. Stewart intended to euthanize and overdose these patients.

206.  Dr. Haines issued the reports anonymously, with his identity disclosed by the hospital only after repeated demands by Dr. Stewart's legal counsel.

207.  All of the statements listed above by Defendant Haines are false in that Dr. Stewart at no time euthanized or caused the death of any patient.

208.  Dr. Haines' statements are defamation *per se* in that they encompass false statements that Dr. Stewart is guilty of a crime, i.e., killing a patient, as well as false statements prejudicing his ability to engage in his profession.

209. Dr. Haines either acted with the knowledge of the falsity of his statements or deliberately failed to determine the truth or falsity of such outrageous statements prior to publication.

210. Conway Regional, Tonya Gierke and Matt Troup republished the false AMR reports to members of the Credentials Committee, which included Dr. Terence Champlin, Dr. Patrick Fraley, Dr. Phillip Gullic, Dr. Michael Fahr, Dr. Jevin Smith, and Dr. Robert Balentine, along with CRMC staff including Margaret Corbett, Rebekah Fincher, and, upon information and belief, to others as well, including the Medical Executive Committee.

211. Because Conway Regional relied on the AMR reports for Dr. Stewart's continued suspension, one insurer required Dr. Stewart to turn over a copy of the AMR reports, resulting in yet further spread of the defamatory statements.

**F.      Harm to Dr. Stewart from the Defamatory Statements in the AMR Reports**

212. The false statements in the AMR reports have damaged Dr. Stewart's reputation by causing the Credentials Committee to have concerns about Dr. Stewart's professional competence and creating doubt as to his professional competence among those who have read or heard about the reports or suspension.

213. Because of the false statements, the Credentials Committee has refused to allow Dr. Stewart to practice at Conway Regional, fueling speculation among members of the Hospital staff, members of the community and others that he euthanized or killed patients.

214. Families of Dr. Stewart's patients and others who know him in the community have heard that he "killed some people at CRMC" and "killed somebody."

215. Any time a physician's privileges to admit patients is revoked, his reputation in the community and among colleagues is harmed.

216.   Dr. Stewart has been damaged further in that the continued suspension means he cannot admit or treat patients in the Hospital or even order tests to be performed there, causing significant lost income and disruption of physician-patient relationships.

217.   The ongoing suspension also has cost him extraordinary fees and ongoing legal expenses as he works to defend himself against the effects of defamation at the Hospital, with insurers and with the Medical Board.

218.   The damages caused by the harm to Dr. Stewart's reputation, career, earnings and relationships is ongoing.

219.   The false statements are a proximate cause of the damages in that without the same reports the suspension would have ended, Dr. Stewart's reputation would not have been harmed, his status with insurers and the Medical Board would not be in jeopardy, and he would be practicing at the Hospital today.

## INTENTIONAL INTERFERENCE

220.   As a result of Defendants' bad faith peer review and suspension, Dr. Stewart is unable to treat his patients while they are in the hospital.

221.   The physician-patient relationship is entitled to exceptional protection. It is forged in trust, confidence, rapport and intimate knowledge. The relationship develops over time, through the care and treatment of chronic conditions and traumatic medical emergencies, with the physician learning the patient's history and exercising professional judgment in evaluating the patient's complaints and ailments. Strong patient relationships are the underpinning of good medicine and it is uncontroverted that patients who have long-term relationships with their doctors have better outcomes.

222.    Defendants knew that the physician-patient relationship carries an expectancy of continuing in the future.

223.    Defendants knew that their reports would inevitably interfere with Dr. Stewart's physician-patient relationship due to the loss of his privileges.

224.    The interference has directly caused Dr. Stewart's harm in that but for Defendants' bad faith peer review he would be able to treat his patients in the Hospital now and in the future.

225.    The end result is that Defendants and one co-conspirator have interfered with Dr. Stewart's physician-patient relationships and deprived Dr. Stewart of income far in excess of the amount required for diversity jurisdiction.

226.    Defendants' intentional acts have been taken with malice toward Dr. Stewart in an effort to sever his relationship with his patients.

## NO IMMUNITY FOR BAD FAITH CONDUCT

227.    The federal Health Care Quality Improvement Act of 1986 ("HCQIA"), provides *qualified* immunity to peer review participants. 42 U.S.C. 1112(a).

228.    The Arkansas Peer Review Fairness Act incorporates this provision at Ark. Code Ann. 20-9-1304(a) and 1308(b)(1).

229.    The immunity applies only to damages, not injunctive relief.

230.    Under both statutes the qualified immunity from damages is lost when peer review participants do not act in good faith in connection with a peer review activity or action or furnishing assistance to a peer review body.  Ark. Code Ann. 20-9-1313(e); 42 U.S.C. 1112(a)[1].

---

[1]To obtain the qualified immunity, peer review participants must act:
(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,

231.   The facts of this case as described above are so egregious that they do not come close to meeting the requirement of good faith, and thus Defendants are not entitled to immunity.

232.   Because Defendants are not afforded immunity for bad faith conduct, Dr. Stewart is entitled under both the Arkansas Peer Review Fairness Act and HCQIA to damages, attorneys' fees, costs and expenses under the causes of action described above.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Stewart respectfully requests the following relief:

1.   A trial by jury.

2.   Compensatory damages in excess of the amount required to establish diversity.

3.   Punitive damages.

4.   Reasonable attorneys' fees, costs and expenses.

5.   All other just and proper relief to which Plaintiff is entitled or to which he may become entitled during the pendency of this litigation.

Respectfully Submitted,
Mitchell, Blackstock, Ivers & Sneddon, PLLC
1010 West Third Street
P.O. Box 1510
Little Rock, AR  72203-1510
Office: (501) 378-7870
Fax:    (501) 375-1940

By:   _Janet A. Pulliam_
Janet L. Pulliam, ABN 79233
Of Counsel
*Attorney for Garry Stewart, M.D.*

---

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
42 U.S.C. 11112(a).

## AGREEMENT

Advanced Medical Reviews, Inc. ("*AMR*") is an independent review organization

This Agreement between AMR and Conway Regional Hospital ("*Client*") is effective as of the date set forth below (the "Effective Date"), and the parties agree as follows:

1. AMR, as an independent review organization, will provide independent medical review services ("Services") as requested by Client, in accordance with Client's requirements. These Services shall be performed based on the Workflow Schedule set forth in **Schedule A**.

2. AMR and Client agree that all services will be performed according to the fee schedule outlined in **Schedule A**. This Agreement shall supplant all previous Agreements and Agreements between AMR and Client. All previous Agreements between AMR and Client shall be considered null and void effective as of the Effective Date as set forth below.

3. AMR will provide the agreed-upon Services to Clients through individuals who are members of the AMR Network ("Reviewers").
   a. AMR will maintain a credentialing program for its Reviewers in order to assure that every Reviewer has a current unrestricted license as applicable.
   b. AMR will assign each review to a Reviewer within the specialty requested by the Client or within a specialty or possessing the appropriate knowledge or experience to address the subject matter of the review.

4. AMR will provide Client with monthly activity reports that detail services provided in a mutually agreed upon format.

5. Client agrees that all present and future communications and business transactions with Reviewers will be made through AMR.

6. AMR will provide Client with services that will be performed in accordance with both Client's requirements, as outlined on this Agreement, and URAC standards.

7. AMR will notify Client in a timely fashion if there is any material change in AMR's ability to perform agreed upon services.

8. AMR agrees that Client may, at any time during the term of this Agreement and upon reasonable notice, conduct a review and/or audit of AMR's records pertaining to the contracted Services.

9. If Client identifies specific issues with AMR's performance of contracted Services, Client shall provide AMR with written notification of such. AMR shall have up to 30 days from receipt of such notice to take actions to correct identified problems to Client's reasonable satisfaction. If AMR fails to correct identified problems within such time period, Client may elect to terminate this Agreement at that time.

10. AMR Services are not substitutes for medical services. AMR is not responsible for benefit or medical care decisions. All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment.

11. **Confidentiality**
    a. <u>Confidential Information</u>. Client understands that during the term of this Agreement, Client will have access to certain of AMR's confidential information, including but not limited to its fees for Services provided, the terms and conditions of this Agreement, Workflow schedules, its password-protected website portal information (including forms and other materials), policies and procedures, and other confidential, proprietary or competitive trade secret information belonging to or in the possession of AMR that is not known to the public, all of which shall be referred to herein as "Confidential Information." Such confidential, proprietary and competitive trade secret information included; but is not limited to, all information in any form relating to the design, function and operation of AMR's products and services, systems and processes, software, organization and staffing and all technical information, knowledge, flow charts, specifications, design documents, sales and marketing plans and strategies or other documents of any type whether in printed or machine readable form

EXHIBIT

_A_

relating thereto. Such Confidential Information shall be protected whether or not it has been marked, stamped or otherwise identified as such by AMR. Client agrees to maintain all such Confidential Information in strictest confidence and not to disclose such Confidential Information to any third party or person within Client's employ, whether as an employee or independent contractor, without AMR's prior written consent. Client shall not make copies, in whole or in part, of any or all Confidential Information without the express consent of **AMR**.

b.   If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

c.   HIPAA: AMR and Client agree to comply by all applicable state and federal laws and regulations concerning the confidentiality of data. This includes compliance to the applicable Standards under the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and in accordance with the terms set forth in Schedule B hereto.

12.  **Conflict of Interest**

a.   AMR reviewers will only complete cases in which they do not have a conflict of interest.

b.   A reviewer conflict of interest is defined as:

  i.   Reviewer has a material professional, familial, or financial conflict of interest regarding an affected party;

  ii.  Reviewer accepts compensation for review activities that is dependent in any way on the specific outcome of the case; or

  iii. Reviewer was involved with the specific episode of care prior to referral of the case for review

c.   The following shall not constitute a reviewer conflict of interest:

  i.   Reviewer has a contract to provide health care services to Client's enrollees; and

  ii.  Reviewer has staff privileges at a facility where the recommended health care service or treatment would be provided if Client's previous non-certification is reversed.

13.  **Termination Clause.** This Agreement may be terminated by either party by providing the other party with thirty (30) days prior written notice of its intent to terminate, with or without cause.

14.  **Use of Name; Publicity.** Neither party may use the other's name or identity in any advertising, public relations, or publicity without the prior written permission of the other.

