```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                       WESTERN DIVISION

 3     * * * * * * * * * * * * * * * * * * *

 4     GARRY STEWART, M.D.

 5


 6

 7     VERSUS                        NO. 4:17-CV-00338-BSM

 8


 9
       ADVANCED MEDICAL REVIEWS, INC.;
10     EXAMWORKS, INC.; J.D. HAINES, M.D.;
       GARY GRAMM, D.O.; DAVID CHEN, M.D.; and
11     ANNA BELMAN, M.D.

12              * * * * * * * * * * * * * * * * * * *

13                         DEPOSITION OF

14                   HOWARD "GIL" JOHNSON, III

15                         April 11, 2018

16              * * * * * * * * * * * * * * * * * * *

17                    Taken At The Office Of:

18
                      Duke Copeland Court Reporters
19                    111 Hudson Lane, Suite A
                      Monroe, Louisiana 71201
20
                * * * * * * * * * * * * * * * * * * *
21
                         Reported By:
22
                              CHRISTINE LARUE REITZELL-BOLES
23                            CERTIFIED COURT REPORTER
                              CERTIFICATE NO. 2016018
24                            PARISH OF OUACHITA
                              STATE OF LOUISIANA
25
```

EXHIBIT C

```
 1    APPEARANCES:
 2
 3                         FOR GARRY STEWART, M.D.:
 4                              PULLIAM & MUSKHELI, PLLC
                                2209 Cantrell Road
 5                              Little Rock, Louisiana 72202
                                appearing herein by and through
 6                              Ms. Janet Pulliam
 7
 8
                           FOR ADVANCED MEDICAL REVIEWS, INC.;
 9                         EXAMWORKS, INC.; J.D. HAINES, M.D.;
                           GARY GRAMM, D.O.; DAVID CHEN, M.D.; and
10                         ANNA BELMAN, M.D.:
11    VIA TELEPHONE:       WRIGHT, LINDSEY & JENNINGS, LLP
                           200 West Capitol Avenue
12                         Suite 2300
                           Little Rock, Louisiana 72201-3699
13                         appearing herein by and through
                           Mr. David C. Jung
14
15
      ALSO PRESENT:        Bob Kidd, Videographer
16                         Garry Stewart, M.D.
17
18
19
20
21
22
23
24
25
```

```
 1                          STIPULATIONS
 2         It is stipulated and agreed between counsel that this
 3    deposition of HOWARD "GIL" JOHNSON, III, is taken pursuant to
 4    Notice by counsel for the defendants, and may be used for all
 5    purposes permitted by the Louisiana Code of Civil Procedure.
 6    All objections, except as to the form of the question and the
 7    responsiveness of the answer, are reserved until such time as
 8    the deposition is offered and introduced into evidence.
 9                 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10         The witness, HOWARD "GIL" JOHNSON, III, was advised of
11    his right to read and sign this deposition, and he elected to
12    exercise that right.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1         HOWARD "GIL" JOHNSON, III, being first duly sworn,
 2    testified as follows:
 3                    VIDEOGRAPHER:  You may begin, Counselor.
 4                    MR. JUNG:  Sir, would you please state your
 5               full name?
 6                    WITNESS:  Howard Gilford Johnson the third.
 7                    MR. JUNG:  Mr. Johnson, my name is David Jung.
 8               We met just a few seconds ago before your
 9               deposition began.  First of all, I appreciate
10               you appearing for the deposition today, and
11               thank you in advance for your patience.  I've
12               tried to do telephone depositions in the past,
13               and they can get frustrating sometimes due to
14               technical issues.  If at any point in time the
15               call drops off or you can't hear me, would you
16               just please identify for the court reporter,
17               or for myself too, that you're having trouble
18               understanding what I'm saying or hearing me.
19                    WITNESS:  I will.
20                    MR. JUNG:  You're doing a good job of
21               answering verbally.  Obviously I can't see any
22               type of head nod or head shake, so please
23               continue to answer with yes', no's, or
24               whatever words you choose to as opposed to
25               even uh-huh's (yes') or uh-uh's (no's).  Is
```

