IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GARRY STEWART, M.D.                                                                    PLAINTIFF

v.                                    CASE NO. 4:17-CV-00338-BSM

ADVANCED MEDICAL REVIEWS, INC.; J.D.
HAINES, M.D.; GARY GRAMM, D.O.; DAVID
CHEN, M.D.; ANNA BELMAN, M.D.; and
JENNIFER CROWLEY, R.N.                                                             DEFENDANTS

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION
IN LIMINE REGARDING IRRELEVANT WITNESSES**

## I.      Introduction

Defendants move to preclude plaintiff from calling certain witnesses at the trial of this case because their testimony is irrelevant. Plaintiff Garry Stewart, M.D., alleges defendants defamed him and intentionally interfered with his business expectancy by conspiring with Conway Regional Medical Center ("CRMC") and other non-parties. Defendants deny plaintiff's allegations and further allege that they are entitled to immunity under the federal Health Care Quality Improvement Act.

Defendants' roles in this case all relate to third-party medical quality of care reviews. Defendant Advanced Medical Reviews, Inc. ("AMR") is a California company that contracted with CRMC to provide medical reviews of plaintiff's care of 14 different patients. Defendant physicians are all independent contractors of AMR who reviewed some of the 14 cases. Defendant Crowley is a registered nurse who

1857120-v1

was employed by AMR at all times relevant to this lawsuit. Her role in this case is limited to sending defendant physicians emails about some of their reviews.

The information electronically uploaded by CRMC to AMR's web portal regarding all 14 reviews is not in dispute. The information includes:

- Patients' medical records from CRMC;
- Memoranda authored by CRMC's risk manager, Tonya Gierke;
- Screenshots of excerpts from patients' electronic medical records from CRMC; and
- For some cases, Pyxis data (data from medication-dispensing equipment).

Plaintiff's allegations of defamation and intentional interference with business expectancy relate to quality of care reports for 7 of the 14 cases. Arkansas's substantive law applies to this diversity action. Based on the essential elements of plaintiff's claims, the anticipated testimony of plaintiff's witnesses identified below has zero probative value. Thus, their testimony should be excluded as irrelevant.

## II.  Argument

### A.  Irrelevant testimony is inadmissible.

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

Plaintiff bears the burden of proving the following essential elements to sustain a claim of defamation under Arkansas law:

First, that he sustained damages;

2

> Second, that defendants published a false statement of fact concerning plaintiff;
>
> Third, that the statement of fact was defamatory;
>
> Fourth, that defendants acted with negligence in failing to determine the truth of the statement prior to its publication or with knowledge the statement was false; and
>
> Fifth, that the publication of the statement was a proximate cause of plaintiff's damages.

*See* Arkansas Model Jury Instructions – Civil 409 (2018 ed.). To prove his claim of intentional interference with business expectancy, plaintiff bears the burden of proving the following essential elements:

> First, that he sustained damages;
>
> Second, that plaintiff had a business expectancy;
>
> Third, that defendants had knowledge of the business expectancy;
>
> Fourth, that by intentional and improper interference defendants induced or caused a disruption or termination of the business expectancy; and
>
> Fifth, that the disruption or termination was a proximate cause of plaintiff's damages.

*See* Arkansas Model Jury Instructions – Civil 403 (2018 ed.). Thus, the facts of consequence in this case relate to these essential elements that plaintiff must prove. If the proposed evidence does not tend to prove or disprove these essential elements, the evidence is inadmissible. *See* Fed. R. Evid. 401, 402.

**B.    Howard "Gil" Johnson, III**

Mr. Johnson is the father of patient A.J. Patient A.J. was the patient whose death triggered the summary suspension of Dr. Stewart. Plaintiff disclosed Mr. Johnson as a witness and indicated that he would be "expected to testify regarding

3

his daughter's physical and mental conditions, Dr. Stewart's care of A.J., and the circumstances surrounding A.J.'s death." *See* Ex. A.