15.  **General Terms and Conditions.**

a.   Notices. Any notice required or permitted to be given hereunder shall be in writing sent by either personal delivery, overnight delivery, or US registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to AMR or Client at their respective addresses listed below, or at such other addresses as either AMR or Client may hereafter designate to the other in writing. Notices sent by personal delivery shall be deemed given upon actual receipt. Notices sent by overnight delivery shall be deemed given on the next business day. Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

b.   Insurance. Each party shall maintain in existence during the term of this Agreement insurance coverage in a commercially reasonable amount that will adequately protect the parties from claims arising out of the Services requested by Client, including, but not limited to, errors and omission and general liability coverage. Upon request, a party shall provide the other with proof of such insurance.

c.   Assignment. This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by either party, nor shall the duties imposed herein be subcontracted or delegated by either party, without the prior written approval of the other party.

d.   Delegation. If AMR delegates organizational functions, those functions shall be subject to the terms of this Agreement and in accordance with URAC standards.

e.   Dispute Resolution. Any controversies or claims between the parties regarding this Agreement must first be put in writing and delivered to the other party. The parties shall make a good faith attempt to resolve the issue in question. If the parties cannot resolve the grievances or disputes between them in an informal and expeditious

fashion, one or both of the parties may pursue legal action as deemed appropriate and necessary. The parties may agree to extend the time for dispute resolution in order to pursue mediation of the dispute.

f.    <u>Entire Agreement; Amendment</u>. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the services to be provided hereunder. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, that are not embodied herein or in an exhibit hereto, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Any modifications, amendments, or waivers of this Agreement shall not be effective except if set forth in writing and signed by both parties.

g.    <u>Applicable Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of California. Any actions, arbitration or proceedings instituted by either party with respect to any matters arising under or growing out of this Agreement shall be brought and tried only in the courts located in the County of Los Angeles, State of California, and each of the parties hereto expressly waives its rights under any applicable statute to cause any such action or proceeding to be brought or tried elsewhere.

h.    <u>Understanding of Agreement</u>. The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement. Accordingly, any rule of law (including, without limitation, California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the parties as set forth in this Agreement.

i.    <u>Schedules</u>. All Schedules referenced in this Agreement and attached hereto are incorporated into this Agreement by reference. In the event of a conflict between a term or condition of this Agreement and that of a Schedule, the term or condition of the Schedule shall control.

j.    <u>Non-solicitation</u>. During the Term of this Agreement, and for a period of one (1) year after its termination, Client agrees not to solicit any of AMR's Reviewers for services substantially similar to the Services that Reviewer has provided to Client on behalf of AMR.

k.    <u>Independent Contractors</u>. The relationship between AMR and Client is that of independent contractors. Neither AMR nor Client is a member, partner, agent, representative, employee, employer or joint venturer of the other. Except as otherwise specified in this Agreement, neither party shall have, nor exercise control or discretion over, the method by which the other party shall perform such work or render or perform such services and functions.

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

| **Advanced Medical Reviews** | **Conway Regional Hospital** |
|---|---|
| By: _____ | By: _____ |
| (Authorized Signature) | (Authorized Signature) |
| Printed Name: Vincent J. Bianco | Printed Name: _____ |
| Title: President | Title: _____ |
| Address: 2950 31st St., Ste 10 | Address: _____ |
| City/State/ZIP: Santa Monica, CA 90405 | City/State/ZIP: _____ |
| Date: 5/26/2016 | Date: _____ |

Advanced Medical Reviews

## SCHEDULE A: WORKFLOW, FEES AND PAYMENT SCHEDULE

Advanced Medical Reviews, Inc. ("*AMR*") will provide Independent Medical Review services as requested by Conway Regional Hospital ("*Client*"). AMR shall have no responsibility for any benefit of medical care decisions. All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment. AMR services are not substitutes for medical services.

Client shall submit peer review requests to AMR via fax, mail, web application or email. AMR shall maintain current credentialing information for individuals who are members of the AMR Network ("Reviewers") to assure that every Reviewer has a current unrestricted license as applicable. AMR shall assign each review to a Reviewer who shall be in an appropriate specialty or who shall possess specific knowledge appropriate to the request of the treating provider. AMR will post completed peer reviews to a web portal. Client will retrieve the completed reviews via the web portal.

AMR's services shall be performed based on Client's requested turnaround times. Turnaround times are calculated from the time the request and all related material are received by AMR

- "Turnaround 1": reviews with a requested turnaround of 5 business days[1] or greater
- "Turnaround 2": reviews with a requested turnaround between 3 and 5 business days[1]
- "Turnaround 3": reviews with a requested turnaround between 1 and 3 business days[1]

AMR and Client agree that all services will be performed according to the following fee schedule:

| Flat/Hourly | Pages[2] | Turnaround 1 5 days[1] | Turnaround 2 3-5 days[1] | Turnaround 3 1-3 days[1] |
|---|---|---|---|---|
| Flat | 0 to 25 pgs | $225.00 | $260.00 | $285.00 |
| Flat | 25+1 to 50 pgs | $258.00 | $295.00 | $320.00 |
| Flat | 50+1 to 75 pgs | $285.00 | $330.00 | $355.00 |
| Flat | 75+1 to 100 pgs | $320.00 | $370.00 | $400.00 |
| Hourly | 101+pgs | $270.00 per hour | $305.00 per hour | $405.00 per hour |

Reviews with up to 100 pages[2], up to 3 items[3], up to 0 call attempts, and with a requested turnaround greater than or equal to 1 days[1] will be billed at the flat rates outlined above. Reviews that fall outside any of the above parameters (i.e. reviews with greater than 100 pages[2], and/or greater than 3 items[3], and/or requiring more than 0 call attempts, and/or with a requested turnaround less than 1 days[1]) will be billed at the hourly rates outlined above. All reviews that fall outside the above parameters and reviews with requirements not detailed above will be billed based the hourly rates outlined above. Reviews that exceed fair and customary standards may incur additional fees as mutually agreed by both parties. Any additional costs incurred during the review process, such as shipping, will be paid for by Client. Reviews may have a maximum duration[4] of up to 30 business days. Reviews with a duration[4] that exceeds 30 business days will be charged as multiple reviews. Reviews that are reopened 10 business days or more after the original completion date will be charged as a separate review. Reviews that are reopened within 10 business days of the original completion date will be charged if the applicable billing tier has changed.

AMR and Client further agree that AMR may adjust the fees set forth above upon thirty (30) days' written notice, which notice may be given at any time after two (2) years following the Effective Date herein.

[1]    *Days are defined as "business days" all days excluding Saturday, Sunday and Federal Holidays*
[1]    *Hours are defined as "business-day hours" on all days excluding Saturday, Sunday and Federal Holidays*
[2]    *Pages: total count of all pages of documentation provided to the reviewer*
[3]    *Items: questions, service under review and/or days under review*
[4]    *Duration: the time between when a review is first created and when a review is completed for the last time.*
[5]    *Reviewers: individuals who are members of the AMR Network*

AMR will provide monthly invoices to Client. Invoices will be mailed and/or e-mailed to:

        Name:    Tonya Gierke

2950 31st St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com
Advanced Medical Reviews, Inc.

Advanced Medical Reviews

Address:    Conway Regional Hospital

2302 College Ave

Conway, AR 72034

Phone:     501-450-2495

Email:      tgierke@conwayregional.org

Client will be responsible to make payment within thirty (30) calendar days of the invoice date ("*Due date*").  Client agrees to pay AMR for all services ordered according to these terms, irrespective of receiving payment from its client/plan provider. A late payment of 2% per month will be applied to the total unpaid balance on the account if full payment is not received by the due date.  Client will mail payment to:

Advanced Medical Reviews, Inc.
2950 31st Street Suite #100
Santa Monica CA 90405

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

| Advanced Medical Reviews | | Conway Regional Hospital | |
|---|---|---|---|
| By: | *(Authorized Signature)* | By: | *(Authorized Signature)* |
| Printed Name: | Vincent J. Bianco | Printed Name: | |
| Title: | President | Title: | |
| Address: | 2950 31st St, Ste 10 | Address: | |
| City/State/ZIP: | Santa Monica, CA 90405 | City/State/ZIP: | |
| Date: | 5/26/2016 | Date: | |

## SCHEDULE B: BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement"), is entered into in connection with the Agreement for provision of medical review services ("Contract") entered into by and between **Conway Regional Hospital** ("Covered Entity") and Advanced Medical Reviews, Inc. ("Business Associate") concurrently herewith and is effective upon execution.

### RECITALS

**WHEREAS**, Covered Entity wishes to disclose certain information to Business Associate pursuant to the terms of the Contract, some of which may constitute Protected Health Information ("PHI"), as defined below;

**WHEREAS**, Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with the Health Insurance Portability and Accountability Act of 1966, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "HITECH Act") and regulations promulgated there under by the U.S. Department of Health and Human Services ("HIPAA Regulations"), and other applicable laws; and

**WHEREAS**, as part of HIPAA Regulations, the Privacy Rule and Security Rule, as defined below, require that prior to disclosure of PHI, Covered Entity enter into a contract with Business Associate containing specific requirements set forth herein, including, but not limited to, 45 C.F.R. §§ 164.314(a) 164.502(a) and (e), and 164.504(e);

**THEREFORE**, in consideration of the mutual promises contained herein and the exchange of information pursuant to this Agreement, the parties agree as follows:

### AGREEMENT

1. **Definitions.** Terms used, but not otherwise defined, in this Agreement shall have the same meaning as set forth in regulations promulgated under HIPAA and the HITECH Act, as amended from time to time.

    1.1. **Breach** shall have the meaning given to such term under the HITECH Act and HIPAA regulations at 42 U.S.C § 17921 and 45 C.F.R. § 164.402.

    1.2 **Breach Notification Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and D, respectively.

    1.3 **Business Associate** shall have the meaning given to such term under the Privacy Rule, the Security Rule and the HITECH Act including, but not limited to, 42 U.S.C. § 17938 and 45 C.F.R. § 160.103.

    1.4 **Covered Entity** shall have the meaning given to such term under the Privacy Rule and the Security Rule including, but not limited to, 45 C.F.R. § 160.103.

    1.5 **Designated Record Set** shall have the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501.

    1.6 **Electronic Protected Health Information** means PHI that is maintained in or transmitted by electronic media, as described in 45 C.F.R. § 160.103..

    1.7 **Health Care Operations** shall have the meaning given to such term in the HITECH Act including, but not limited to, 45 C.F.R. § 164.501.

    1.8 **Privacy Rule** shall mean the HIPAA privacy rules codified at 45 C.F.R., Parts 160 and 164, Subparts A and E, respectively.