1   would like to get your agreement that you plan to offer no
2   expert testimony at trial.  Is that correct?
3        A    Expert testimony regarding what?
4        Q    So, good point.  Thank you for asking the
5   clarification question.  First, you plan to offer no expert
6   testimony regarding the standard of care applicable to
7   Dr. Stewart.  Is that correct?
8        A    Yeah.  I'm not a doctor.  I-- I wouldn't really be
9   able to offer anything more than a--a father's vantage point
10  or view of what transpired.
11       Q    Mr. Johnson, I understand that you work in the
12  finance industry.  Is that true?
13       A    It is.
14       Q    So, one of the other experts that plaintiff has
15  disclosed in this matter is somebody that, I would say, a
16  little bit closer to your world of what you do on a day-to-
17  day basis, just want to confirm from that angle that you have
18  not been asked nor do you plan to give any expert testimony
19  regarding financial issues applicable to Dr. Stewart.  Is
20  that fair?
21       A    Sure.  Yeah.  I wouldn't have any information about
22  that anyway.
23       Q    Yes, sir.  Are you represented by Ms. Pulliam?
24       A    No.  Ms. Pulliam has stated that she would give me
25  advice if I asked for it though.

```
 1         A    No.
 2         Q    Dr. David Chen?
 3         A    I--  The name sounds familiar, but I know some
 4   Chens.  So, I--I--I would answer that question no.
 5         Q    Dr. Anna Belman?
 6         A    No.
 7         Q    Dr. Gary Gramm?
 8         A    No.
 9         Q    Okay.  Thank you for indulging my request.
10         A    Sure.
11         Q    I'm going to switch gears, Mr. Johnson, and ask you
12   some specific questions about your daughter's
13   hospitalization, and specifically focus on her last hour of
14   life.  And again, I sincerely apologize that I have to go
15   through these questions.  I understand that they might be
16   difficult questions.  And if you ever need a break during
17   these questions, please feel free to jump in and tell me so.
18   Okay?
19         A    I--  I appreciate that.  I'm a big boy.  We can--
20   We can move forward.  Thank you, though, for your
21   consideration.
22         Q    Yes, sir.  So, as I understand it your daughter,
23   ███, passed away on May the 18th of 2016.  Is that true?
24         A    Yes.
25         Q    Were you present at her bedside when the decision
```

```
 1  was made to allow her to pass away?
 2       A    Yes.
 3       Q    And did you remain at her bedside until she passed
 4  away?
 5       A    Yes.
 6       Q    During that time, or even in the moments after, did
 7  you ever--this is going to sound weird--but did you ever
 8  assist any of the medical personnel in typing information
 9  into the hospital medical records?
10       A    Typing it into the records?  No.
11       Q    Yes, sir.
12       A    No.
13       Q    Did you observe anyone typing in information into
14  your daughter's medical records?
15       A    I think that there was one occasion when I walked
16  to the nurse's station, and Dr. Lee was entering data onto
17  the medical records after he had seen her.  And I think there
18  was an--an occasion the Monday before her death when
19  Dr. Stewart had come into the room and had examined her, and
20  he too was going back to the desk, and I went by to ask a
21  question.  But as far as watching them type in information,
22  or reading anything that they had done, no.
23       Q    And focusing again on the time frame of roughly the
24  last hour of ▇▇▇▇'s life, I assume the same holds true that
25  you didn't observe anybody typing anything into the chart
```

```
 1    during that time?
 2        A    No.  I stayed by her--
 3        Q    Would you--
 4        A    --bed the--
 5        Q    --have any--
 6        A    --entire time.
 7        Q    I'm sorry?
 8        A    I stayed by her bed the--kneeling by her bedside
 9    holding her hand the entire time after the respirator was
10    removed and she was dying.
11        Q    Yes, sir.  And again, these are not the kind of
12    questions I would ask you in a normal conversation, and even
13    in this context it might seem unusual to you, but--
14        A    I understand.  Go ahead.
15        Q    --there is a purpose to me asking these questions.
16    So--  I lost my train of thought.  Bear with me one minute.
17    Mr. Johnson, do you have any personal knowledge of the
18    medications that were administered to your daughter during
19    that roughly one-hour time frame from the point she was
20    extubated until she passed?
21        A    Yes.
22        Q    And where did that knowledge come from?
23        A    The medical records.
24        Q    Okay.  Outside of reviewing the medical records, do
25    you have any independent memory of the different medications
```

```
 1  that were given to your daughter during that time?
 2       A    No.  I mean, Dr. Stewart had told us that we signed
 3  what's referred to as a comfort care authorization form, and
 4  he had told the family, myself included, all of this.  That
 5  there would be g- --she would be given medications.  My
 6  concerns were would she have any pain, would she be
 7  suffering, and he assured us that she would not.  That th- --
 8  they would be giving her medication that would render her
 9  unaware of, you know, what was happening, and any suffering
10  that she might be going through, she wouldn't--she wouldn't
11  know anything of it.  She wouldn't know anything about it.
12       Q    So is it fair for me to understand that outside of
13  reviewing the medical record, you would have no personal
14  knowledge of the number of medication administrations that
15  ███ received or the types of medication she received or the
16  dosages that she received during that roughly one-hour time
17  frame?
18       A    With the exception of observing the number of
19  injections that were given by the nurse during that time
20  period, we--we--he never discussed with us any of the
21  specifics of the medications that would be given--or be used,
22  dosages, or anything like that.  We only saw that she
23  received several injections in that final hour.
24       Q    Okay. And when you're saying the word "Several,"
25  is that just your best estimate based on trying to think back
```

```
 1   roughly two years ago to that time frame?
 2        A    Well, that and--and the fact that I've had the
 3   medical records reviewed.  You know, we--we did--  You know,
 4   we did note the fact, or I did note the fact that she was
 5   given several injections during that period of time, but I
 6   mean, I didn't sit there and count them while I was holding
 7   my hand--my daughter's hand watching her die.  No.  I just
 8   know that he was giving medication.
 9        Q    I don't think anyone would expect you to either,
10   and that goes back to my comment about some of my questions
11   will seem unusual to you.
12        A    I understand. Go ahead. Don't--  Don't feel like
13   you have to apologize to me at--at all.  I understand that
14   we've got a very important matter going on.  I understand a
15   man's life is--and--and his career is at stake.  I understand
16   that there are the questions surrounding his care, and the
17   possibility that he might have mismanaged or done something
18   to have hurt my daughter. I understand that.  And--  And--
19   So you don't have to apologize about anything.
20        Q    Sure.  Mr. Johnson, I'm going to give you a few
21   more names of people that you may or may not know, and my
22   guess is you probably will not know them.  And I'd like to
23   just figure out whether you know them or not.  Okay?
24        A    Okay.
25        Q    So, Morgan Sauer is one of plaintiff's--that's
```