Mr. Johnson's testimony in this case is irrelevant because it does not tend to prove or disprove any fact of consequence. Defendant Dr. Gramm is the reviewer who authored the report relating to Dr. Stewart's care of patient A.J. Based on his review of patient A.J.'s chart, Dr. Gramm was critical of Dr. Stewart's medical management of patient A.J. at or around the time of her extubation. Specifically, Dr. Gramm wrote that Dr. Stewart's dosing frequency of Versed and Dilaudid was excessive. *See* Ex. B, p. GG-AJ.002048 (highlighted portion). He also wrote that Lopressor was not indicated, and that there were no progress notes authored prior to death. *Id.* Finally, Dr. Gramm wrote that "[t]he amount and frequency of Versed and Dilaudid had the potential to hasten the patient's death." *Id.*

Mr. Johnson's testimony has no bearing on Dr. Gramm's review of records. At the time of the review, Dr. Gramm had no knowledge of Mr. Johnson's memory of events, nor is there any claim here that the standard of care for a reviewer is to speak with or interview family members present at the time of the patient's death. Mr. Johnson is not a medical expert. He has no recollection of what drugs were administered at any particular time, let alone the dosages of those drugs for each administration. Mr. Johnson's lack of knowledge regarding all these points was established at his deposition in this case:

> Q. . . . First, you plan to offer no expert testimony regarding the standard of care applicable to Dr. Stewart. Is that correct?

A.     Yeah. I'm not a doctor. I – I wouldn't really be able to offer anything more than a—a father's vantage point or view of what transpired.

* * *

Q.     Yes, sir. So, as I understand it your daughter, [REDACTED], passed away on May the 18th of 2016. Is that true?

A.     Yes.

Q.     Where you present at her bedside when the decision was made to allow her to pass away?

A.     Yes.

Q.     And did you remain at her bedside until she passed away?

A.     Yes.

Q.     During that time, or even in the moments after, did you ever—this is going to sound weird—but did you ever assist any of the medical personnel in typing information into the hospital medical records?

A.     Typing it into the records? No.

Q.     Yes, sir.

A.     No.

* * *

Q.     And focusing again on the time frame of roughly the last hour of [REDACTED]'s life, I assume the same holds true that you didn't observe anybody typing anything into the chart during that time?

A.     No. I stayed by her—

Q.     Would you—

A.     --bed the—

Q.     have any—

A.     --entire time.

Q.     I'm sorry?

5

A.   I stayed by her bed the—kneeling by her bedside holding her hand the entire time after the respirator was removed and she was dying.

\* \* \*

Q.   Mr. Johnson, do you have any personal knowledge of the medications that were administered to your daughter during that roughly one-hour time frame from the point she was extubated until she passed?

A.   Yes.

Q.   And where did that knowledge come from?

A.   The medical records.

Q.   Okay. Outside of reviewing medical records, do you have any independent memory of the different medications that were given to your daughter during that time?

A.   No. I mean, Dr. Stewart had told us that we signed what's referred to as a comfort care authorization form, and he had told the family, myself included, all of this. That there would be g- --she would be given medications. My concerns were would she have any pain, would she be suffering, and he assured us that she would not. That th---they would be giving her medications that would render her unaware of, you know, what was happening, and any suffering that she might be going through, she wouldn't—she wouldn't know anything of it. She wouldn't know anything of it.

Q.   So is it fair for me to understand that outside of reviewing the medical record, you would have no personal knowledge of the number of medication administrations that [REDACTED] received or the types of medication she received or the dosages that she received during that roughly one-hour time frame?

A.   With the exception of observing the number of injections that were given by the nurse during that time period, we—we—he never discussed with us any of the specifics of the medications that would be given—or be used, dosages, or anything like that. We only saw that she received several injections in that final hour.

Q.   Okay. And when you're saying the word "Several," is that just your best estimate based on trying to think back roughly two years ago to that time frame?

6

> A.   Well, that and—and the fact that I've had the medical records reviewed. You know, we—we did—You know, we did note the fact, or I did note the fact that she was given several injections during that period of time, but I mean, I didn't sit there and count them while I was holding my hand—my daughter's hand watching her die. No. I just know that he was giving medication.

See Ex. C, pp. 8:5–10; 24:22–25:12, 25:23–26:10; 26:17–28:8. Because Mr. Johnson has no recollection of these events, he has nothing to offer that would tend to make a fact of consequence more or less likely. Additionally, it is unequivocal that Dr. Gramm did not rely on Mr. Johnson's recollection, nor was Dr. Gramm expected to do so in arriving at his opinion on whether Dr. Stewart's care was appropriate. Therefore, Mr. Johnson's testimony is irrelevant, and he should be precluded from testifying at trial.