    1.9 **Protected Health Information** ("PHI") means any information, whether oral or recorded in any form or medium, that (a) relates to the past, present or future physical or mental condition of an individual, the provision of health care to an individual or the past, present or future payment for the provision of health care to an individual; (b) identifies the individual or, with respect to which, there is a reasonable basis to believe the information can be used to identify the individual; and (c) has the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501. PHI includes Electronic Protected Health Information.

1.10   **Security Incident** shall have the meaning given to such term under the Security Rule including, but not limited to, 45 C.F.R. § 164.304.

1.11   **Security Rule** shall mean the HIPAA security rule codified at 45 C.F.R. Parts 160 and 164, Subparts A and C, respectively.

1.12   **Unsecured PHI** shall have the meaning given to such term under the HITECH Act and any guidance issued pursuant to such Act including, but not limited to, 42 U.S.C. § 17932(h) and 45 C.F.R. § 164.402.

2.   Obligations of Business Associate.

2.1   **Permitted Uses.** Business Associate shall use PHI solely for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law. Further, Business Associate shall not use PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by the Covered Entity.

2.2   **Permitted Disclosures.** Business Associate shall disclose PHI only for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law. Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by the Covered Entity.

2.3   **Prohibited Uses and Disclosures.** Business Associate shall not use or disclose PHI other than as permitted or required by the Contract, this Agreement or as required by law.

2.4   **Appropriate Safeguards.** Business Associate shall implement appropriate safeguards, and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to electronic PHI, to prevent use or disclosure of PHI other than as provided for by this Agreement including, but not limited to, administrative, physical and technical safeguards in accordance with the Security Rule. Business Associate shall comply with the policies and procedures and documentation requirements of the Security Rule including, but not limited to, 45 C.F.R. § 164.316.

2.5   **Subcontractors and Agents.** Business Associate shall ensure that any agents and subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate agree in writing to the same restrictions and conditions that apply to Business Associate with respect to such PHI and implement the safeguards required by Paragraph 2.4 above.

2.6   **Access to Protected Information.** Business Associate shall make PHI maintained by Business Associate or its agents or subcontractors in Designated Record Sets available to the Covered Entity for inspection and copying within five (5) days of a request by Covered Entity to enable Covered Entity to fulfill its obligations under California law, Health & Safety Code § 123110, and the Privacy Rule including, but not limited to, 45 C.F.R. § 164.524. If Business Associate maintains PHI in electronic format, Business Associate shall provide such information in electronic format as necessary to enable Covered Entity to fulfill its obligations under the HITECH Act and HIPAA Regulations.

2.7   **Amendment of PHI.** Within ten (10) days of a request by the Covered Entity for an amendment of PHI or a record about an individual contained in a Designated Record Set, Business Associate and its agents and subcontractors shall make such PHI available to the Covered Entity for amendment and incorporate any such amendment or other documentation to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.526.

2.8   **Accounting of Disclosures.** Within ten (10) days of a request by the Covered Entity for an accounting of disclosures of PHI, Business Associate and its agents and subcontractors shall make available to the Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.528, and the HITECH Act including, but not limited to, 42 U.S.C. § 17935, as determined by the Covered Entity.

2.8.1   **Retention of Records.** Business Associate and its agents and subcontractors shall maintain such accounting for at least six (6) years; provided, however, that accounting of disclosures from an Electronic Health Record for treatment, payment or health care operations purposes are required to be maintained for at least three (3) years and only to the extent that the Business Associate maintains an Electronic Health Record.

2.8.2   **Information Required.** At minimum, the information collected and maintained shall include (a) the date of disclosure; (b) the name of the entity or person who received PHI and, if known, the address of such entity or person; (c) a brief description of PHI disclosed; and (d) a brief statement of purpose of the disclosure that reasonably informs

the individual of the basis for the disclosure(s) or a copy of the individual's authorization or a copy of the written request for disclosure.

2.9     **Governmental Access to Records.** Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI available to the Covered Entity and to the Secretary of the U.S. Department of Health and Human Services ("HHS") for the purpose of determining Business Associate's compliance with HIPAA.

2.10     **Minimum Necessary.** Business Associate and its agents and subcontractors shall request, use and disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure. Business Associate understands and agrees that the definition of "minimum necessary" is in flux and shall keep itself informed of guidance issued by HHS with respect to what constitutes "minimum necessary."

2.11     **Notification of Breach.** Business Associate shall notify Covered Entity within twenty-four (24) hours of any (a) suspected or actual breach of PHI; (b) use or disclosure of PHI not permitted by the Contract or this Agreement; (c) Security Incident, including attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with system operations in an information system; and (d) actual or suspected use or disclosure of data in violation of any applicable federal or state laws by Business Associate or its agents or subcontractors.

2.11.1     **Contents of Notification.** The notification shall include, to the extent possible, the identification of each individual whose unsecured PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, used or disclosed, as well as any other available information that the Covered Entity is required to include in a notification to the individual, the media, HHS and any other entity under the Breach Notification Rule and any other applicable state or federal laws.

2.12     **Breach Pattern or Practice by Agents or Subcontractors.** In accordance with the provisions of 42 U.S.C. § 17934(b) and 45 C.F.R. § 164.504, if the Business Associate knows of a pattern of activity or practice of an agent or subcontractor that constitutes a material breach or violation of the agent's or subcontractor's obligations as required under the Contract, this Agreement or other arrangement, Business Associate must take reasonable steps to cure the breach or end the violation. In the event Business Associate is unable to resolve the breach of violation, Business Associate must immediately terminate the arrangement with said agent or subcontractor and notify the Covered Entity of such termination.

3.     **Obligations of Covered Entity.**

3.1     **Notification of Limitations.** Covered Entity shall notify Business Associate of any limitation(s) in the Notice of Privacy Practices of Covered Entity under 45 C.F.R. § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

3.2     **Notification of Change in Authorization.** Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

3.3     **Notification of Restriction.** Covered Entity shall notify Business Associate of any restriction on the use or disclosure of PHI that Covered Entity has agreed to or is required to abide by under 45 C.F.R. § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

4.     **Indemnification**

4.1     If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

5.     **Term and Termination.**

5.1     **Term.** The term of this Agreement shall be coextensive with the term of the Contract to which this Agreement relates.

5.2     **Material Breach.** Any breach by Business Associate of any provision of this Agreement shall, at the option of the Covered Entity, constitute a material breach of the Contract and shall be cause for immediate termination of the Contract and this Agreement, any provision in the Contract to the contrary notwithstanding.

5.2.1     **Covered Entity's Right of Cure.** At the expense of Business Associate, the Covered Entity shall have the right to cure any breach of the Business Associate's obligations under this Agreement. Covered Entity shall give the

Business Associate notice of its election to cure and Business Associate shall cooperate fully in the efforts of Covered Entity to effect such cure. Payment by Business Associate to Covered Entity for the cost of cure under this Subsection shall be made within thirty (30) days following Covered Entity's request for same.

     5.3     **Obligation of Business Associate Upon Termination.**  Upon termination of this Agreement for any reason, Business Associate shall, at the option of the Covered Entity, return or destroy all PHI that Business Associate and its agents and subcontractors maintain in any form, and shall retain no copies of such PHI.  If return or destruction is not feasible, as determined by the Covered Entity, Business Associate shall continue to use appropriate safeguards as required in Section 2 of this Agreement and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to Electronic Protected Health Information.  With respect to any retained PHI, Business Associate shall limit further use and disclosure of such PHI to those purposes that make the return or destruction of such information infeasible.

          5.3.1     **Notification.**  If Covered Entity elects destruction of the PHI, Business Associate shall certify in writing to the Covered Entity that such PHI has been destroyed in accordance with guidance promulgated by HHS.

     5.4     **Survival of Obligations.**  The obligations of Business Associate pursuant to Subsection 5.3 shall survive termination of the Agreement.

**6.**     **General Provisions.**

     6.1     **Amendment.**  Business Associate and Covered Entity agree to cooperate in amending this Agreement to the extent necessary to comply with changes in law with respect to California law, HIPAA, the HITECH Act and all regulations promulgated there under.  Notwithstanding any contrary provision in the Contract, Covered Entity may, at its option, terminate the Contract and this Agreement upon thirty (30) days written notice in the event the parties are not able to agree upon an amendment.

     6.2     **Notices.**  Any notice required or permitted to be given hereunder shall be in writing sent either by personal delivery, overnight delivery, or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to Covered Entity and Business Associate as follows:

     To Covered Entity:     _____

                                       _____

          Attention:     _____

     To Business Associate:     Advanced Medical Reviews, Inc.
                                   2950 31ˢᵗ St., Ste 100
                                   Santa Monica, CA 90405

Notices sent by personal delivery shall be deemed given upon actual receipt.  Notices sent by overnight delivery shall be deemed given on the next business day.  Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed as of the Effective Date hereof.

**ADVANCED MEDICAL REVIEWS, INC.**     **COVERED ENTITY**

By: _____     By: _____

Printed Name: Vincent J. Bianco     Printed Name: _____

Title: President     Title: _____

**Advanced Medical Reviews**

| Form **W-9**<br>(Rev. December 2014)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give Form to the requester. Do not send to the IRS.** |
|---|---|---|

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**Advanced Medical Reviews Inc.**

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☒ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)

**PO Box 492345**

6 City, state, and ZIP code

**Redding, CA 96049**

7 List account number(s) here (optional)

Requester's name and address (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

☐☐☐ – ☐☐ – ☐☐☐☐

or

Employer identification number

5 9 – 3 7 9 1 5 9 8

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

| Sign<br>Here | Signature of<br>U.S. person ▶ | Date ▶ C.5/16/16 |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)   5/26/2016

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X    Form **W-9** (Rev. 12-2014)

**From:** Tom M. Patterson <TPatterson@admere.com>
**Sent:** Thursday, May 26, 2016 12:12 PM
**To:** Tonya Gierke
**Subject:** FW: Conway signed contract
**Attachments:** image001.jpg; AMR-Conway Regional Hospital agreement-signed vjb1.pdf

Here you go Tonya!

Tom Patterson
Sales Representative
Advanced Medical Reviews
(310) 575-3020 | work
(949) 439-6196 | cell
(310) 470-4717 | fax
TPatterson@admere.com
www.admere.com



Advanced Medical Reviews

*"We believe every patient should receive quality healthcare."*

**CONFIDENTIALITY NOTICE:** This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Vince Bianco
**Sent:** Thursday, May 26, 2016 10:11 AM
**To:** Tom M. Patterson <TPatterson@admere.com>
**Subject:** RE: Conway signed contract

Attached.