**Duke Copeland Court Reporters**
P.O. Box 4177, Monroe, LA 71211   Tel. 318-387-2889  Fax 318-387-3271         **28**

```
 1      A    No, he wasn't.
 2      Q    Okay.  But Dr. Stewart was?
 3      A    Yes, sir.
 4      Q    Okay.
 5                MR. JUNG:  That's all I have for you, sir.
 6           Thank you.
 7                WITNESS:  Okay.
 8                COURT REPORTER:  Read and sign?
 9                MS. PULLIAM:  I'm done.
10                COURT REPORTER:  Read and sign or waive?
11                MS. PULLIAM:  He's going to read and sign.
12                COURT REPORTER:  Yes, ma'am.
13                MS. PULLIAM:  I asked him.
14                COURT REPORTER:  Oh, you did?  I'm sorry.
15
...
25                                    DEPOSITION CONCLUDED.
```

```
1    STATE OF LOUISIANA
     PARISH OF OUACHITA
2
          I, CHRISTINE LARUE REITZELL-BOLES, Certified Court
3
     Reporter in and for the State of Louisiana, as the officer
4
     before whom this testimony was taken, do hereby certify that
5
     HOWARD "GIL" JOHNSON, III, after having been duly sworn by me
6
     upon authority of R.S. 37:2554, did testify as set forth in
7
     the foregoing deposition, pages 1 through 39, at The Office
8
     of Duke Copeland Court Reporters, 111 Hudson Lane, Suite A,
9
     Monroe, Louisiana 71201, on the 11th day of April, 2018,
10
     commencing at 12:59 p.m. and concluding at 1:52 p.m.; that
     this testimony was reported by me in the stenomask reporting
11
     method, was prepared and transcribed under my personal
12
     direction and supervision, and is a true and correct
13
     transcript to the best of my ability and understanding; that
14
     the transcript has been prepared in compliance with the
     transcript format guidelines required by statute or by rules
15
     of the board, that I have acted in compliance with the
16
     prohibition on contractual relationships as defined by
17
     Louisiana Code of Civil Procedure Article 1434, and in rules
     and advisory opinions of the board; that I am not related to
18
     counsel or to the parties herein nor am I otherwise
19
     interested in the outcome of this matter.
20
          This certification is valid only for a transcript
21
     accompanied by my original signature and original seal on
22   this page.
          Monroe, Louisiana, this 29th day of April, 2018.
23

24
                              _____
25
                              CHRISTINE LARUE REITZELL-BOLES, CCR
```

**DUKE COPELAND COURT REPORTERS**

P. O. Box 4177, Monroe, LA 71211    Tel. 318-387-2889  Fax 318-387-3271    **40**