**C.   James Johnston**

Mr. Johnston is the father of patient S.J. Patient S.J. was one of the 14 patients whose records from CRMC were sent to AMR for review. Plaintiff disclosed Mr. Johnston as a witness and indicated that he would be "expected to testify regarding his daughter's physical and mental conditions, Dr. Stewart's care of S.J., and the circumstances surrounding S.J.'s death." See Ex. A.

Just was the case with Mr. Johnson, Mr. Johnston's testimony in this case is irrelevant because it does not tend to prove or disprove any fact of consequence. Defendant Dr. Belman is the reviewer who authored the report relating to Dr. Stewart's care of patient S.J. Based on her review of patient S.J.'s chart, Dr. Belman was critical of Dr. Stewart's medical management of patient S.J. at or around the time of her extubation. Specifically, Dr. Belman wrote that Dr. Stewart

7

ordered "very large doses of pain medication as well as sedative without proper documentation. . . . The medical care provided was not medically appropriate nor conducted in accordance with the current best standard of care." *See* Ex. D, p. AB-SJ.000229 (highlighted portion). She also wrote that "[i]ncreased IV Dilaudid with the addition of IV Versed (midazolam) in a short period of time would hasten expiration, such as in this case." *Id.*

Mr. Johnston's testimony has no bearing on Dr. Belman's review of records. At the time of the review, Dr. Belman had no knowledge of Mr. Johnson's memory of events, nor is there any claim here that the standard of care for a reviewer is to speak with or interview family members present at the time of the patient's death. Mr. Johnston is not a medical expert. He has no recollection of what drugs were administered at any particular time, let alone the dosages of those drugs for each administration. Mr. Johnston's lack of knowledge regarding all these points was established at his deposition in this case:

> Q. Did either Mr. Muskheli or Dr. Stewart tell you anything about this lawsuit?
>
> A. None other than I think what I had said earlier; that, you know, they were trying to get his license.
>
> Q. What was the purpose of your meeting with them?
>
> A. I guess they wanted to know what – what I knew or what I felt or what I thought, I assume.
>
> Q. And what did you tell them?
>
> A. I don't believe Dr. Stewart – well, let me put it this way for me and my children, my other five – four children. We stood around her, the bed she was in. She was unconscious. She –

Q. And "her" is your daughter, [REDACTED]; right?

A. [REDCATED].

Q. Okay.

A. She knew nothing that was going on. And Dr. Stewart had come out and talked to us and gave us the option of leaving her on life support or taking her off. And my recollection, recollection is that he told us that she might live five minutes or she might live 30.

Well, in a conversation with my children, we decided the best thing to do was to go ahead and take her off of life support. We – we gave Dr. Stewart that answer, to take her off life support. And he did and she was gone in five minutes.

\* \* \*

Q. Do you have any sort of medical background?

A. Do I –

Q. Do you –

A. Something was wrong with me?

Q. No, no. In the medical field?

A. Oh, no. No, not at all.

Q. So you've never had a job in the medical field in any capacity; is that right?

A. I have not.

\* \* \*

Q. Do you intend to give an opinion as though you were an expert in either the medical field or an expert in the financial field in this lawsuit?

A. No.

\* \* \*

Q. Are you going to testify about any of the medical care that was taking place around the time of your daughter's death?

9

A. Well, from a medical standpoint, I don't know what it was. But I know that – I know that she was given medications, and I know that she was hooked up to the – you know, life support and that sort of thing. But that's really all I know.

Q. And how do you know that? Was that just your personal observation? You knew she was hooked up to –

A. Yeah, observation. I saw it.

Q. Do you know any specifics about what those medications were?

A. No.

Q. Do you know who was administering those medications?

A. Not by name. Nurses.

Q. Do you know what doctor was ordering or doctors were ordering those medications?

A. I assume Dr. Stewart did. I don't know that, but I assume he did.

Q. Did you keep any records of what was going on at the hospital during that time?

A. No.

Q. You didn't jot anything on a napkin or a piece of paper or anything like that?

A. No.

Q. And, again, you're not commenting on – you're not testifying to any of the medical treatment given to your daughter by Dr. Stewart or any other physician at Conway Regional; right?