Vince Bianco
President
Advanced Medical Reviews
(949) 230-1354

**From:** Tom M. Patterson
**Sent:** Thursday, May 26, 2016 9:59 AM
**To:** Vince Bianco <vbianco@admere.com>
**Subject:** Conway signed contract
**Importance:** High

Vince,

agreement only signed by client. This way I can send to them and they have a fully executed agreement.

Thanks,

Tom Patterson
Sales Representative
Advanced Medical Reviews
(310) 575-3020 | work
(949) 439-6196 | cell
(310) 470-4717 | fax
TPatterson@admere.com
www.admere.com



**Advanced Medical Reviews**

*"We believe every patient should receive quality healthcare."*

CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Tonya Gierke [mailto:tgierke@conwayregional.org]
**Sent:** Wednesday, May 25, 2016 2:07 PM
**To:** Tom M. Patterson <TPatterson@admere.com>
**Subject:** signed contract
**Importance:** High

Please see attached. Can we do training tomorrow so we can get the records to you?

Tonya Gierke RN, BSN, JD, CHC, CHPC
Corporate Compliance Officer & Risk Manager
Conway Regional Medical Center
Quality Resources
2302 College Ave.
Conway, AR 72034
Office:  501-450-2495
Fax:  501-513-5312

Advanced Medical Reviews

## AGREEMENT

Advanced Medical Reviews, Inc. ("*AMR*") is an independent review organization

This Agreement between AMR and Conway Regional Hospital ("*Client*") is effective as of the date set forth below (the "Effective Date"), and the parties agree as follows:

1. AMR, as an independent review organization, will provide independent medical review services ("Services") as requested by Client, in accordance with Client's requirements.  These Services shall be performed based on the Workflow Schedule set forth in **Schedule A.**

2. AMR and Client agree that all services will be performed according to the fee schedule outlined in **Schedule A.** This Agreement shall supplant all previous Agreements and Agreements between AMR and Client. All previous Agreements between AMR and Client shall be considered null and void effective as of the Effective Date as set forth below.

3. AMR will provide the agreed-upon Services to Clients through individuals who are members of the AMR Network ("Reviewers").
   a. AMR will maintain a credentialing program for its Reviewers in order to assure that every Reviewer has a current unrestricted license as applicable.
   b. AMR will assign each review to a Reviewer within the specialty requested by the Client or within a specialty or possessing the appropriate knowledge or experience to address the subject matter of the review.

4. AMR will provide Client with monthly activity reports that detail services provided in a mutually agreed upon format.

5. Client agrees that all present and future communications and business transactions with Reviewers will be made through AMR.

6. AMR will provide Client with services that will be performed in accordance with both Client's requirements, as outlined on this Agreement, and URAC standards.

7. AMR will notify Client in a timely fashion if there is any material change in AMR's ability to perform agreed upon services.

8. AMR agrees that Client may, at any time during the term of this Agreement and upon reasonable notice, conduct a review and/or audit of AMR's records pertaining to the contracted Services.

9. If Client identifies specific issues with AMR's performance of contracted Services, Client shall provide AMR with written notification of such. AMR shall have up to 30 days from receipt of such notice to take actions to correct identified problems to Client's reasonable satisfaction. If AMR fails to correct identified problems within such time period, Client may elect to terminate this Agreement at that time.

10. AMR Services are not substitutes for medical services. AMR is not responsible for benefit or medical care decisions.  All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment.

11. **Confidentiality**
    a. Confidential Information.  Client understands that during the term of this Agreement, Client will have access to certain of AMR's confidential information, including but not limited to its fees for Services provided, the terms and conditions of this Agreement, Workflow schedules, its password-protected website portal information (including forms and other materials), policies and procedures, and other confidential, proprietary or competitive trade secret information belonging to or in the possession of AMR that is not known to the public, all of which shall be referred to herein as "Confidential Information."  Such confidential, proprietary and competitive trade secret information included, but is not limited to, all information in any form relating to the design, function and operation of AMR's products and services, systems and processes, software, organization and staffing and all technical information, knowledge, flow charts, specifications, design documents, sales and marketing plans and strategies or other documents of any type whether in printed or machine readable form

2950 31ˢᵗ St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com

**Advanced Medical Reviews**

relating thereto.  Such Confidential Information shall be protected whether or not it has been marked, stamped or otherwise identified as such by AMR. Client agrees to maintain all such Confidential Information in strictest confidence and not to disclose such Confidential Information to any third party or person within Client's employ, whether as an employee or independent contractor, without AMR's prior written consent.  Client shall not make copies, in whole or in part, of any or all Confidential Information without the express consent of AMR.

b.  If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

c.  <u>HIPAA:</u> AMR and Client agree to comply by all applicable state and federal laws and regulations concerning the confidentiality of data.  This includes compliance to the applicable Standards under the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and in accordance with the terms set forth in Schedule B hereto.

12. <u>Conflict of Interest</u>

    a.  AMR reviewers will only complete cases in which they do not have a conflict of interest.

    b.  A reviewer conflict of interest is defined as:

       i.  Reviewer has a material professional, familial, or financial conflict of interest regarding an affected party;

      ii.  Reviewer accepts compensation for review activities that is dependent in any way on the specific outcome of the case; or

      iii.  Reviewer was involved with the specific episode of care prior to referral of the case for review

    c.  The following shall not constitute a reviewer conflict of interest:

      i.  Reviewer has a contract to provide health care services to Client's enrollees; and

      ii.  Reviewer has staff privileges at a facility where the recommended health care service or treatment would be provided if Client's previous non-certification is reversed.

13. **Termination Clause.**  This Agreement may be terminated by either party, by providing the other party with thirty (30) days prior written notice of its intent to terminate, with or without cause.

14. **Use of Name; Publicity.**  Neither party may use the other's name or identity in any advertising, public relations, or publicity without the prior written permission of the other.

15. <u>General Terms and Conditions</u>.

    a.  <u>Notices.</u>  Any notice required or permitted to be given hereunder shall be in writing sent by either personal delivery, overnight delivery, or US registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to AMR or Client at their respective addresses listed below, or at such other addresses as either AMR or Client may hereafter designate to the other in writing. Notices sent by personal delivery shall be deemed given upon actual receipt.  Notices sent by overnight delivery shall be deemed given on the next business day.  Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

    b.  <u>Insurance.</u>  Each party shall maintain in existence during the term of this Agreement insurance coverage in a commercially reasonable amount that will adequately protect the parties from claims arising out of the Services requested by Client, including, but not limited to, errors and omission and general liability coverage.  Upon request, a party shall provide the other with proof of such insurance.

    c.  <u>Assignment.</u>  This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by either party, nor shall the duties imposed herein be subcontracted or delegated by either party, without the prior written approval of the other party.

    d.  <u>Delegation.</u> If AMR delegates organizational functions, those functions shall be subject to the terms of this Agreement and in accordance with URAC standards.

    e.  <u>Dispute Resolution.</u>  Any controversies or claims between the parties regarding this Agreement must first be put in writing and delivered to the other party.  The parties shall make a good faith attempt to resolve the issue in question.  If the parties cannot resolve the grievances or disputes between them in an informal and expeditious

fashion, one or both of the parties may pursue legal action as deemed appropriate and necessary. The parties may agree to extend the time for dispute resolution in order to pursue mediation of the dispute.

f.   **Entire Agreement; Amendment.** This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the services to be provided hereunder. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, that are not embodied herein or in an exhibit hereto, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Any modifications, amendments, or waivers of this Agreement shall not be effective except if set forth in writing and signed by both parties.

g.   **Applicable Law.** This Agreement and the rights and obligations of the parties hereunder shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of California. Any actions, arbitration or proceedings instituted by either party with respect to any matters arising under or growing out of this Agreement shall be brought and tried only in the courts located in the County of Los Angeles, State of California, and each of the parties hereto expressly waives its rights under any applicable statute to cause any such action or proceeding to be brought or tried elsewhere.

h.   **Understanding of Agreement.** The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement. Accordingly, any rule of law (including, without limitation, California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the parties as set forth in this Agreement.

i.   **Schedules.** All Schedules referenced in this Agreement and attached hereto are incorporated into this Agreement by reference. In the event of a conflict between a term or condition of this Agreement and that of a Schedule, the term or condition of the Schedule shall control.

j.   **Non-solicitation.** During the Term of this Agreement, and for a period of one (1) year after its termination, Client agrees not to solicit any of AMR's Reviewers for services substantially similar to the Services that Reviewer has provided to Client on behalf of AMR.

k.   **Independent Contractors.** The relationship between AMR and Client is that of independent contractors. Neither AMR nor Client is a member, partner, agent, representative, employee, employer or joint venturer of the other. Except as otherwise specified in this Agreement, neither party shall have, nor exercise control or discretion over, the method by which the other party shall perform such work or render or perform such services and functions.

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

| Advanced Medical Reviews | Conway Regional Hospital |
|---|---|
| By: _____ | By: _____ |
| (Authorized Signature) | (Authorized Signature) |
| Printed Name: _____ | Printed Name: Matt Troup |
| Title: _____ | Title: CEO |
| Address: 2950 31st St., Ste 10 | Address: 2302 College Ave. |
| City State ZIP: Santa Monica, CA 90405 | City/State/ZIP: Conway, AR 72034 |
| Date: _____ | Date: 05/25/16 |

**Advanced Medical Reviews**

## SCHEDULE A: WORKFLOW, FEES AND PAYMENT SCHEDULE

Advanced Medical Reviews, Inc. ("*AMR*") will provide Independent Medical Review services as requested by Conway Regional Hospital ("*Client*"). AMR shall have no responsibility for any benefit of medical care decisions. All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment. AMR services are not substitutes for medical services.

Client shall submit peer review requests to AMR via fax, mail, web application or email. AMR shall maintain current credentialing information for individuals who are members of the AMR Network ("Reviewers") to assure that every Reviewer has a current unrestricted license as applicable. AMR shall assign each review to a Reviewer who shall be in an appropriate specialty or who shall possess specific knowledge appropriate to the request of the treating provider. AMR will post completed peer reviews to a web portal. Client will retrieve the completed reviews via the web portal.