A. No.

Q. And you stated earlier that you have not seen your daughter's medical chart from Conway Regional Medical Center; is that correct?

A. I have not.

Q. So you can't state whether the information in her medical chart is correct or incorrect?

A.     I would not know.

* * *

Q.     Do you know anything about the relative success of Dr. Stewart's medical practice?

A.     I've not heard of anything negative.

Q.     Okay. And that's you haven't heard anything negative about his medical practice?

A.     Right.

* * *

Q.     Have you ever heard anyone talk about Dr. Stewart in a negative way?

A.     No.

Q.     None? Nobody whatsoever?

A.     No.

Q.     No one's ever made a negative comment about Dr. Stewart as a person to you?

A.     Not to me.

Q.     Did you hear anyone in the community express an opinion about what happened to your daughter at the hospital?

A.     No.

Q.     Have you heard anyone say that Dr. Stewart killed your daughter?

A.     He told me that. He told me that your company or the doctors said that. That's all I've ever heard.

Q.     Have you ever heard that from anyone besides Dr. Stewart or his lawyer?

A.     No.

Q.     No one in the community has represented that to you?

11

> A. No.
>
> Q. Have you ever heard anyone say that Dr. Stewart euthanized your daughter?
>
> A. No.

*See* Ex. E, pp. 19:5–20:4, 25:10–18, 25:25–26:3, 29:10–30:22, 31:21–32:1, 32:13–33:10. Because Mr. Johnston has no recollection of these events, he has nothing to offer that would tend to make a fact of consequence more or less likely. Therefore, his testimony is irrelevant, and he should be precluded from testifying at trial.

**D.   Laura Gullett**

Plaintiff disclosed Ms. Gullett as a witness "expected to testify regarding events that took place in August or September of 2013, involving Tonya Gierke making threats toward her and Dr. Stewart." *See* Ex. A. All the allegations in this case relate to events that occurred in May and June, 2016. Plaintiff does not contend that Ms. Gullett interacted in any way with defendants. Rather, plaintiff's sole basis for disclosing Ms. Gullett relates to some event occurring approximately three years before the events underlying this lawsuit. Accordingly, Ms. Gullett's testimony would not be probative of any fact of consequence in this case, and she should be precluded from testifying.

**E.   Heather Harvey**

Plaintiff disclosed Ms. Harvey as a witness "expected to testify regarding A.J.'s physical and mental conditions, medical care she received, and circumstances surrounding her death." *See* Ex. A. Plaintiff did not disclose Ms. Harvey as an expert witness. Ms. Harvey appears to have information about patient A.J.'s

12

condition at the Conway Human Development Center as opposed to patient A.J.'s care during the relevant admission at CRMC. *See id.* But even if Ms. Harvey had information about patient A.J.'s condition at CRMC during the relevant admission, her testimony has no bearing on the review that defendant Dr. Gramm performed in this case. As noted in section II.B., Dr. Gramm's review was based solely on the information provided to him through the AMR web portal. That information was uploaded to the web portal by CRMC, and it consisted of patient A.J.'s medical records and additional clinical information. Therefore, anything Ms. Harvey may have to say about patient A.J. is irrelevant to Dr. Gramm's review, and she should be precluded from testifying at trial.

**F.     Dr. Jeremy Thompson**

Dr. Thompson is a psychiatrist who is on staff at the Conway Human Development Center. *See* Ex. F. Plaintiff did not disclose Dr. Thompson as an expert witness. *See* Doc. No. 120, p. 2 ("As Defendants well know, Plaintiff does not intend to offer Dr. Thompson as an expert witness, nor to elicit any expert testimony regarding Dr. Stewart's care, or AMR's reviews thereof."). Rather, plaintiff indicated that Dr. Thompson was "expected to testify about his treatment of CHDC patients, and specific challenges that this patient population presents, including responsiveness to medications." *See* Ex. F.