AMR's services shall be performed based on Client's requested turnaround times. Turnaround times are calculated from the time the request and all related material are received by AMR
- "Turnaround 1": reviews with a requested turnaround of 5 business days[1] or greater
- "Turnaround 2": reviews with a requested turnaround between 3 and 5 business days[1]
- "Turnaround 3": reviews with a requested turnaround between 1 and 3 business days[1]

AMR and Client agree that all services will be performed according to the following fee schedule:

| Flat/Hourly | Pages[1] | Turnaround 1 >=5 days[1] | Turnaround 2 3-5 days[1] | Turnaround 3 1-3 days[1] |
|---|---|---|---|---|
| Flat | 0 to 25 pgs | $225.00 | $260.00 | $285.00 |
| Flat | 25+1 to 50 pgs | $258.00 | $295.00 | $320.00 |
| Flat | 50+1 to 75 pgs | $285.00 | $330.00 | $355.00 |
| Flat | 75+1 to 100 pgs | $320.00 | $370.00 | $400.00 |
| Hourly | 101+pgs | $270.00 per hour | $305.00 per hour | $405.00 per hour |

Reviews with up to 100 pages[2], up to 3 items[3], up to 0 call attempts, and with a requested turnaround greater than or equal to 1 days[1] will be billed at the flat rates outlined above. Reviews that fall outside any of the above parameters (i.e. reviews with greater than 100 pages[2], and/or greater than 3 items[3], and/or requiring more than 0 call attempts, and/or with a requested turnaround less than 1 days[1]) will be billed at the hourly rates outlined above. All reviews that fall outside the above parameters and reviews with requirements not detailed above will be billed based the hourly rates outlined above. Reviews that exceed fair and customary standards may incur additional fees as mutually agreed by both parties. Any additional costs incurred during the review process, such as shipping, will be paid for by Client. Reviews may have a maximum duration[4] of up to 30 business days. Reviews with a duration[4] that exceeds 30 business days will be charged as multiple reviews. Reviews that are reopened 10 business days or more after the original completion date will be charged as a separate review. Reviews that are reopened within 10 business days of the original completion date will be charged if the applicable billing tier has changed.

AMR and Client further agree that AMR may adjust the fees set forth above upon thirty (30) days' written notice, which notice may be given at any time after two (2) years following the Effective Date herein.

[1] *Days are defined as "business days" all days excluding Saturday, Sunday and Federal Holidays*
[1] *Hours are defined as "business-day hours" on all days excluding Saturday, Sunday and Federal Holidays*
[2] *Pages: total count of all pages of documentation provided to the reviewer*
[3] *Items: questions, service under review and/or days under review*
[4] *Duration: the time between when a review is first created and when a review is completed for the last time.*
[5] *Reviewers: individuals who are members of the AMR Network*

AMR will provide monthly invoices to Client. Invoices will be mailed and/or e-mailed to:

Name:   **Tonya Gierke**

2950 31ˢᵗ St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com

**M** Advanced Medical Reviews

Address:   **Conway Regional Hospital**

**2302 College Ave**

**Conway, AR 72034**

Phone:   **501-450-2495**

Email:   **tgierke@conwayregional.org**

Client will be responsible to make payment within thirty (30) calendar days of the invoice date ("*Due date*").  Client agrees to pay AMR for all services ordered according to these terms, irrespective of receiving payment from its client/plan provider. A late payment of 2% per month will be applied to the total unpaid balance on the account if full payment is not received by the due date.  Client will mail payment to:

Advanced Medical Reviews, Inc.
2950 31st Street Suite #100
Santa Monica CA 90405

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

**Advanced Medical Reviews**

By:   _____
        (Authorized Signature)

Printed Name:   _____

Title:   _____

Address:   2950 31st St., Ste 10 _____

City/State/ZIP:   Santa Monica, CA 90405 _____

Date:   _____

**Conway Regional Hospital**

By:   *[signature]*
        (Authorized Signature)

Printed Name:   Matt Troup

Title:   CEO

Address:   2302 College Ave

City State ZIP:   Conway, AR 72034

Date:   5/25/2016

## SCHEDULE B: BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement"), is entered into in connection with the Agreement for provision of medical review services ("Contract") entered into by and between Conway Regional Hospital ("Covered Entity") and Advanced Medical Reviews, Inc. ("Business Associate") concurrently herewith and is effective upon execution.

### RECITALS

   **WHEREAS,** Covered Entity wishes to disclose certain information to Business Associate pursuant to the terms of the Contract, some of which may constitute Protected Health Information ("PHI"), as defined below;

   **WHEREAS,** Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with the Health Insurance Portability and Accountability Act of 1966, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "HITECH Act") and regulations promulgated there under by the U.S. Department of Health and Human Services ("HIPAA Regulations"), and other applicable laws; and

   **WHEREAS,** as part of HIPAA Regulations, the Privacy Rule and Security Rule, as defined below, require that prior to disclosure of PHI, Covered Entity enter into a contract with Business Associate containing specific requirements set forth herein, including, but not limited to, 45 C.F.R. §§ 164.314(a) 164.502(a) and (c), and 164.504(e);

   **THEREFORE,** in consideration of the mutual promises contained herein and the exchange of information pursuant to this Agreement, the parties agree as follows:

### AGREEMENT

1.    **Definitions.** Terms used, but not otherwise defined, in this Agreement shall have the same meaning as set forth in regulations promulgated under HIPAA and the HITECH Act, as amended from time to time.

   1.1.    **Breach** shall have the meaning given to such term under the HITECH Act and HIPAA regulations at 42 U.S.C § 17921 and 45 C.F.R. § 164.402.

   1.2    **Breach Notification Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and D, respectively.

   1.3    **Business Associate** shall have the meaning given to such term under the Privacy Rule, the Security Rule and the HITECH Act including, but not limited to, 42 U.S.C. § 17938 and 45 C.F.R. § 160.103.

   1.4    **Covered Entity** shall have the meaning given to such term under the Privacy Rule and the Security Rule including, but not limited to, 45 C.F.R. § 160.103.

   1.5    **Designated Record Set** shall have the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501.

   1.6    **Electronic Protected Health Information** means PHI that is maintained in or transmitted by electronic media, as described in 45 C.F.R. § 160.103..

   1.7    **Health Care Operations** shall have the meaning given to such term in the HITECH Act including, but not limited to, 45 C.F.R. § 164.501.

   1.8    **Privacy Rule** shall mean the HIPAA privacy rules codified at 45 C.F.R., Parts 160 and 164, Subparts A and E, respectively.

   1.9    **Protected Health Information** ("PHI") means any information, whether oral or recorded in any form or medium, that (a) relates to the past, present or future physical or mental condition of an individual, the provision of health care to an individual or the past, present or future payment for the provision of health care to an individual; (b) identifies the individual or, with respect to which, there is a reasonable basis to believe the information can be used to identify the individual; and (c) has the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501. PHI includes Electronic Protected Health Information.

1.10     Security Incident shall have the meaning given to such term under the Security Rule including, but not limited to, 45 C.F.R. § 164.304.

1.11     Security Rule shall mean the HIPAA security rule codified at 45 C.F.R. Parts 160 and 164, Subparts A and C, respectively.

1.12     Unsecured PHI shall have the meaning given to such term under the HITECH Act and any guidance issued pursuant to such Act including, but not limited to, 42 U.S.C. § 17932(h) and 45 C.F.R. § 164.402.

## 2.     Obligations of Business Associate.

2.1     Permitted Uses. Business Associate shall use PHI solely for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law. Further, Business Associate shall not use PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by the Covered Entity.

2.2     Permitted Disclosures. Business Associate shall disclose PHI only for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law. Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by the Covered Entity.

2.3   ·  Prohibited Uses and Disclosures. Business Associate shall not use or disclose PHI other than as permitted or required by the Contract, this Agreement or as required by law.

2.4     Appropriate Safeguards. Business Associate shall implement appropriate safeguards, and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to electronic PHI, to prevent use or disclosure of PHI other than as provided for by this Agreement including, but not limited to, administrative, physical and technical safeguards in accordance with the Security Rule. Business Associate shall comply with the policies and procedures and documentation requirements of the Security Rule including, but not limited to, 45 C.F.R. § 164.316.

2.5     Subcontractors and Agents. Business Associate shall ensure that any agents and subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate agree in writing to the same restrictions and conditions that apply to Business Associate with respect to such PHI and implement the safeguards required by Paragraph 2.4 above.

2.6     Access to Protected Information. Business Associate shall make PHI maintained by Business Associate or its agents or subcontractors in Designated Record Sets available to the Covered Entity for inspection and copying within five (5) days of a request by Covered Entity to enable Covered Entity to fulfill its obligations under California law, Health & Safety Code § 123110, and the Privacy Rule including, but not limited to, 45 C.F.R. § 164.524. If Business Associate maintains PHI in electronic format, Business Associate shall provide such information in electronic format as necessary to enable Covered Entity to fulfill its obligations under the HITECH Act and HIPAA Regulations.

2.7     Amendment of PHI. Within ten (10) days of a request by the Covered Entity for an amendment of PHI or a record about an individual contained in a Designated Record Set, Business Associate and its agents and subcontractors shall make such PHI available to the Covered Entity for amendment and incorporate any such amendment or other documentation to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.526.

2.8     Accounting of Disclosures. Within ten (10) days of a request by the Covered Entity for an accounting of disclosures of PHI, Business Associate and its agents and subcontractors shall make available to the Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.528, and the HITECH Act including, but not limited to, 42 U.S.C. § 17935, as determined by the Covered Entity.

2.8.1     Retention of Records. Business Associate and its agents and subcontractors shall maintain such accounting for at least six (6) years; provided, however, that accounting of disclosures from an Electronic Health Record for treatment, payment or health care operations purposes are required to be maintained for at least three (3) years and only to the extent that the Business Associate maintains an Electronic Health Record.

2.8.2     Information Required. At minimum, the information collected and maintained shall include (a) the date of disclosure; (b) the name of the entity or person who received PHI and, if known, the address of such entity or person; (c) a brief description of PHI disclosed; and (d) a brief statement of purpose of the disclosure that reasonably informs

the individual of the basis for the disclosure(s) or a copy of the individual's authorization or a copy of the written request for disclosure.

2.9 **Governmental Access to Records.** Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI available to the Covered Entity and to the Secretary of the U.S. Department of Health and Human Services ("HHS") for the purpose of determining Business Associate's compliance with HIPAA.

2.10 **Minimum Necessary.** Business Associate and its agents and subcontractors shall request, use and disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure. Business Associate understands and agrees that the definition of "minimum necessary" is in flux and shall keep itself informed of guidance issued by HHS with respect to what constitutes "minimum necessary."