These representations alone are sufficient to show how Dr. Thompson has nothing to say that will make a fact of consequence more or less probable. But to

13

remove any iota of doubt, a simple review of Dr. Thompson's deposition testimony sheds light on this issue:

> Q. Okay. And this is what's called a subpoena duces tecum which means basically documents to be produced.
>
> A. Right.
>
> Q. And any and all materials you reviewed to form your opinions regarding this case.
>
> A. Right.
>
> Q. Did you bring any documents or materials with you?
>
> A. No, but I did review the complaint and that's all I've reviewed. It is in my bag, I believe, in the car.
>
> \* \* \*
>
> Q. Anything else you reviewed to prepare for this deposition today?
>
> A. No.
>
> Q. Just the complaint –
>
> A. Correct.
>
> Q. -- in this lawsuit?
>
> A. Correct.
>
> \* \* \*
>
> Q. I think the answer to this is no based upon your earlier testimony, but correct me if I'm wrong. Have you reviewed the medical records of the seven patients at issue in this case?
>
> A. No.
>
> Q. And you testified a moment ago that it's important for you to review all information available to you before performing an opinion; is that correct?
>
> A. Correct.

Q. But you haven't reviewed any of the medical records in this case; correct?

A. Correct.

* * *

Q. Okay. So you think you may know some of these people; is that right?

A. Their names sound familiar to me, and to say that I think I know them, I'd have to see their chart and see if I saw them.

Q. And in what capacity would that name be familiar and in what capacity would you potentially know them?

A. Well, the only way I would know them would be in the clinic at Conway – at the Conway Human Development Center and in a psychiatric unit.

Q. So do you think you may have treated any of these people?

A. If I know them, I would – I – yeah, very possible.

Q. But as we sit here today, you are not certain enough to say that you treated any of these patients or didn't treat any of these patients?

A. That's true. That is true.

Q. So in other words, you can't tell me that you a hundred percent treated any of those seven people that we just mentioned?

A. Not without seeing their charts, no, or having somebody else with some reliable record of their appointments and, you know, who they saw. There's probably other things outside of their chart. Somebody in administration probably keeps a track of who goes to what.

Q. But you have no independent recollection of any of those seven?

A. Not just off the top of my head about being – about the treatment of any of these individuals as far as – no.

* * *

Q. And when was it that you started at Conway Human Development Center?

15

> A. July 1st of – two years ago from this July 1st, so –
>
> MR. CULLEN: '16.
>
> A. Yeah.
>
> **Q. July 1, 2016 is when you began working at Conway Human Development Center?**
>
> **A. July 1, yes.**
>
> *   *   *
>
> Q. My question really is just do you plan to testify about patients that you don't know and that you have never treated?
>
> A. No. I wouldn't – I would not – I would not talk about a specific patient that I have never treated. However, I would be comfortable talking about a disease process or that type of thing that I – if someone were to ask me about intellectual disabilities or if they were to ask me about what do I do or that kind of thing, I'd be fine to talk about that, but I would not opine about a specific patient that I had never – you know, start talking – you know, making detailed statements about a specific patient that I've not treated, but I would – I would be fine to just tell them about me and – or the work – or the work that I try to do with these folks and –
>
> Q. Do you know – I think the answer is no based on your prior testimony – what medications any of those seven patients were taking on a daily basis prior to their admission to Conway Regional?
>
> A. I don't. I don't.

*See* Ex. G, pp. 16:11–23, 17:9–15, 28:14–25, 38:5–39:11, 39:23–7, 44:7–45:2

(emphasis added). It is impossible for Dr. Thompson to offering any testimony that would make a fact of consequence more or less probable in this case because he did not even begin to work that the Conway Human Development Center until after <u>every</u> CHDC patient whose care was reviewed by defendants had died. Thus, Dr. Thompson should be precluded from testifying in this case.

1857120-v1

## III. Conclusion

Based on the foregoing, plaintiff should be precluded from calling Mr. Gil Johnson, Mr. James Johnston, Ms. Laura Gullett, Ms. Heather Harvey, and Dr. Jeremy Thompson at the trial of this case.

        WRIGHT, LINDSEY & JENNINGS LLP
        200 West Capitol Avenue, Suite 2300
        Little Rock, Arkansas 72201-3699
        (501) 371-0808
        FAX: (501) 376-9442
        E-MAIL: elowther@wlj.com; djung@wlj.com

        By   David C. Jung
           Edwin L. Lowther, Jr. (81107)
           David C. Jung (2013141)
           Jessica Pruitt Koehler (2015226)
           *Attorneys for defendants*