2.11 **Notification of Breach.** Business Associate shall notify Covered Entity within twenty-four (24) hours of any (a) suspected or actual breach of PHI; (b) use or disclosure of PHI not permitted by the Contract or this Agreement; (c) Security Incident, including attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with system operations in an information system; and (d) actual or suspected use or disclosure of data in violation of any applicable federal or state laws by Business Associate or its agents or subcontractors.

2.11.1 **Contents of Notification.** The notification shall include, to the extent possible, the identification of each individual whose unsecured PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, used or disclosed, as well as any other available information that the Covered Entity is required to include in a notification to the individual, the media, HHS and any other entity under the Breach Notification Rule and any other applicable state or federal laws.

2.12 **Breach Pattern or Practice by Agents or Subcontractors.** In accordance with the provisions of 42 U.S.C. § 17934(b) and 45 C.F.R. § 164.504, if the Business Associate knows of a pattern of activity or practice of an agent or subcontractor that constitutes a material breach or violation of the agent's or subcontractor's obligations as required under the Contract, this Agreement or other arrangement, Business Associate must take reasonable steps to cure the breach or end the violation. In the event Business Associate is unable to resolve the breach of violation, Business Associate must immediately terminate the arrangement with said agent or subcontractor and notify the Covered Entity of such termination.

### 3. Obligations of Covered Entity.

3.1 **Notification of Limitations.** Covered Entity shall notify Business Associate of any limitation(s) in the Notice of Privacy Practices of Covered Entity under 45 C.F.R. § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

3.2 **Notification of Change in Authorization.** Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

3.3 **Notification of Restriction.** Covered Entity shall notify Business Associate of any restriction on the use or disclosure of PHI that Covered Entity has agreed to or is required to abide by under 45 C.F.R. § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

### 4. Indemnification

4.1 If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

### 5. Term and Termination.

5.1 **Term.** The term of this Agreement shall be coextensive with the term of the Contract to which this Agreement relates.

5.2 **Material Breach.** Any breach by Business Associate of any provision of this Agreement shall, at the option of the Covered Entity, constitute a material breach of the Contract and shall be cause for immediate termination of the Contract and this Agreement, any provision in the Contract to the contrary notwithstanding.

5.2.1 Covered Entity's Right of Cure. At the expense of Business Associate, the Covered Entity shall have the right to cure any breach of the Business Associate's obligations under this Agreement. Covered Entity shall give the

Business Associate notice of its election to cure and Business Associate shall cooperate fully in the efforts of Covered Entity to effect such cure. Payment by Business Associate to Covered Entity for the cost of cure under this Subsection shall be made within thirty (30) days following Covered Entity's request for same.

5.3     **Obligation of Business Associate Upon Termination.** Upon termination of this Agreement for any reason, Business Associate shall, at the option of the Covered Entity, return or destroy all PHI that Business Associate and its agents and subcontractors maintain in any form, and shall retain no copies of such PHI. If return or destruction is not feasible, as determined by the Covered Entity, Business Associate shall continue to use appropriate safeguards as required in Section 2 of this Agreement and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to Electronic Protected Health Information. With respect to any retained PHI, Business Associate shall limit further use and disclosure of such PHI to those purposes that make the return or destruction of such information infeasible.

5.3.1     **Notification.** If Covered Entity elects destruction of the PHI, Business Associate shall certify in writing to the Covered Entity that such PHI has been destroyed in accordance with guidance promulgated by HHS.

5.4     **Survival of Obligations.** The obligations of Business Associate pursuant to Subsection 5.3 shall survive termination of the Agreement.

6.     **General Provisions.**

6.1     **Amendment.** Business Associate and Covered Entity agree to cooperate in amending this Agreement to the extent necessary to comply with changes in law with respect to California law, HIPAA, the HITECH Act and all regulations promulgated there under. Notwithstanding any contrary provision in the Contract, Covered Entity may, at its option, terminate the Contract and this Agreement upon thirty (30) days written notice in the event the parties are not able to agree upon an amendment.

6.2     **Notices.** Any notice required or permitted to be given hereunder shall be in writing sent either by personal delivery, overnight delivery, or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to Covered Entity and Business Associate as follows:

To Covered Entity:     *Conway Regional Med. Center*
                       *2302 College Ave*
Attention:             *Conway, AR, 72034*
                       *Tonya Burke, Quality*

To Business Associate:     Advanced Medical Reviews, Inc.
                           2950 31st St., Ste 100
                           Santa Monica, CA 90405

Notices sent by personal delivery shall be deemed given upon actual receipt. Notices sent by overnight delivery shall be deemed given on the next business day. Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date hereof.

**ADVANCED MEDICAL REVIEWS, INC.**          **COVERED ENTITY**

By: _____          By: _____

Printed Name: _____          Printed Name: *Matt Troup*

Title: _____          Title: *CEO*

**Advanced Medical Reviews**

| Form **W-9** | **Request for Taxpayer** | Give Form to the |
|---|---|---|
| (Rev. December 2014) | **Identification Number and Certification** | requester. Do not |
| Department of the Treasury Internal Revenue Service | | send to the IRS. |

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Advanced Medical Reviews Inc.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☑ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any):

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

6 Address (number, street, and apt. or suite no.)

PO Box 492345

6 City, state, and ZIP code

Redding, CA 96049

Requester's name and address (optional)

7 List account number(s) here (optional)

**Part I** — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

5 9 – 3 7 9 1 5 9 8

**Part II** — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign Here | Signature of U.S. person ▶ | Date ▶ 6.5/16/16

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at www.irs.gov/fw9.

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See What is FATCA reporting? on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

2950 31st St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com

## AGREEMENT

Advanced Medical Reviews, Inc. ("*AMR*") is an independent review organization

This Agreement between AMR and Conway Regional Hospital ("*Client*") is effective as of the date set forth below (the "Effective Date"), and the parties agree as follows:

1.  AMR, as an independent review organization, will provide independent medical review services ("Services") as requested by Client, in accordance with Client's requirements. These Services shall be performed based on the Workflow Schedule set forth in Schedule A.

2.  AMR and Client agree that all services will be performed according to the fee schedule outlined in Schedule A. This Agreement shall supplant all previous Agreements and Agreements between AMR and Client. All previous Agreements between AMR and Client shall be considered null and void effective as of the Effective Date as set forth below.

3.  AMR will provide the agreed-upon Services to Clients through individuals who are members of the AMR Network ("Reviewers").
    a.  AMR will maintain a credentialing program for its Reviewers in order to assure that every Reviewer has a current unrestricted license as applicable.
    b.  AMR will assign each review to a Reviewer within the specialty requested by the Client or within a specialty or possessing the appropriate knowledge or experience to address the subject matter of the review.

4.  AMR will provide Client with monthly activity reports that detail services provided in a mutually agreed upon format.

5.  Client agrees that all present and future communications and business transactions with Reviewers will be made through AMR.

6.  AMR will provide Client with services that will be performed in accordance with both Client's requirements, as outlined on this Agreement, and URAC standards.

7.  AMR will notify Client in a timely fashion if there is any material change in AMR's ability to perform agreed upon services.

8.  AMR agrees that Client may, at any time during the term of this Agreement and upon reasonable notice, conduct a review and/or audit of AMR's records pertaining to the contracted Services.

9.  If Client identifies specific issues with AMR's performance of contracted Services, Client shall provide AMR with written notification of such. AMR shall have up to 30 days from receipt of such notice to take actions to correct identified problems to Client's reasonable satisfaction. If AMR fails to correct identified problems within such time period, Client may elect to terminate this Agreement at that time.

10. AMR Services are not substitutes for medical services. AMR is not responsible for benefit or medical care decisions. All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment.

11. **Confidentiality**
    a.  Confidential Information. Client understands that during the term of this Agreement, Client will have access to certain of AMR's confidential information, including but not limited to its fees for Services provided, the terms and conditions of this Agreement, Workflow schedules, its password-protected website portal information (including forms and other materials), policies and procedures, and other confidential, proprietary or competitive trade secret information belonging to or in the possession of AMR that is not known to the public, all of which shall be referred to herein as "Confidential Information." Such confidential, proprietary and competitive trade secret information included, but is not limited to, all information in any form relating to the design, function and operation of AMR's products and services, systems and processes, software, organization and staffing and all technical information, knowledge, flow charts, specifications, design documents, sales and marketing plans and strategies or other documents of any type whether in printed or machine readable form

2950 31st St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com

relating thereto. Such Confidential Information shall be protected whether or not it has been marked, stamped or otherwise identified as such by AMR. Client agrees to maintain all such Confidential Information in strictest confidence and not to disclose such Confidential Information to any third party or person within Client's employ, whether as an employee or independent contractor, without AMR's prior written consent. Client shall not make copies, in whole or in part, of any or all Confidential Information without the express consent of AMR.

b. If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

c. HIPAA: AMR and Client agree to comply by all applicable state and federal laws and regulations concerning the confidentiality of data. This includes compliance to the applicable Standards under the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and in accordance with the terms set forth in Schedule B hereto.

12. Conflict of Interest

a. AMR reviewers will only complete cases in which they do not have a conflict of interest.

b. A reviewer conflict of interest is defined as:
   i. Reviewer has a material professional, familial, or financial conflict of interest regarding an affected party;
   ii. Reviewer accepts compensation for review activities that is dependent in any way on the specific outcome of the case; or
   iii. Reviewer was involved with the specific episode of care prior to referral of the case for review

c. The following shall not constitute a reviewer conflict of interest:
   i. Reviewer has a contract to provide health care services to Client's enrollees; and
   ii. Reviewer has staff privileges at a facility where the recommended health care service or treatment would be provided if Client's previous non-certification is reversed.

13. Termination Clause. This Agreement may be terminated by either party by providing the other party with thirty (30) days prior written notice of its intent to terminate, with or without cause.

14. Use of Name; Publicity. Neither party may use the other's name or identity in any advertising, public relations, or publicity without the prior written permission of the other.

15. General Terms and Conditions.

a. Notices. Any notice required or permitted to be given hereunder shall be in writing sent by either personal delivery, overnight delivery, or US registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to AMR or Client at their respective addresses listed below, or at such other addresses as either AMR or Client may hereafter designate to the other in writing. Notices sent by personal delivery shall be deemed given upon actual receipt. Notices sent by overnight delivery shall be deemed given on the next business day. Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

b. Insurance. Each party shall maintain in existence during the term of this Agreement insurance coverage in a commercially reasonable amount that will adequately protect the parties from claims arising out of the Services requested by Client, including, but not limited to, errors and omission and general liability coverage. Upon request, a party shall provide the other with proof of such insurance.

c. Assignment. This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by either party, nor shall the duties imposed herein be subcontracted or delegated by either party, without the prior written approval of the other party.

d. Delegation. If AMR delegates organizational functions, those functions shall be subject to the terms of this Agreement and in accordance with URAC standards.

e. Dispute Resolution. Any controversies or claims between the parties regarding this Agreement must first be put in writing and delivered to the other party. The parties shall make a good faith attempt to resolve the issue in question. If the parties cannot resolve the grievances or disputes between them in an informal and expeditious

**Advanced Medical Reviews**

fashion, one or both of the parties may pursue legal action as deemed appropriate and necessary. The parties may agree to extend the time for dispute resolution in order to pursue mediation of the dispute.

f. <u>Entire Agreement; Amendment.</u> This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the services to be provided hereunder. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, that are not embodied herein or in an exhibit hereto, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Any modifications, amendments, or waivers of this Agreement shall not be effective except if set forth in writing and signed by both parties.

g. <u>Applicable Law.</u> This Agreement and the rights and obligations of the parties hereunder shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of California. Any actions, arbitration or proceedings instituted by either party with respect to any matters arising under or growing out of this Agreement shall be brought and tried only in the courts located in the County of Los Angeles, State of California, and each of the parties hereto expressly waives its rights under any applicable statute to cause any such action or proceeding to be brought or tried elsewhere.

h. <u>Understanding of Agreement.</u> The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement. Accordingly, any rule of law (including, without limitation, California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the parties as set forth in this Agreement.

i. <u>Schedules.</u> All Schedules referenced in this Agreement and attached hereto are incorporated into this Agreement by reference. In the event of a conflict between a term or condition of this Agreement and that of a Schedule, the term or condition of the Schedule shall control.

j. <u>Non-solicitation.</u> During the Term of this Agreement, and for a period of one (1) year after its termination, Client agrees not to solicit any of AMR's Reviewers for services substantially similar to the Services that Reviewer has provided to Client on behalf of AMR.

k. <u>Independent Contractors.</u> The relationship between AMR and Client is that of independent contractors. Neither AMR nor Client is a member, partner, agent, representative, employee, employer or joint venturer of the other. Except as otherwise specified in this Agreement, neither party shall have, nor exercise control or discretion over, the method by which the other party shall perform such work or render or perform such services and functions.

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

| **Advanced Medical Reviews** | **Conway Regional Hospital** |
|---|---|
| By: _____ | By: _____ |
| (Authorized Signature) | (Authorized Signature) |
| Printed Name: Vincent J. Bianco | Printed Name: Matt Troup |
| Title: President | Title: CEO |
| Address: 2950 31st St., Ste 10 | Address: 2302 College Ave. |
| City State ZIP: Santa Monica, CA 90405 | City/State/ZIP: Conway, AR 72034 |
| Date: 5/26/2016 | Date: 05/25/16 |

Advanced Medical Reviews

## SCHEDULE A: WORKFLOW, FEES AND PAYMENT SCHEDULE

Advanced Medical Reviews, Inc. ("*AMR*") will provide Independent Medical Review services as requested by Conway Regional Hospital ("*Client*"). AMR shall have no responsibility for any benefit of medical care decisions. All determinations made by AMR are recommendations only, and are not intended to be construed to require any person to have or forgo medical treatment. AMR services are not substitutes for medical services.

Client shall submit peer review requests to AMR via fax, mail, web application or email. AMR shall maintain current credentialing information for individuals who are members of the AMR Network ("Reviewers") to assure that every Reviewer has a current unrestricted license as applicable. AMR shall assign each review to a Reviewer who shall be in an appropriate specialty or who shall possess specific knowledge appropriate to the request of the treating provider. AMR will post completed peer reviews to a web portal. Client will retrieve the completed reviews via the web portal.

AMR's services shall be performed based on Client's requested turnaround times. Turnaround times are calculated from the time the request and all related material are received by AMR

- "Turnaround 1": reviews with a requested turnaround of 5 business days[1] or greater
- "Turnaround 2": reviews with a requested turnaround between 3 and 5 business days[1]
- "Turnaround 3": reviews with a requested turnaround between 1 and 3 business days[1]

AMR and Client agree that all services will be performed according to the following fee schedule:

| Flat/Hourly | Pages[2] | Turnaround 1 >=5 days[1] | Turnaround 2 3-5 days[1] | Turnaround 3 1-3 days[1] |
|---|---|---|---|---|
| Flat | 0 to 25 pgs | $225.00 | $260.00 | $285.00 |
| Flat | 25+1 to 50 pgs | $258.00 | $295.00 | $320.00 |
| Flat | 50+1 to 75 pgs | $285.00 | $330.00 | $355.00 |
| Flat | 75+1 to 100 pgs | $320.00 | $370.00 | $400.00 |
| Hourly | 101+pgs | $270.00 per hour | $305.00 per hour | $405.00 per hour |

Reviews with up to 100 pages[2], up to 3 items[3], up to 0 call attempts, and with a requested turnaround greater than or equal to 1 days[1] will be billed at the flat rates outlined above. Reviews that fall outside any of the above parameters (i.e. reviews with greater than 100 pages[2], and/or greater than 3 items[3], and/or requiring more than 0 call attempts, and/or with a requested turnaround less than 1 days[1]) will be billed at the hourly rates outlined above. All reviews that fall outside the above parameters and reviews with requirements not detailed above will be billed based the hourly rates outlined above. Reviews that exceed fair and customary standards may incur additional fees as mutually agreed by both parties. Any additional costs incurred during the review process, such as shipping, will be paid for by Client. Reviews may have a maximum duration[4] of up to 30 business days. Reviews with a duration[4] that exceeds 30 business days will be charged as multiple reviews. Reviews that are reopened 10 business days or more after the original completion date will be charged as a separate review. Reviews that are reopened within 10 business days of the original completion date will be charged if the applicable billing tier has changed.

AMR and Client further agree that AMR may adjust the fees set forth above upon thirty (30) days' written notice, which notice may be given at any time after two (2) years following the Effective Date herein.

[1]   *Days are defined as "business days" all days excluding Saturday, Sunday and Federal Holidays*
[1]   *Hours are defined as "business-day hours" on all days excluding Saturday, Sunday and Federal Holidays*
[2]   *Pages: total count of all pages of documentation provided to the reviewer*
[3]   *Items: questions, service under review and/or days under review*
[4]   *Duration: the time between when a review is first created and when a review is completed for the last time.*
[5]   *Reviewers: individuals who are members of the AMR Network*

AMR will provide monthly invoices to Client. Invoices will be mailed and/or e-mailed to:

    Name:    Tonya Gierke

2950 31st St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com

**M**

Advanced Medical Reviews

|  |  |
|---|---|
| Address: | **Conway Regional Hospital** |
|  | **2302 College Ave** |
|  | **Conway, AR 72034** |
| Phone: | **501-450-2495** |
| Email: | **tgierke@conwayregional.org** |

**Client will be responsible to make payment within thirty (30) calendar days of the invoice date ("*Due date*").  Client agrees to pay AMR for all services ordered according to these terms, irrespective of receiving payment from its client/plan provider. A late payment of 2% per month will be applied to the total unpaid balance on the account if full payment is not received by the due date.  Client will mail payment to:**

Advanced Medical Reviews, Inc.
2950 31st Street Suite #100
Santa Monica CA 90405

IN WITNESS WHEREOF, the parties have executed this Agreement, as set forth below.

| Advanced Medical Reviews | | Conway Regional Hospital | |
|---|---|---|---|
| By: | _(Authorized Signature)_ | By: | _(Authorized Signature)_ |
| Printed Name: | Vincent J. Bianco | Printed Name: | Matt Troup |
| Title: | President | Title: | CEO |
| Address: | 2950 31st St., Ste 10 | Address: | 2302 College Ave |
| City/State/ZIP: | Santa Monica, CA 90405 | City State ZIP: | Conway, AR 72034 |
| Date: | 5/26/2016 | Date: | 5/25/2016 |

**Advanced Medical Reviews**

## SCHEDULE B: BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement"), is entered into in connection with the Agreement for provision of medical review services ("Contract") entered into by and between Conway Regional Hospital ("Covered Entity") and Advanced Medical Reviews, Inc. ("Business Associate") concurrently herewith and is effective upon execution.

### RECITALS

    **WHEREAS,** Covered Entity wishes to disclose certain information to Business Associate pursuant to the terms of the Contract, some of which may constitute Protected Health Information ("PHI"), as defined below;

    **WHEREAS,** Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with the Health Insurance Portability and Accountability Act of 1966, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "HITECH Act") and regulations promulgated there under by the U.S. Department of Health and Human Services ("HIPAA Regulations"), and other applicable laws; and

    **WHEREAS,** as part of HIPAA Regulations, the Privacy Rule and Security Rule, as defined below, require that prior to disclosure of PHI, Covered Entity enter into a contract with Business Associate containing specific requirements set forth herein, including, but not limited to, 45 C.F.R. §§ 164.314(a) 164.502(a) and (e), and 164.504(e);

    **THEREFORE,** in consideration of the mutual promises contained herein and the exchange of information pursuant to this Agreement, the parties agree as follows:

### AGREEMENT

1.    **Definitions.** Terms used, but not otherwise defined, in this Agreement shall have the same meaning as set forth in regulations promulgated under HIPAA and the HITECH Act, as amended from time to time.

    1.1.    **Breach** shall have the meaning given to such term under the HITECH Act and HIPAA regulations at 42 U.S.C § 17921 and 45 C.F.R. § 164.402.

    1.2    **Breach Notification Rule** shall mean the HIPAA Regulation that is codified at 45 C.F.R. Parts 160 and 164, Subparts A and D, respectively.

    1.3    **Business Associate** shall have the meaning given to such term under the Privacy Rule, the Security Rule and the HITECH Act including, but not limited to, 42 U.S.C. § 17938 and 45 C.F.R. § 160.103.

    1.4    **Covered Entity** shall have the meaning given to such term under the Privacy Rule and the Security Rule including, but not limited to, 45 C.F.R. § 160.103.

    1.5    **Designated Record Set** shall have the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501.

    1.6    **Electronic Protected Health Information** means PHI that is maintained in or transmitted by electronic media, as described in 45 C.F.R. § 160.103.

    1.7    **Health Care Operations** shall have the meaning given to such term in the HITECH Act including, but not limited to, 45 C.F.R. § 164.501.

    1.8    **Privacy Rule** shall mean the HIPAA privacy rules codified at 45 C.F.R., Parts 160 and 164, Subparts A and E, respectively.

    1.9    **Protected Health Information ("PHI")** means any information, whether oral or recorded in any form or medium, that (a) relates to the past, present or future physical or mental condition of an individual, the provision of health care to an individual or the past, present or future payment for the provision of health care to an individual; (b) identifies the individual or, with respect to which, there is a reasonable basis to believe the information can be used to identify the individual; and (c) has the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.501. PHI includes Electronic Protected Health Information.

1.10    **Security Incident** shall have the meaning given to such term under the Security Rule including, but not limited to, 45 C.F.R. § 164.304.

1.11    **Security Rule** shall mean the HIPAA security rule codified at 45 C.F.R. Parts 160 and 164, Subparts A and C, respectively.

1.12    **Unsecured PHI** shall have the meaning given to such term under the HITECH Act and any guidance issued pursuant to such Act including, but not limited to, 42 U.S.C. § 17932(h) and 45 C.F.R. § 164.402.

2.    **Obligations of Business Associate.**

2.1    **Permitted Uses.**  Business Associate shall use PHI solely for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law.  Further, Business Associate shall not use PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by the Covered Entity.

2.2    **Permitted Disclosures.**  Business Associate shall disclose PHI only for the purpose of performing Business Associate's obligations under the Contract and as permitted or required under the Contract, this Agreement, or as required by law.  Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by the Covered Entity.

2.3    **Prohibited Uses and Disclosures.**  Business Associate shall not use or disclose PHI other than as permitted or required by the Contract, this Agreement or as required by law.

2.4    **Appropriate Safeguards.**  Business Associate shall implement appropriate safeguards, and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to electronic PHI, to prevent use or disclosure of PHI other than as provided for by this Agreement including, but not limited to, administrative, physical and technical safeguards in accordance with the Security Rule.  Business Associate shall comply with the policies and procedures and documentation requirements of the Security Rule including, but not limited to, 45 C.F.R. § 164.316.

2.5    **Subcontractors and Agents.**  Business Associate shall ensure that any agents and subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate agree in writing to the same restrictions and conditions that apply to Business Associate with respect to such PHI and implement the safeguards required by Paragraph 2.4 above.

2.6    **Access to Protected Information.**  Business Associate shall make PHI maintained by Business Associate or its agents or subcontractors in Designated Record Sets available to the Covered Entity for inspection and copying within five (5) days of a request by Covered Entity to enable Covered Entity to fulfill its obligations under California law, Health & Safety Code § 123110, and the Privacy Rule including, but not limited to, 45 C.F.R. § 164.524.  If Business Associate maintains PHI in electronic format, Business Associate shall provide such information in electronic format as necessary to enable Covered Entity to fulfill its obligations under the HITECH Act and HIPAA Regulations.

2.7    **Amendment of PHI.**  Within ten (10) days of a request by the Covered Entity for an amendment of PHI or a record about an individual contained in a Designated Record Set, Business Associate and its agents and subcontractors shall make such PHI available to the Covered Entity for amendment and incorporate any such amendment or other documentation to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.526.

2.8    **Accounting of Disclosures.**  Within ten (10) days of a request by the Covered Entity for an accounting of disclosures of PHI, Business Associate and its agents and subcontractors shall make available to the Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule including, but not limited to, 45 C.F.R. § 164.528, and the HITECH Act including, but not limited to, 42 U.S.C. § 17935, as determined by the Covered Entity.

2.8.1    **Retention of Records.**  Business Associate and its agents and subcontractors shall maintain such accounting for at least six (6) years; provided, however, that accounting of disclosures from an Electronic Health Record for treatment, payment or health care operations purposes are required to be maintained for at least three (3) years and only to the extent that the Business Associate maintains an Electronic Health Record.

2.8.2    **Information Required.**  At minimum, the information collected and maintained shall include (a) the date of disclosure; (b) the name of the entity or person who received PHI and, if known, the address of such entity or person; (c) a brief description of PHI disclosed; and (d) a brief statement of purpose of the disclosure that reasonably informs

the individual of the basis for the disclosure(s) or a copy of the individual's authorization or a copy of the written request for disclosure.

 2.9 **Governmental Access to Records.** Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI available to the Covered Entity and to the Secretary of the U.S. Department of Health and Human Services ("HHS") for the purpose of determining Business Associate's compliance with HIPAA.

 2.10 **Minimum Necessary.** Business Associate and its agents and subcontractors shall request, use and disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure. Business Associate understands and agrees that the definition of "minimum necessary" is in flux and shall keep itself informed of guidance issued by HHS with respect to what constitutes "minimum necessary."

 2.11 **Notification of Breach.** Business Associate shall notify Covered Entity within twenty-four (24) hours of any (a) suspected or actual breach of PHI; (b) use or disclosure of PHI not permitted by the Contract or this Agreement; (c) Security Incident, including attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with system operations in an information system; and (d) actual or suspected use or disclosure of data in violation of any applicable federal or state laws by Business Associate or its agents or subcontractors.

  2.11.1 **Contents of Notification.** The notification shall include, to the extent possible, the identification of each individual whose unsecured PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, used or disclosed, as well as any other available information that the Covered Entity is required to include in a notification to the individual, the media, HHS and any other entity under the Breach Notification Rule and any other applicable state or federal laws.

 2.12 **Breach Pattern or Practice by Agents or Subcontractors.** In accordance with the provisions of 42 U.S.C. § 17934(b) and 45 C.F.R. § 164.504, if the Business Associate knows of a pattern of activity or practice of an agent or subcontractor that constitutes a material breach or violation of the agent's or subcontractor's obligations as required under the Contract, this Agreement or other arrangement, Business Associate must take reasonable steps to cure the breach or end the violation. In the event Business Associate is unable to resolve the breach of violation, Business Associate must immediately terminate the arrangement with said agent or subcontractor and notify the Covered Entity of such termination.

### 3. Obligations of Covered Entity.

 3.1 **Notification of Limitations.** Covered Entity shall notify Business Associate of any limitation(s) in the Notice of Privacy Practices of Covered Entity under 45 C.F.R. § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

 3.2 **Notification of Change in Authorization.** Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

 3.3 **Notification of Restriction.** Covered Entity shall notify Business Associate of any restriction on the use or disclosure of PHI that Covered Entity has agreed to or is required to abide by under 45 C.F.R. § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

### 4. Indemnification

 4.1 If any party breaches any part of this Agreement, the non-breaching party shall be entitled to relief by appropriate legal or equitable means. Further, the parties agree to mutually indemnify each other against any and all claims, losses or liabilities incurred as a result of the other party's wrongful actions.

### 5. Term and Termination.

 5.1 **Term.** The term of this Agreement shall be coextensive with the term of the Contract to which this Agreement relates.

 5.2 **Material Breach.** Any breach by Business Associate of any provision of this Agreement shall, at the option of the Covered Entity, constitute a material breach of the Contract and shall be cause for immediate termination of the Contract and this Agreement, any provision in the Contract to the contrary notwithstanding.

  5.2.1 Covered Entity's Right of Cure. At the expense of Business Associate, the Covered Entity shall have the right to cure any breach of the Business Associate's obligations under this Agreement. Covered Entity shall give the

Advanced Medical Reviews

Business Associate notice of its election to cure and Business Associate shall cooperate fully in the efforts of Covered Entity to effect such cure. Payment by Business Associate to Covered Entity for the cost of cure under this Subsection shall be made within thirty (30) days following Covered Entity's request for same.

  5.3  **Obligation of Business Associate Upon Termination.** Upon termination of this Agreement for any reason, Business Associate shall, at the option of the Covered Entity, return or destroy all PHI that Business Associate and its agents and subcontractors maintain in any form, and shall retain no copies of such PHI. If return or destruction is not feasible, as determined by the Covered Entity, Business Associate shall continue to use appropriate safeguards as required in Section 2 of this Agreement and comply with the provisions of 45 C.F.R. Part 164, Subpart C, with respect to Electronic Protected Health Information. With respect to any retained PHI, Business Associate shall limit further use and disclosure of such PHI to those purposes that make the return or destruction of such information infeasible.

    5.3.1  **Notification.** If Covered Entity elects destruction of the PHI, Business Associate shall certify in writing to the Covered Entity that such PHI has been destroyed in accordance with guidance promulgated by HHS.

  5.4  **Survival of Obligations.** The obligations of Business Associate pursuant to Subsection 5.3 shall survive termination of the Agreement.

6.  **General Provisions.**

  6.1  **Amendment.** Business Associate and Covered Entity agree to cooperate in amending this Agreement to the extent necessary to comply with changes in law with respect to California law, HIPAA, the HITECH Act and all regulations promulgated there under. Notwithstanding any contrary provision in the Contract, Covered Entity may, at its option, terminate the Contract and this Agreement upon thirty (30) days written notice in the event the parties are not able to agree upon an amendment.

  6.2  **Notices.** Any notice required or permitted to be given hereunder shall be in writing sent either by personal delivery, overnight delivery, or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to Covered Entity and Business Associate as follows:

To Covered Entity:  Conway Regional Med. Center
          2302 College Ave

Attention:     Conway, AR, 72034
          Tonya Burke, Quality

To Business Associate:  Advanced Medical Reviews, Inc.
          2950 31st St., Ste 100
          Santa Monica, CA 90405

Notices sent by personal delivery shall be deemed given upon actual receipt. Notices sent by overnight delivery shall be deemed given on the next business day. Notices sent via United States registered or certified mail shall be deemed given two (2) business days from mailing.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed as of the Effective Date hereof.

**ADVANCED MEDICAL REVIEWS, INC.**    **COVERED ENTITY**

By: _____     By: _____

Printed Name:  Vincent J. Bianco    Printed Name:  Matt Troup

Title:  President         Title:  CEO

**Advanced Medical Reviews**

| Form **W-9**<br>(Rev. December 2014)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**Advanced Medical Reviews Inc.**

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☒ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ►

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ►

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

5 Address (number, street, and apt. or suite no.)

**PO Box 492345**

Requester's name and address (optional)

6 City, state, and ZIP code

**Redding, CA 96049**

7 List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

5 9 – 3 7 9 1 5 9 8

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

| Sign<br>Here | Signature of<br>U.S. person ► | Date ► 6/16/16 |

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at www.irs.gov/fw9.

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See What is FATCA reporting? on page 2 for further information.

5/25/2016

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

2950 31st St., Ste 100 Santa Monica, CA 90405   Phone (310) 575-0900   Fax (310) 470-4717   www.admere.com