IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GARRY STEWART, M.D.,

                Plaintiff,

     v.                              No. 4:17CV00338 BSM

ADVANCED MEDICAL REVIEWS,
INC.; EXAMWORKS, INC.; J.D.
HAINES, M.D.; GARY GRAMM,          June 10, 2019
D.O.; DAVID CHEN, M.D.; ANNA       Little Rock, Arkansas
BELMAN, M.D.; and JENNIFER
CROWLEY, R.N.,

                Defendants.

**EXCERPTED TRANSCRIPT OF BENCH TRIAL**
**(Testimony of Terence Champlin, M.D.)**
BEFORE THE HONORABLE BRIAN S. MILLER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Plaintiff:

     MS. JANET L. PULLIAM, Attorney at Law
     MR. MICHAEL MUSKHELI, Attorney at Law
        Pulliam & Muskheli, PLLC
        2209 Cantrell Road
        Little Rock, Arkansas   72202

     MR. TIMOTHY JAMES CULLEN, Attorney at Law
        Cullen & Co., PLLC
        Post Office Box 3255
        Little Rock, Arkansas   72203-3255

     MR. JOHN G. JACOBS, Attorney at Law
        Jacobs Kolton, Chartered
        55 West Monroe Street, Suite 2970
        Chicago, Illinois   60603

     MR. BRYAN G. KOLTON, Attorney at Law
        Jacobs Kolton, Chartered
        150 North Michigan Avenue, Suite 2800
        Chicago, Illinois   60601              CONTINUED:

Kathleen E. Maloney, RPR, FCRR, CSR
United States Court Reporter

APPEARANCES CONTINUED:

On Behalf of the Defendants:

    MR. EDWIN L. LOWTHER, JR., Attorney at Law
    MR. DAVID CHAN JUNG, Attorney at Law
    MS. JESSICA PRUITT KOEHLER, Attorney at Law
      Wright, Lindsey & Jennings
      200 West Capitol Avenue, Suite 2300
      Little Rock, Arkansas  72201-3699

    Proceedings reported by machine stenography and displayed in realtime; transcript prepared utilizing computer-aided transcription.

Kathleen E. Maloney, RPR, FCRR, CSR
United States Court Reporter

[Testimony of Terence Champlin, M.D., excerpted from bench trial proceedings held June 10, 2019, as follows:]

* * * * *

TERENCE CHAMPLIN, M.D., DEFENDANT'S WITNESS, DULY SWORN

THE COURT:  All right, Doctor.  Have a seat on the witness stand.

DIRECT EXAMINATION

BY MR. CULLEN:

Q.   Good afternoon, Dr. Champlin.

Would you introduce yourself real briefly to the Court and the court reporter?

A.   I'm Terence Champlin, M.D.

Q.   Okay.  You're a pediatrician in Conway?

A.   Yes.

Q.   In 2016 were you the chairman of the Conway Regional Medical Center Credentials Committee?

A.   Yes.

Q.   And are you still the chairman of the credentials committee?

A.   No.

Q.   Okay.  Are you on the credentials committee?

A.   No.

Q.   Okay.  You know why we are here today.  We are talking about Dr. Garry Stewart and some actions the credentials committee took in 2016.  You're familiar with that, right?

A.   Yes.

Q.   Did you read your deposition in preparation for today?

A.   Yes.

Q.   Okay.  Good.

Just so we've got a timeline, Dr. Champlin, do you recall that it was about May 18th when -- of 2016 when Dr. Stewart was suspended emergently?

A.   Yes.

Q.   Okay.  And what were the circumstances of that suspension?

A.   It was related to medications that were given during palliative care for patient AJ.

Q.   Okay.  Was the credentials committee involved in that May 18th suspension?

A.   No.

Q.   Was that an administrative suspension?

A.   Yes.

Q.   Okay.  And then was the credentials committee obligated to follow up on that within a few days to investigate?

A.   Yes.

Q.   Okay.  And what did the credentials committee do to investigate that administrative suspension?

A.   We met the following week to review information that was provided by administration and then by Dr. Stewart.

Q.   Okay.  Was that --

MR. CULLEN:  Let's pull up Plaintiff's Exhibit 189,

Stacey, please.  Rotate it.  Here we go.  Okay.

BY MR. CULLEN:

Q.    Dr. Champlin, can you see the document on your monitor in front of you that's been marked as Plaintiff's Exhibit 189?

A.    Yes.

Q.    Okay.  Is that the May 25th, 2016, minutes of the credentials committee meeting?

A.    It appears to be, yes.

Q.    Okay.  And does that summarize the actions the credentials committee had taken up to that point in time related to Dr. Stewart's suspension?

A.    There are three pages?

Q.    Sure.  Let's page down to the next page for you.

A.    Next page please.  Thank you.

      That looks correct, yes.

Q.    Okay.  And you've taken a moment to read that carefully.

      Does that anywhere mention an internal peer-review report by Dr. Whaley?

A.    No.

      MR. CULLEN:  Okay.  Please scroll back to page 1.

BY MR. CULLEN:

Q.    And you agree this meeting took place May 25th, 2016?

A.    To the best of my knowledge, yes.

      MR. CULLEN:  Okay.  Now, Stacey, if you will pull up Exhibit 144.  Okay.

BY MR. CULLEN:

Q.    Are you familiar with this document, Dr. Champlin?

A.    I'm familiar with this type of document, but I haven't seen this one.

        MR. CULLEN:  Okay.  If you would scroll to the third page please, Stacey.

BY MR. CULLEN:

Q.    I'll give you a second to read that, Dr. Champlin, since you've not seen it before.

A.    I've completed it.

Q.    Have you had a chance to read that?

A.    Yes.

Q.    Okay.  Do you see that that's dated May 24th, 2016?

A.    Yes.

Q.    Is that the day prior to the credentials committee meeting about Dr. Stewart's suspension?

A.    Yes.

Q.    Okay.  Was this internal peer-review report from Dr. Whaley shared with you or the credentials committee meeting -- at their meeting on May 25th?

A.    No.

Q.    Was it shared with you prior to the May 25th meeting?

A.    No.

Q.    Was it shared with you after the May 25th meeting?

A.    Yes.

Q.   Okay.  At what point in time did you learn about this document?

A.   I'm not exactly sure.  I don't recall.

Q.   Okay.  At the beginning of this -- looking at this document, you said you were familiar with this type of document, right?

A.   Yes.

Q.   Is that first page sort of the standard score sheet for internal peer-review reports?

A.   We use something very similar to this in an online form.

Q.   Okay.  And what is the significance of a score of 2 right there in the middle of the page?

A.   It says, "Morbidity difficult to avoid regardless of care."

Q.   Okay.  Is there more significance to a score of 2 that you can elaborate on?

A.   No.

        MR. CULLEN:  Okay.  Pull up Exhibit 16 please.  35.  The page numbers are at the bottom.  Yeah.  Page down a little bit.  12.3D.  Yes.

BY MR. CULLEN:

Q.   Okay.  Dr. Champlin, this is some kind of policies and procedures or something.  What's it labeled?

     "Medical Staff Rules and Regulations for Conway Regional."

     Are you familiar with this document generally?

A.   I haven't read the entire document.

Q.    Have or have not?

A.    Have not.

Q.    Okay.  Do you agree that this provides for rules, regulations, procedures for conducting peer review?

A.    Yes.

Q.    Okay.  Would you just read for me letter D, 12.3D?

A.    "If a physician performance score is assigned a 1 or 2, the form will be sent directly to the quality resources department and put in the reviewed physician's quality file.  If the score is 3, 4, or 5, the form will be forwarded to the reviewed physician for response without identification of the reviewer."

Q.    Okay.  And didn't we just establish that Dr. Whaley's peer-review report assigned a score of 2?

A.    Yes.

Q.    According to this document, what should be done with a report with a score of 2?

A.    Sent directly to the quality resources department and put in the reviewed physician's quality file.

Q.    Is that the end of the peer review at that point?

A.    I'm not sure.

Q.    Just goes in the file, right?

A.    I'm not sure.

Q.    Okay.  You don't think that's stated right there in Part D?
      Doesn't even require a response from the physician if it's a 1 or 2, right?

A.    That's correct.

Q.    Okay.  So had the credentials committee known on May 25th that you had already had an internal peer review and it was scored at 2, shouldn't that have been the end of the matter?

A.    I'm certain we would have wanted to review that reviewer's notes.

Q.    Regardless of the score of 2?

A.    We would have made sure we were following proper procedure as well.

Q.    Including this section right here that says a score of 1 or 2 goes in the file?  Those procedures, right?

A.    Those and any others that might apply to the case.

Q.    Sure.  But won't you agree with me that that's pretty important information for the credentials committee to have when they are investigating Dr. Stewart, is the fact that there has already been an internal peer-review report?

A.    That would be one important piece of information for us.

Q.    But you did not have that information, correct?

A.    That's correct.

Q.    Okay.  In fact, was the first time you ever saw Dr. Whaley's report -- was that in your deposition?

A.    I believe it was in preparation for the deposition.

Q.    Okay.  Years after these events?

A.    I don't remember the time frame.

        MR. CULLEN:  Okay.  All right.  Okay.  Let's go to

Exhibit 183, Plaintiff's 183.

BY MR. CULLEN:

Q.   Do you recognize this document, Dr. Champlin?

A.   It looks like everything I have, or most of it, is blacked out.

Q.   Um-hum.

MR. CULLEN:  Okay.  Slow down, Stacey.

BY MR. CULLEN:

Q.   Can you read that?

A.   Which part would you like for me to read?

Q.   Okay.  "New business, department of primary care."  Do you agree that it says, "Action," and this was June 2nd; is that right?

A.   1st.

Q.   June 1, credentials committee.  You're the chairman. "Action:  The committee recommends Dr. Garry Stewart's reappointment be deferred pending outcome of internal review." Is that what that says?

A.   Yes.

Q.   Is that a fair record of the committee's actions?

A.   I don't remember.

Q.   Do you have any reason to doubt your own committee's minutes?

A.   No.

Q.   Okay.  So on June 2nd, the credentials committee deferred

Dr. Stewart's reappointment pending outcome of internal review.

Didn't we just establish that Dr. Whaley did an internal review on May 25th?

A.   Yes.

Q.   Okay.  Again, if the credentials committee had known about that, they might have taken some different action there, right?

A.   I'm unable to say.

Q.   Well, you wouldn't be deferring anything pending internal review if you knew you already had an internal review?  Fair?

A.   We might possibly have still deferred.

Q.   Okay.  But it wouldn't be based on pending internal review, right?

A.   That is inferred there.

Q.   Okay.  So, again, that would have been valuable information for you and for the credentials committee to have in that internal review report when you were considering Dr. Stewart's reappointment?

A.   Yes.

Q.   Okay.  Okay.  Turning to the AMR reports, you know there are a bunch of reports from AMR from physician reviewers on Dr. Stewart's cases, right?

A.   Yes.

Q.   Okay.  And do you know there are the first final reports for several reviews that were issued in late May, early June, and then a couple weeks later, their second, subsequent final

reports?

A.    Yes.

Q.    Do you know what I'm talking about?

A.    Yes.

Q.    And it's confusing because both of them say "Final Report," right?

A.    I don't remember the headings.

Q.    Okay.  We can show those to you.

      Did the credentials committee hire AMR to do this external peer review?

A.    We didn't hire them directly.

Q.    Okay.  Did you, as the chairman of the committee, hire them?

A.    No.

Q.    Okay.  Is that the credentials committee's role, to select external reviewers?

A.    I don't think so.

      MR. CULLEN:  Okay.  Stacey, if you'll give me Exhibit 241.  We're going to scroll to 1309.

BY MR. CULLEN:

Q.    Are you familiar with the Arkansas Peer Review Fairness Act?

      I'll get you to the relevant section here.  1309.

      MR. CULLEN:  Keep going.

      THE WITNESS:  I've probably heard it referenced.

MR. CULLEN:  Yeah, a little bit higher up.  Okay.  All right.

BY MR. CULLEN:

Q.   I'm going to direct your attention to paragraph C.  Have you read paragraph C?

A.   Yes.

Q.   Do you agree that that says that a professional review body that decides to use an external review is responsible for selecting the external reviewers?

A.   Yes.

Q.   Okay.  In this case, in May and June of 2016, was the credentials committee a professional review body?

A.   No.

Q.   No, you were not?

A.   Not from the stand -- perhaps I misunderstood the question. I'm thinking of external review.

Q.   Um-hum.  Professional review body --

A.   Professional review body, yes.

Q.   -- commissions an external review.

A.   Yes.

Q.   Are you with me?

A.   Yes.

Q.   Does that statute say it's the responsibility of the professional review body to select the reviewers?

A.   Yes.

Q.    Okay.  And in this case the credentials committee, in fact, did not select the reviewers?

A.    Not directly.

Q.    Okay.  And it also says, "the method of selecting cases for review."  Did the credentials committee determine the method of selecting cases for review?

A.    Yes.

Q.    Okay.  And what was that method?

A.    We wanted to review cases that were similar to AJ's that involved end-of-life care.

Q.    Okay.  And was there a time window on that?

A.    We arbitrarily said 90 days.

Q.    Okay.  But then, in fact, you got reviews from cases that were much older than 90 days, right?

A.    Yes.

Q.    Okay.  And you were aware of Dr. Stewart's unique patient population of residents of CHDC like AJ, right?

A.    Yes.

Q.    Okay.  Are you aware that, in prior peer reviews, CHDC cases were specifically excluded because they are such a different patient group?

A.    I was aware --

          MR. JUNG:  Can I object to the leading?

          THE COURT:  He asked him was he aware of that.  I'll overrule the objection.  He can ask the question.

BY MR. CULLEN:

Q.   What was your answer?

A.   I was aware of one other incident.

Q.   When CHDC patients were excluded from the review?

A.   Yes.

Q.   Okay.  Why didn't the same logic apply this time?

A.   I don't recall having any reason to exclude anybody from it, any of his patients.

Q.   Sure.  (C)(1)(B), kind of right there in the bottom third of the page, says that the review body can also seek the input of the physician under review in selecting reviewers.

     Did that happen here?

A.   I'm unaware if Dr. Stewart was asked.

Q.   Did the credentials committee ask Dr. Stewart for input on who the external reviewers would be?

A.   I did not as a member.  As chairman, I did not ask him.

Q.   Okay.  All right.  And then below that, it says the physician under review, Dr. Stewart in this case, shall be included on any substantive communications with the external reviewers.

     Do you agree with that?

A.   Yes.

Q.   Okay.  Did you have any direct communication with the AMR reviewers?

A.   No.

Q.   Did any member of your committee have any direct communication with AMR reviewers?

A.   Not that I'm aware of.

Q.   Okay.  But you're aware that Ms. Gierke did have communication with the reviewers?

A.   Yes.

Q.   Both written in the form of a memo, right?

A.   I believe so.

Q.   Okay.  And there's testimony that she had a phone conversation with at least one of the reviewers.  Are you familiar with that?

A.   I have heard that, yes.

Q.   Okay.  And would you consider those substantive communications with the external reviewers that Dr. Stewart should have been included on?

        MR. JUNG:  Your Honor, I'm going to object.  I think this is a legal conclusion.  I think he's asking Dr. Champlin to comment on the statute and what substantive communications means under the statute.

        THE COURT:  What's your response to that because I think that falls in the area of argument, but what's your response?

        MR. CULLEN:  Sure.  I'm just trying to establish, Your Honor, that the credentials committee had this authority and this responsibility and that Dr. Stewart was, in fact, not

included in those communications.

THE COURT:  Okay.  I'll sustain the objection as to whether you're asking him what the law requires.

MR. CULLEN:  Sure.

THE COURT:  Going down the statute and getting him to admit or deny whether they did what the statute required or whether they complied with it, I'll let you do that.

MR. CULLEN:  Thank you, Your Honor.

BY MR. CULLEN:

Q.   So, Dr. Champlin, to your knowledge, was Dr. Stewart included in any substantive communications with the external reviewers?

A.   I'm not aware if he was included on any communications with the external reviewers.

Q.   Okay.  Okay.  You've already told me that the credentials committee did not select AMR, right?

A.   That's correct.

Q.   Did the credentials committee have any input on particular reviewers in AMR that they wanted to send cases to?

A.   No.

Q.   Okay.  So any of those requests would have come from who?

A.   Administration.

Q.   Okay.  Who in administration was dealing with AMR?

A.   I know Ms. Gierke was.  I'm not sure who else.

Q.   Was there any discussion in the credentials committee about

getting an autopsy for AJ?

A.   I don't remember any discussion.

Q.   Okay.  Is an autopsy typically a valuable piece of evidence in a death investigation?

A.   It can be.

Q.   Okay.  So you gave me some parameters of cases that the credentials committee wanted to review including death cases, you said, like AJ within 90 days, right?

A.   Yes.

Q.   Then did you, as a committee, or you, as a chairman -- did you review charts to decide if those would be appropriate for review?

A.   We set the parameters involving end-of-life care.

Q.   I'm just trying to make sure I understand your answer.

     You didn't actually look at those charges and make any determinations before sending them to AMR; is that right?

A.   No.  That's correct.

Q.   You relied on someone else to do that?

A.   Yes.

Q.   And who was that?

A.   It was through hospital administration.

Q.   Ms. Gierke?

A.   I'm not sure if she was the only one involved or not.

Q.   Okay.  And, likewise, did the committee, credentials committee, or you, as the chairman, give some parameters to

Ms. Gierke or to administration on what qualifications you wanted these reviewers to have?

A.   We did want people who were -- reviewers who were -- had expertise in end-of-life care, palliative care.

Q.   You did want that?

A.   We wanted people who could review beyond what our own credentials committee staff could review.

Q.   Okay.  And are you satisfied that you got that?

A.   I'm not aware of their specific credentials.

Q.   Okay.  Are you aware of Dr. Whaley's credentials?

A.   No.

Q.   Okay.

A.   I believe she's a hospitalist.

Q.   Okay.  And have you reviewed any of the résumés of the individual reviewers?

A.   No.

Q.   Okay.  And have you read their depositions?

A.   No.

Q.   Okay.  So you -- would you be surprised to learn that none of them have any relevant palliative care experience?

          MR. LOWTHER:  Your Honor, I object.  Misstates testimony.  There's been no testimony from the reviewers about their experience, and the Court will hear that the reviewers will talk about their palliative experience.

          THE COURT:  I'll overrule that.  I'll let him answer

the question, and you can clear that up on cross-examination.

And that will be an issue for argument later.

BY MR. CULLEN:

Q.   I think my question was:  Would you be surprised to learn that none of the reviewers had any relevant palliative care experience?

A.   I'm not sure what you mean by "relevant."

Q.   You wanted the reviewers to have professional experience like Dr. Stewart had in terminal extubations, end-of-life care, palliative care, right?

A.   Yes.

Q.   Okay.  And so you -- surely, you would be surprised if you learned that they didn't?

A.   Somewhat.

Q.   Okay.  Just to be clear, did you request Dr. Whaley's internal peer-review report?

A.   No.

Q.   Okay.  And were you involved in any way in obtaining Dr. Whaley's report?

A.   No.

Q.   Okay.  Were you involved -- as chairman of the credentials committee, were you involved in a May 31st, 2016, GoToMeeting with AMR?

A.   I'm not familiar with the term "GoToMeeting."

Q.   Some kind of video chat, Skype kind of thing?

A.    With AMR?

Q.    Yes.

A.    No.

Q.    Okay.  And did you draft or author or even edit that memo that Tonya Gierke sent to the AMR reviewers?

A.    I'm not sure which memo you're referring to.

Q.    Okay.  We'll get to that.

In considering Dr. Stewart's care and treatment of patient AJ, did the credentials committee consider the rule of double effect?

A.    Yes.

Q.    Okay.  And what is -- what was the discussion about about that?

A.    We still wanted external peer review.

Q.    Okay.  But you're familiar with the rule of double effect?

A.    Yes.

Q.    Okay.  Did you get any input from administration about any consultations that anyone had had about the rule of double effect?

A.    I'm not sure what consultations you're referencing.

Q.    Okay.  Let's pull up Exhibit 77.  This is Plaintiff's Exhibit 77.

MR. JUNG:  Your Honor, I object.  This is not in evidence.  It's hearsay.

THE COURT:  What's the response to this?  I don't

think he's on these e-mails.

MR. CULLEN:  He's not a party to this e-mail, Your Honor, but it is -- I believe he will testify that it contains information that was obtained by the hospital that would have been relevant to the credentials committee's decision and, again, they didn't get this information; it was buried just like the Whaley report.

THE COURT:  Okay.  And so you're offering it to show that this is information he did not receive?

MR. CULLEN:  Yes, Your Honor.

THE COURT:  What's your response because I think we did go over this with Ms. Gierke or we were in the process?

MR. JUNG:  This one has not been shown before.  This is an e-mail that begins with an e-mail from Steve Hillis, who's the insurance carrier for the hospital, to Ms. Gierke.  This has never been discussed at all.

If it's not being admitted for the truth of the matter asserted, then it's not relevant, Judge.

THE COURT:  I haven't seen this e-mail.

What essentially --

MR. CULLEN:  It talks about the rule of double effect and how it may apply here.  It's an ethical principle involving administration of medications.

MR. JUNG:  Plaintiff's expert, Dr. Quill, is going to be talking about double effect.  Defendant's experts are going

to be talking about double effect.  There are people that are going to be talking about it, but it's improper for proof to come in the way plaintiffs are attempting to now.

THE COURT:  I don't think he's attempting to get the document in.

I think what -- his response is that he wants to ask this witness about it to see if this was information that the doctors should have had at the time they were making decisions.  I think that's the point of it.

MR. CULLEN:  Yes, Your Honor.

THE COURT:  Now, the substance of the document, if he goes over this with the witness, then, of course, I hear the substance of the document.

MR. JUNG:  May I add, Judge, the witness has already said that he's familiar with the principle of double effect.  So I don't understand the point of it at this time.

THE COURT:  And he did say that.  So --

MR. CULLEN:  I'm trying to establish just what he said, Your Honor, is that this was information in the possession of the hospital that they didn't share with the credentials committee.

THE COURT:  Okay.  I'll overrule the objection as to you asking him questions about it.  Of course, I'm not going to receive the document.

MR. CULLEN:  Sure.

THE COURT:  Okay.

MR. CULLEN:  Sure.

BY MR. CULLEN:

Q.    Have you had a chance to read that while we have been talking about it?

A.    No.

Can I have the second page please?

I have read it.

Q.    My question is simple, Dr. Champlin.  Would that have been helpful information for the credentials committee to consider in their review of these cases?

A.    It would have been one piece of information we would have considered.

Q.    But, in fact, you were not given that information?

A.    I don't remember seeing this information.

Q.    Okay.  Thank you.

Can you agree -- well, you tell me.

Why was the review of patient AJ reopened?

A.    The initial review did not include the medication dosages -- the medications and dosages and the interval of those dosages for the end-of-life care.  And, therefore, it was incomplete.

Q.    So you expected the reviewers to itemize all the medications that the patient was given?

A.    We were specifically interested in the medications

involving the palliative care at the end of life.

Q.    Uh-hum.  Which are opioids and benzodiazepines, right?

A.    Yes, and a blood pressure medication.

          MR. CULLEN:  All right.  Let's pull up Exhibit 223.

BY MR. CULLEN:

Q.    So is it your testimony that the first report from AMR on patient AJ did not address those palliative care end-of-life medications?

A.    That's correct.

Q.    Okay.  Do you recognize this as that first report?

A.    Yes.

Q.    Okay.  And can you agree with me that it's dated -- date completed, May 30th, 2016?

A.    Yes.

Q.    Okay.  Do you know when you first saw this report?

A.    I don't remember.

Q.    Okay.  Did the credentials committee get this report?

A.    I don't remember.

Q.    Okay.  Do you remember when we were -- strike that.

      Do you recall anywhere in the minutes of the credentials committee where it talks about the fact that there were a series of positive reports and then they were reopened and sent back and got a handful of negative reports back?

A.    Yes.

Q.    What are the circumstances that the committee reviewed the

positive reports and the negative reports? How did that happen?

A. I'm not sure I understand the question.

Q. Did you simultaneously look at both reports and try to decide which one was right?

A. I don't remember seeing the initial report.

Q. Okay. The positive report, positive for Dr. Stewart?

A. The positive, yes.

Q. You don't recall seeing that?

A. The best I remember, we saw the reports with the addendums.

Q. Okay. So is that another piece of information that administration chose not to share with the credentials committee, the positive reports?

A. If we heard about them, we would have heard they were incomplete reports.

Q. Incomplete because they didn't address the end-of-life care medications, right?

A. Yes.

        MR. CULLEN: Okay. Scroll down to page 2. This one.
BY MR. CULLEN:

Q. Will you read the second paragraph there on page 2 out loud?

A. The one that starts on 5-18?

Q. Yes, sir.

A. On 5-18-2016, after consulting -- consulting with the family, it was decided to extubate the patient and provide

end-of-life care -- end-of-life comfort care in terms of oxygen, sedation, and opioids.  The patient subsequently expired on that date at 9:00 a.m.

Q.   Okay.  And is this the report that you said didn't adequately address the end-of-life medications?

A.   I don't believe this report includes the external reviewer's information.

Q.   Tell me --

A.   Regarding the end-of-life medications.

Q.   I didn't understand that statement.

A.   Can I ask you to repeat the question?

Q.   Sure.  Doesn't this sentence that you just read address end-of-life medications in the form of sedation and opioids?

A.   In general terms.

Q.   Okay.  And it says it was proper?

A.   Where does it say it was proper?

Q.   I'm skipping down to the sentence that begins, "Therefore."

A.   Okay.  Yes, that sentence in the initial review says --

Q.   Um-hum.

A.   -- it was medically appropriate.

     MR. CULLEN:  Okay.  Scroll down a little bit, Stacey.  Okay.  In fact, are each of those -- all four of those paragraphs, numbered paragraphs, they are favorable to Dr. Stewart's care, aren't they?

A.   Yes.

THE COURT:  What's this exhibit again?

MR. CULLEN:  Pardon me?

THE COURT:  What exhibit is this again?

MR. CULLEN:  This is Exhibit 223, Plaintiff's, and this is the first final peer-review report on Patient AJ.

BY MR. CULLEN:

Q.   So what about that report doesn't address every possible concern that the credentials committee had?

A.   We were told that this did not include our specific question and did not address our specific question of the amounts of the dosages and the time internal in which they were given.

Q.   Okay.  And who told you that?

A.   We were told that by administration.

Q.   Who in administration told you that?

A.   Probably Ms. Gierke.

Q.   Okay.  But you agree that it specifically mentions those end-of-life opioids and sedatives?

MR. CULLEN:  Scroll up a little bit for him.

THE WITNESS:  That paragraph I read says that.

BY MR. CULLEN:

Q.   Yes.  And you agree that it says that all the medical care provided was medically appropriate and conducted in accordance with current best standard of care?

A.   Yes.

Q.   Okay.  And that the patient's respiratory failure -- a complication of death was not unexpected considering significant underlying pulmonary disease and prevention was not possible?

A.   Yes.

Q.   Okay.  And you agree that there's a finding the complication or adverse outcome was not due to deviation from standard of care?

A.   Yes.

Q.   Okay.  All right.  Would you read the sentence numbered paragraph 4.1?

A.   "Did the type, amount, and frequency of medications given within the 24 hours prior to the time of death hasten and/or cause the patient's demise?"

     Answer is "No."

Q.   Isn't that the very specific, precise question that you wanted answered?

A.   That's the question we were asking.

Q.   And isn't it answered right there?

A.   It is answered.

Q.   Definitively, "No"?

A.   It is answered "No."  And we were aware that they did not have those dosages and amounts of medications to comment on accurately.

Q.   How were you aware that they did not have those doses of medications?

A.   We were told by administration that that portion of the medical record was not -- had to be retransmitted to them because they did not get those with their -- for their review information.

Q.   So are you telling me that Conway Regional sent out these cases for peer review and didn't include the full medical record?

A.   I understand that that portion on the medications was not transmitted, and I'm not aware of what happened there.

Q.   Did you ever review what was sent to AMR initially?

A.   Did I personally?

Q.   Yes.

A.   No.

Q.   Okay.  So you're taking someone else's word for it?

A.   We requested the medical record to be sent.

Q.   Okay.  But you requested the medical record to be sent in the first place, didn't you?

A.   Correct.

Q.   Okay.  And do you know what was subsequently re-sent?

A.   The medications, the end-of-life-care medications.

Q.   Okay.

A.   And their dosages and dosage intervals.

Q.   But wasn't that already in the chart that AMR had?

A.   We were told it was not in the initial copy that they received.

Q.   Okay.  And doesn't that first paragraph that you read --
doesn't that suggest that there was information in the chart on
the first review about sedation and opioid medications?

A.   Yes.

Q.   Okay.  So that contradicts what you were told?

A.   Their statement is general, generalized, and does not
specifically address what we were looking at.

Q.   So at any point were you ever aware that there were 12 AMR
reports that were all positive, favorable to Dr. Stewart?

A.   I saw some that were favorable, yes.

Q.   12?

A.   I don't remember the number.

Q.   Okay.  Did you ever see a report from a Dr. Hassain?

A.   I don't remember that report or that name.

Q.   Okay.

         MR. CULLEN:  Can I have just a moment, Your Honor?

         THE COURT:  Yes.

BY MR. CULLEN:

Q.   Dr. Champlin, I have got one more question.  I'm afraid
it's a rambling one, though.

     As credentials committee chairman and as a medical doctor
yourself, does it give you pause or concern that a review
company could write a whole series of reports presumably based
on the medical record that were completely favorable to
Dr. Stewart and then a month later turn around and basically

have the opposite conclusions in another series of reports? Does that bother you?

A.   Not under the circumstances, knowing that they were not receiving some of the information.

Q.   Okay.  So you're sticking with the fact that you think they didn't have a complete medical chart?

A.   That's what I was told.  That's what the committee was told.

Q.   If you learned that, in fact, the complete medical chart was sent to AMR in the first instance, that takes away the basis for what you just said, right?  Would you have a different conclusion?

A.   I'm unable to speculate on that.

          MR. CULLEN:  Fair enough.

     Pass the witness.

                    CROSS-EXAMINATION

BY MR. JUNG:

Q.   Dr. Champlin, let's pick up right where Mr. Cullen left off.

     If you learned later on that the reviewers who looked at the chart didn't really understand what they were looking for or what they were looking at, would you want to make sure that those reviewers actually understood what they were looking for before they answered the question?

A.   Yes.

Q.   We met, I think it was last year sometime, at your deposition at Conway Regional, correct?

A.   Yes.

Q.   We haven't spoken since that time?

A.   That's correct.

Q.   I want to go back and backtrack.  I'm going to try not to replow any ground, Dr. Champlin.

You testified that you were a pediatrician.

Can you give the judge an overview of how long you have been in practice?

A.   Since 1992 in general pediatrics.

Q.   Where were you trained?

A.   At the University of Arkansas for Medical Sciences for my M.D. degree, and then I was trained at Arkansas Children's Hospital for my pediatric training.

Q.   After you completed your pediatric residency, I take it that's when you entered private practice; is that correct?

A.   Yes.

Q.   And where did you set up shop?

A.   I was at Texarkana, Texas, for nine years, then Boliver, Missouri, for three years, and I have been in Conway, Arkansas, since 2004.

Q.   When did you come on staff at Conway Regional?

A.   2004.

Q.   We got into some discussion about the credentials

committee.

You were the chair of the committee when Dr. Stewart was summarily suspended.

Can you tell the judge what the role of the credentials committee is in general?

A.    We do peer review.  We also -- the majority of our work is to review applicant or reapplication charts for physicians and other health professionals to be sure they reach Conway Regional's criteria for staff membership.

Q.    Sir, as chair of the credentials committee, what additional responsibilities might you have that the regular members of the committee don't have?

A.    There were occasions, when it was a locum tenens physician who would need rather urgent temporary privileges, I would be asked to review and sign on that, approving it until they could make it to the next committee meeting.

Q.    When did your term on the credentials committee end?

A.    At the end of 2016.

Q.    When that term ended at the end of 2016, how many years had you served on the credentials committee?

A.    At least six.

Q.    Were all of those six years spent as chair?

A.    No.  The last two only.

Q.    I want to focus on the credentials committee's role regarding summary suspensions in general.  And I'm showing you

page 43 of Defendant's 29.  I want to focus on Sections 6.3.1.

Can you read that, sir?

A.   Out loud?

Q.   No, no.  Can you see it?

A.   Yes.

Q.   Okay.  So as I understand it, under this section of the hospital policies and procedures, the medical staff policies and procedures, the summary suspension, and the first line we can see is something that can be done by the credentials committee, the board, and the MEC; is that correct?

A.   Yes.

Q.   What's the MEC?

A.   The medical executive committee.

Q.   So if you read further down in this paragraph, I'm going to go down to the authority of the credentials committee.  Let's see if I can highlight that for you.

Do you see where I'm highlighting, sir?

A.   Yes.

Q.   Okay.  So the paragraph I have highlighted, or the text from it, can you describe who the authority of the credentials committee is delegated to in certain instances for summary suspensions?

A.   It says to any one of the following individuals: the chief of staff, the chairman of any department, and the CEO.

Q.   If any of these individuals end up deciding to summarily

suspend a medical staff member, does the committee have --

credentials committee have any responsibility to follow up on

that summary suspension?

A.   Yes.

Q.   In fact, we see that in the bottom of this paragraph; is

that correct?

A.   Yes.

Q.   Do you recall who the chief of staff was in May of 2016 at

Conway Regional?

A.   Dr. France.

Q.   Who was the chief of medicine, the division chief?

A.   Dr. Hardin.

Q.   And who was the CEO at the time?

A.   Mr. Trout.

Q.   So under the hospital's rules and regulations -- the

medical staff rules and regulations, if Dr. France, Mr. Troup,

and Dr. Hardin were the ones to collectively decide to summarily

suspend Dr. Stewart on May the 18th, that would have been in

accordance with these rules and regs; is that correct?

A.   Yes.

Q.   I'm going to stay with Defendant's 29 and draw your

attention to page 44.  And here we have a section that's titled,

"Investigation."

     Do you see that, sir?

A.   Yes.

Q.    Now, I believe you were talking about this investigation with Mr. Cullen through some of his questioning; is that correct?

A.    Yes.

Q.    So generally how does the credentials committee go about investigating an event like a summary suspension?

A.    We hear from the involved parties, and we request information as we deem necessary.

Q.    When you say all the parties, does that include the physician or medical staff member that is the subject of the suspension?

A.    Yes.

Q.    Who else will present facts to the committee other than the physician who has been suspended?

A.    In this case, it was Dr. Hardin, Dr. France, Mr. Troup, as well as other members of hospital administration.

Q.    Is the credentials committee required to vote on what type of action to take when it is following up on a summary suspension?

A.    Yes.

Q.    And in this case, when the committee met on May the 25th of 2018, was there a vote to take some type of action?

A.    Yes.

Q.    And what was that?

A.    We upheld the suspension pending further investigation.

Q.   I'm going to switch gears, sir, and talk about your relationship, professional relationship, with Dr. Stewart.

How much do you or did you interact with Dr. Stewart as of May of 2016?

A.   Very little.

Q.   Do you have similar practices?

A.   No.  Our patient populations do not overlap, that I'm aware.  He may see some pediatric patients, but we have never worked together on any pediatric patients.

Q.   Sir, do you have any conflicts with Dr. Stewart?

A.   No.

Q.   Have you ever had any conflicts with Dr. Stewart?

A.   No.

Q.   To your knowledge, has any Conway Regional Medical Center administrator ever suggested that the hospital had a conflict with Dr. Stewart?

A.   No.

Q.   Has any other physician suggested that the hospital had a conflict with Dr. Stewart?

A.   No.

Q.   Are you aware of any reputation that Dr. Stewart has at the hospital?

A.   I'm not aware.

Q.   Outside of any peer-review investigations in this lawsuit, are you aware of Dr. Stewart having any disputes at all with the

hospital?

A.   We had a previous encounter as the credentials committee, I believe, in 2013, and I don't remember the nature of that encounter.

Q.   Other than that one encounter and your role on the credentials committee, have you heard of any dispute at all that the hospital had with Dr. Stewart?

A.   I have not heard of any dispute with the hospital.

Q.   Do you regularly attend the hospital's medical staff meetings?

A.   Yes.

Q.   And have you done so since you first came on staff?

A.   Yes.

Q.   Do physicians on the medical staff sometimes raise issues or concerns at those meetings about regulations and bylaws of the medical staff?

A.   Yes.

Q.   Is that a common occurrence?

A.   Yes.

Q.   Sometimes physicians don't like what the bylaws are and want to propose changes; is that fair?

A.   Yes.

Q.   If Dr. Stewart testifies that he raised concerns at those meetings, that wouldn't be anything unique to him; is that fair?

A.   Yes.

Q.   Are the other physicians that you are thinking about that have raised issues or concerns about policies and bylaws -- to your knowledge, are those physicians still on staff at the hospital?

A.   Yes.

Q.   Did the fact that Dr. Stewart might have raised concerns at these medical staff meetings have any impact or any bearing on the way that you treated him in your role as the chair of the credentials committee in 2016?

A.   No.

Q.   To be clear, you were not involved on the -- strike that.

You were not involved on May 18th in the summary suspension discussion that Dr. Stewart had with the chief of staff, the chair of medicine, and the CEO?

A.   That's correct.

Q.   When do you recall becoming first involved in that summary suspension?

A.   I was notified of it the next day.

Q.   Who notified you?

A.   I don't remember.  Someone from hospital administration.

Q.   You've seen this excerpt from the credentials committee minutes of May the 25th of 2016.  This is Defense 24, page HR 018, and I think you went through this with Mr. Cullen and said it fairly summarized what you recall about the meeting; is that correct?

A.    Yes.

Q.    So members present at the meeting, in addition to yourself, it looks like there were four other physicians, correct, as far as members?

A.    Yes.

Q.    What kind of doctor is Dr. Gullic, G-u-l-l-i-c?

A.    Dr. Gullic is an OB-GYN.

Q.    What about Dr. Fraley?

A.    ENT, ears, nose, and throat.

Q.    Dr. Smith?

A.    An anesthesiologist.

Q.    And Dr. Balentine?

A.    Hospitalist.

Q.    Did Dr. Stewart attend a portion of the May 25th meeting?

A.    I believe this is the meeting where he spoke with the committee.

Q.    Do you have a memory of that, of him presenting his version of the events with patient AJ at that committee?

A.    Yes.

Q.    Did you place any restrictions as the chair of the committee on a time limitation as far as saying, Dr. Stewart, you have ten minutes and that's it?

A.    I was unaware of any time limitations.

Q.    In fact, Dr. Stewart was given as much as time as he needed to discuss his care of patient AJ; is that correct?

A.    I would assume so, yes.

Q.    Do you recall Dr. Stewart dropping off either at that meeting or perhaps beforehand, maybe at your clinic, a bunch of medical literature as well?

A.    I had received some information from him.  I don't remember the time frame.

Q.    If you received that information from him and if the proof in this case shows that Dr. Stewart submitted medical literature at this May 25th meeting, would there be any reason to dispute that?

A.    I'm sorry.  Can you ask the question again?

Q.    I'll ask a different question.  Sorry.

      If Dr. Stewart dropped off medical literature at this May 25th meeting, is that information that the credentials committee would have considered?

A.    Yes.

Q.    Did the committee discuss the circumstances around patient AJ after Dr. Stewart presented his interview and then was excused from the meeting?

A.    I believe we did.

Q.    Were there any committee members in particular that you were relying on as far as their background?  Perhaps it was more similar to the issues involved in this case.

A.    Yes.  Dr. Smith, the anesthesiologist, and Dr. Balentine, the hospitalist.

Q.   What do you recall Dr. Balentine and Dr. Smith telling the rest of the committee members about the medications given to AJ?

MR. CULLEN:  Objection.  Hearsay.

THE COURT:  What's the response to that?

MR. JUNG:  I'm not asking the witness to testify as to the truth of the matter asserted.  I'm going to follow that up with some questions about what his state of mind is, how he processed that information.

THE COURT:  Are you saying it's a foundation question for other questions?

MR. JUNG:  Yes, Your Honor.

THE COURT:  And what is your response to that?

He's saying he's not asking for the truth of the matter asserted, just laying it as a foundation for the questions he's going to ask.

MR. CULLEN:  That's not the question I heard, Your Honor.  It was directly what did a declarant say who's not here.

THE COURT:  That's what he said.  He says -- the question was:  What do you recall Dr. Belman and Dr. Smith telling the rest of the committee members about the medications given to AJ, and that's --

MR. CULLEN:  That's an out-of-court statement.

THE COURT:  Yeah, that's an out-of-court statement.

The objection is hearsay, and what the response has been

is, yes, it's an out-of-court statement but it's not offered for the truth of the matter asserted; I'm laying a foundation for other questions I am going to ask.

I will -- I don't know how you ask that question that's not offered for the truth of the matter asserted.  But I'll overrule the objection and let you ask the questions to lead to your questions.  We'll see.  And to the extent it calls for hearsay, I can just disregard it.

MR. CULLEN:  Thank you.

BY MR. JUNG:

Q.   What do you recall Dr. Balentine and Dr. Smith telling the rest of the committee specifically about their concerns with the medications given to patient AJ?

A.   They were concerned that they were excessive.

Q.   Excessive in terms of magnitude of dosing or frequency?

A.   Both.

Q.   Do you remember what classes of medications that Drs. Balentine and Smith were discussing?

A.   Yes, the sedative and the opiates.

Q.   So after Dr. Balentine and Smith share their concerns, what did that make you think about what to do in terms of whether there was a continued investigation or what actions the committee should take after that?

A.   We wanted to get further opinion on it and wanted external peer review to address those concerns and questions.

Q.   I want to be absolutely clear, sir.  The summary suspension and the May 25th meeting, was that solely related to Dr. Stewart's care of patient AJ?

A.   Yes.  To the best of my memory, it was.

Q.   It was unrelated at this point to any other patient that Dr. Stewart cared for; is that correct?

A.   Yes.

Q.   At any time during this May 25th, 2016, meeting, did the credentials committee consider modifying the suspension to some lesser sanction?

A.   I believe we discussed the possibility.

Q.   And ultimately it looks like the possibility was not implemented; is that fair?

A.   That's correct.

Q.   And do you know why the committee decided not to modify the sanctions to something lesser?

A.   Their restrictions would have required 24-7 monitoring by another physician of Dr. Stewart's actions in the hospital.

Q.   And that's not feasible?

A.   Not feasible.

Q.   At this point was the committee aware that the duration of Dr. Stewart's suspension could lead to a mandatory report to the National Practitioner Data Bank?

A.   Yes.

Q.   Did the committee decide to act with haste to ensure that a

report would be avoided, if possible?

A.   Yes.

Q.   So what was the purpose of obtaining an external review for cases apart from Dr. Stewart's care of AJ?

A.   AJ's care raised significant concerns, and we felt it was best to see if there was a pattern of similar care delivered to other patients.

Q.   And those concerns were perceived even after Dr. Stewart had a chance to talk to the committee during his interview; is that fair?

A.   Yes.

Q.   Mr. Cullen showed you a part of this peer-review report that's been admitted into evidence.  It's also been admitted as Defendant's Exhibit 75.

     I don't think he showed you the last page.  I could be wrong.

     This, I'll represent to you, Dr. Champlin, is written by Dr. Whaley.  Can you read that, sir?

A.   Yes.

Q.   Let me know when you've had a chance to finish reading through it.

A.   I have read it.

Q.   Sir, if you had been presented with Dr. Whaley's entire peer-review report, including this addendum that she signed, would you have still had those same concerns that the committee

had when Dr. Stewart finished discussing his care of patient AJ?

A.    Yes.

Q.    Focusing on Dr. Whaley's.

A.    These -- her statements -- Dr. Whaley's statements supported the committee's concerns.

Q.    Sir, I don't think you talked about the metoprolol at the bottom of this blowup from Dr. Whaley's report.  And, again, I apologize if you have.

      Did the committee discuss at all Dr. Stewart's use of metoprolol for patient AJ?

A.    Yes.

Q.    What was the committee discussing or considering when that drug was being contemplated?

A.    There was no obvious indication for it.

Q.    What is metoprolol?

A.    It was a medication used to lower blood pressure.

Q.    It's a betablocker?

A.    Yes.

Q.    Lopressor is a type of -- Lopressor is metoprolol, is it not?

A.    I don't remember the brand names.

Q.    Now, in retrospect you've learned that some of the cases selected for external review after this May 25th credentials committee extended beyond the 90-day time frame that you stated was arbitrary; is that correct?

A.    Yes.

Q.    Did that concern you in any way?

A.    No.

Q.    Why not?

A.    The 90-day window was arbitrary, and we were not intending it to be a restricting period of time.

Q.    The proof in this case is that the next time the credentials committee met was June the 1st of 2016.  Is that consistent with your memory?

A.    Yes.

Q.    By my calculation, June the 1st was exactly 16 days after the -- excuse me -- 14 days after the summary suspension.

What did the credentials committee decide to do on June the 1st with the summary suspension?

A.    I believe at that point we decided to go with the fair hearing route.

Q.    Showing you Defense 24, page HR 002, and it's titled, "Report of the Credentials Committee to Dr. James France, Chief of Staff," dated June the 1st, and the "re" line states that it's "Summary Suspension of Dr. Garry Stewart."

Was this the report that you directed, as the chair of the credentials committee, to be sent to Dr. France?

A.    I don't remember if I signed this or not.

Q.    In any event, it is a report of the credentials committee that was delivered to Dr. France or at least by the top of the

report?

A.   Yes.

Q.   The bottom of the blowup, there's a sentence that reads, "This decision" -- excuse me.  "This decision constitutes an adverse action, and Dr. Stewart is being advised of the decision according to the Conway Regional Medical Center Medical Staff Policies and Procedures;" is that correct?

A.   Yes.

Q.   To be absolutely clear, this report and this recommendation to the medical executive committee, to the fair hearing committee, was based solely on Dr. Stewart's care of patient AJ; is that correct?

A.   Yes.

Q.   And this report and the decision was made by the credentials committee without consideration of any AMR report; is that fair?

A.   I don't recall the date we got the reports, but as I recollect, that's correct.

Q.   Dr. Stewart and his counsel have suggested that there were factual inconsistencies in the memoranda prepared by Tonya Gierke and presented to the credentials committee on May the 25th and on June the 1st in this report.

     Did the credentials committee consider any of these potential inconsistencies specifically related to whether a single dose was given or whether this time was accurate or if it

was maybe five minutes too late?

A.   We were notified of a discrepancy from the -- I believe the time that was reported for the initial doses.

Q.   Even with being aware that there might be a discrepancy, did the committee still have those same concerns about the frequency and magnitude of dosing?

A.   Yes.

THE COURT:  Mr. Jung, hold on just one second.

Tell Mr. Gierke for me that she can leave and come back tomorrow at 9:00 o'clock.  There's no need to keep her out there.

MR. JUNG:  May I proceed, Your Honor?

THE COURT:  Yes, sir.  I'm sorry.

BY MR. JUNG:

Q.   Did the credentials committee have any involvement with scheduling Dr. Stewart's fair hearing on that summary suspension?

A.   I believe that goes to the MEC, medical executive committee.  I believe it's their responsibility to schedule that.

Q.   Did the credentials committee have any involvement at all with the suspension of Dr. Stewart based on patient AJ after June the 1st?

A.   I don't think we made any other decisions regarding that case.

Q.   Dr. Champlin, I'm showing you Defense 24, HF3.  This is a memo dated July the 6th of 2016 to the credentials committee. This memo references the AMR peer-review results being included along with the additional information that was sent to the reviewers.

Do you have any recollection of receiving any AMR report prior to this July 6th date referenced in the memo?

A.   I didn't receive any reports outside of committee meetings.

Q.   And if this memo was presented to the committee meeting, that's probably when those reports were transmitted to the committee; is that fair?

A.   If that's what the record reflects, or the minutes, that would be correct.

Q.   Sir, I'm showing you Defense 24, page DSR 1570, and this is a July 8th letter from Matt Troup to Dr. Stewart.

Do you see that?

A.   Yes.

Q.   And Judge Miller has seen this with Mr. Troup this morning, but he references in this letter that the committee invited Dr. Stewart to come discuss his -- excuse me -- Dr. Stewart to discuss his care of the patients who are the subject of those reports, those external reviews; is that correct?

A.   Yes.

Q.   Did that informal interview occur, to your knowledge?

A.   No.

Q.   Do you know why?

A.   No.

Q.   But in any event, the committee has taken no action based on these other reports; is that fair?

A.   That is correct.

Q.   When I started asking you questions today, I was asking you about wanting to ensure that the AMR reviewers actually understood what moment in time of the medical care they needed to focus on, and I think your testimony was that, yes, you wanted to make sure that they understood it before they answered the question; is that fair?

A.   Yes.

Q.   And that's whether or not they had access to the information.  Obviously, if they are not looking at that moment in time, they are not answering the questions the committee wanted them to answer.  Fair?

A.   That's correct.

Q.   As the chairman of the credentials committee, regardless of the conclusions that the external reviewers reached, you would want to be sure that they were interpreting the medical records correctly, correct?

A.   Yes.

Q.   You would want to be sure that the reviewers understood the specific time frame the credentials committee was concerned about?

A.   Yes.

Q.   You would want to be sure that the reviewers understood the medication administration record in the chart?

A.   Yes.

Q.   As the chair of the committee, did you have any concerns about Ms. Gierke requesting that the reviewers look at this information again to confirm they understood the relevant time frame?

A.   No.

Q.   Did you have any concerns about Ms. Gierke requesting that the reviewers look at it again to confirm they understood the medication administration record?

A.   No.

Q.   Did you have any concern about Ms. Gierke including a memorandum and screenshots of the electronic medical record with her request to reopen the cases?

A.   No.

Q.   I think I have just a couple more questions for you, sir. I'm going to ask you about the medical staff rules and regulations that Mr. Cullen asked you about the general procedure for ongoing review.

The question is simple, sir.  Is the credentials committee the same thing as a PI committee, or is the PI committee listed in this regulation a separate committee?

A.   I don't recall the PI listed.

MR. JUNG:  May I approach the witness, Judge?

THE COURT:  You may, and I think we have it back up now.

BY MR. JUNG:

Q.   I'm pointing to the PI committee referenced under Regulation 12.3.

A.   Okay.  Yes.

Q.   The PI committee and the credentials committee are not the same thing; is that correct?

A.   That's correct.

MR. JUNG:  Judge, may I consult with my co-counsel?

THE COURT:  You may.

MR. JUNG:  Pass the witness, Your Honor.

THE COURT:  Okay.  Mr. Cullen, redirect.

REDIRECT EXAMINATION

BY MR. CULLEN:

Q.   Dr. Champlin, do you remember that June 1st report from the credentials committee to Dr. France that we were just looking at?

Do you know what I'm talking about?

A.   That was sent to Dr. France?

Q.   Yes.

A.   Yes.

Q.   Did you write that, or did Tonya Gierke write that?

A.   I did not write it.

Q.   Okay.  So is it fair to say that someone in administration wrote that report?

A.   Yes.

Q.   Okay.  And they would have been aware of the positive AMR reviews, right?

MR. JUNG:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.

BY MR. CULLEN:

Q.   Okay.  Well, administration is the one --

THE COURT:  Hold on just one second.  The objection was that it calls for speculation.  His answer was, "I don't know."

I had not ruled on it because I was going to look back and see what the question was to make sure, but since he said, "I don't know," I'll overrule the objection.  He's answered the question.

THE WITNESS:  Sorry.

THE COURT:  That's okay.

BY MR. CULLEN:

Q.   The point of my question was that administration was the one dealing with AMR and sending them information and getting information from them, correct?

A.   Yes.

Q.   Okay.  And administration apparently was the one that got Dr. Whaley's review since that wasn't done through you or

through the committee?

A.    Yes.

Q.    Okay.  So it would be reasonable for administration to know about those positive reviews even when they wrote this June 1st report?

MR. JUNG:  Judge, objection.  Speculation.

THE COURT:  Let me make sure what the question is again.

MR. JUNG:  He already said he doesn't know, Your Honor.

THE COURT:  Oh, he already answered the question?  It doesn't appear on the realtime.

The question was:  So it would be reasonable for the administration to know about those positive reviews even when they wrote this June 1st report, and then the objection, and he hasn't answered.

MR. JUNG:  That's true, Your Honor.  I'm just pointing out that a couple words might be different but it's the same question that he --

THE COURT:  That he just answered?  I'll sustain the objection.

BY MR. CULLEN:

Q.    I think the first question you were asked on cross-examination was something along the lines of that you were concerned the reviewers didn't understand the medical records.

Is that -- is that what you said or --

A.   As a committee we were concerned they didn't have a complete medical record.

Q.   Okay.  Did any of the reviewers at any point say something is missing; we don't have the MAR out of the medical records?

Are you aware of any communication like that from the reviewers?

A.   No.

Q.   Okay.  Would you expect the reviewers to be able to recognize whether or not they are working with a complete chart?

A.   I don't know how the process works on their end as far as receiving the records.

Q.   Okay.  Did you ever authorize anyone on behalf of the credentials committee to use the term "euthanasia" when discussing these cases with AMR?

A.   I don't recall us using that term.

Q.   Do you agree that would be inflammatory and suggestive if somebody used that term?

A.   I can't say.

Q.   We talked about that in your deposition.  Is that a term that you typically see in a medical record?

A.   No.

MR. CULLEN:  Okay.  Let's look at Exhibit 166, Stacey.

BY MR. CULLEN:

Q.   Didn't you agree that the primary thing for the reviewers

to look at would be the medical chart and the medical records?

A.    Entire medical record, yes.

Q.    The entire medical record.

Here in Exhibit 166, is that something you see in a medical record?

A.    It's headed as a memo.

Q.    Right.

A.    So, no, I don't think we would usually see memos in a medical record.

Q.    Okay.  So you agree that's outside of the medical record?

A.    Yes.

Q.    Okay.  I asked you -- let's see.  This is your deposition. I whittled down those 15 tabs to just 2.

Were you aware that CRMC put a hold on paying AMR's bills?

MR. JUNG:  Judge, I'm going to object.  It certainly goes beyond the scope of cross-examination too.

THE COURT:  Mr. Cullen, how would you respond to the objection to this being beyond the scope of the cross-examination?

MR. CULLEN:  This is like that other question, Judge, where I'm trying to establish that the administration and the committee were not working together and that a lot of things were done that the committee never knew about.

THE COURT:  Response?

MR. JUNG:  Judge, he had a chance to do that when he

first questioned Dr. Champlin.

I didn't ask any questions about payments, anything at all about that.

I asked about Dr. Champlin's interactions as chair of the credentials committee.

THE COURT:  I'll sustain the objection.

MR. CULLEN:  Good enough.

BY MR. CULLEN:

Q.   Do you remember in your deposition, Dr. Champlin, when I asked you, "Has the credentials committee relied on the AMR reports as a basis for Dr. Stewart's continued suspension?"

A.   I don't remember the question.

MR. CULLEN:  Okay.  May I approach the witness and refresh?

THE COURT:  You may.

MR. CULLEN:  This is a March 2nd deposition of Dr. Champlin at page 79, line 7.

BY MR. CULLEN:

Q.   So you remember the question that I just asked?

A.   Yes.

Q.   "Has the credentials committee relied on the AMR reports as a basis for Dr. Stewart's continued suspension?"  And what was your answer?

A.   My answer was, "Yes."

Q.   Okay.  Did you look at the second question while I was --

A.   No.   I'm sorry.

Q.   Sorry.  We'll do this again.  I also asked you, "If all of the outside peer-review reports came back as an A plus, no criticisms of Dr. Stewart's care, would his suspension have been lifted already?"  And what was your response?

A.   "I think possibly."

MR. CULLEN:  Okay.  Thank you.  Pass the witness.

THE COURT:  I have a question.  Did you have something you wanted to follow up on?

MR. JUNG:  May I, Your Honor?  Two quick lines of questioning.

THE COURT:  That were raised in the redirect?

MR. JUNG:  Yes, Your Honor.

THE COURT:  Let me ask this question of Mr. Cullen. And, you know, I don't want to go too far in asking this question, but I want to make sure of something.

Is the theory of the case that the committee, the credentials committee, wasn't necessarily involved in it; it was the administration -- the administrators who kept the committee from receiving certain documents and other things that might have led them to make different decisions?

MR. CULLEN:  That's part of it, Your Honor, yes.

THE COURT:  Because I've been writing down some questions that I might want to ask the doctor, but I want to make sure what the theory is because I don't want to get into my

questions if that's the theory.

If part of the theory is that the credentials committee was in on it, I was going to ask a couple questions, but if that's not the case, I'll --

MR. CULLEN:  It may be, Your Honor.

THE COURT:  Okay.

MR. CULLEN:  Yeah, I'd encourage you to ask your questions.

THE COURT:  Okay.  Let me hear from Mr. Jung.

MR. JUNG:  May I approach the witness?

THE COURT:  You may.

RECROSS EXAMINATION

BY MR. JUNG:

Q.   Dr. Champlin, I want to give you an opportunity to look at the June 1st report of the credentials committee.  I have the whole thing, and this is Defendant's 24, pages HR 002 through 8.

And my question that I'm going to ask you, after you have had a chance to look at it is:  Is there anything in that memo delivered by the credentials committee to Dr. France that you disagree with, whether it's factually or conclusions of the committee?

A.   This appears accurate, to the best of my knowledge.

Q.   Sir, the other thing I wanted to ask you about was following up on Mr. Cullin's line of questioning about your deposition transcript.

The deposition transcript he showed you was from the deposition that I took of you in this case, and that was your second deposition regarding these events.  Fair?

A.   Yes.

Q.   The deposition you gave was on March the 1st of 2018, correct?

A.   Yes.

Q.   So how long was that after the events underlying this lawsuit?

A.   Almost two years.

Q.   At the end of that deposition, you were asked on redirect by Mr. Gabriel Mallard some additional questions on page 80, lines 4 through 11.  You don't have to read it out loud.  I just want to make sure you're given a fair opportunity to see all of your testimony.

A.   4 through?

Q.   It was just at the top of page 8, 4 through line 11.

A.   Yes.

Q.   After seeing your -- the testimony, is it fair that you couldn't remember what the events were that were underlying -- in terms of the timeline, underlying this case when this deposition was taken?

A.   That's fair.

Q.   And after your deposition, at some point, you sent a declaration under penalty of perjury to your lawyer that

specified what the timeline was, correct?

A.    That's correct.

MR. JUNG:  Your Honor, I'll provide a copy to the Court, but I would like the Court to take judicial notice of the declaration that was attached as a -- to the reply, the Defendant's Motion for Summary Judgment on the Issue of HCQIA Immunity.

Pass the witness, Judge.

EXAMINATION

BY THE COURT:

Q.    Doctor, what I want from you more so than what the lawyers asked --

MR. CULLEN:  I apologize for the interruption.  I have like two follow-ups.

THE COURT:  I'll let you do that.

MR. CULLEN:  I didn't know --

THE COURT:  Let you do it, and not only that, I'll let you follow up on what I ask here.  That way, that will give you a fair chance to listen to what my questions are.  And then if you have some questions, same thing, Mr. Jung.

BY THE COURT:

Q.    What I would like to do, more so than what the lawyers are asking you about, is to take us into the setting, not so much into the room when the credentials committee is meeting but to the setting when all of this is taking place.

I have to give you a story before I ask you the question so you understand. I attended -- what is the medical review board that disciplines doctors? What's it called here in Arkansas?

A. I believe it's through the Arkansas State Medical Board.

Q. Arkansas State Medical Board.

I once went to a hearing over there, and the case was presented against a doctor, and it appeared to me that there were certain people on the committee who understood the doctor's position and there were other people on the committee who almost came in and immediately were ready to suspend the doctor and take his license. There were different personalities there.

As far as the circumstance involving Dr. Stewart, what was the setting in the room?

Did you have doctors that all come to the table patient, just wanting to look at the evidence and make a good decision?

Or did you have some doctors who had different points of view from the get-go?

A. We were all concerned as one body, as the physician -- the physician component of the credentials committee. We were in agreement that we should have further investigation.

Q. And why was that?

A. We were recognizing our limited expertise by at least three members of the committee in these matters, and the ones who had more expertise, they were sufficiently concerned that we wanted to investigate further.

Q.   And what expertise was that?

A.   The anesthesiologist and the hospitalist.

Q.   And explain to me exactly what a hospitalist is.  I've heard that phrase used a couple times or term used.

A.   At Conway Regional Medical Center, a hospitalist is usually a family practice doctor or an internal medicine doctor, and they do not have outpatient practices.  They focus solely on caring for patients who are admitted by community physicians and maybe even from around that area.

Q.   And I think some of the people who have been listening to this who are not doctors and are not lawyers in the courtroom, sometimes we have a hard time following some of these terms.

When you speak of palliative care, you are talking about providing relief for high-stress cases or people who are severally ill, right?  Is it always end of life?

A.   To my knowledge, palliative care is always regarding end-of-life situations.

Q.   And it's essentially trying to make a person comfortable?

A.   Yes.

Q.   Okay.  And I think when we talk about the rule of double effect -- I guess we'll get into this at some point with some of the other people -- but that's essentially providing care to a person or providing an option to a person that you also know will hurt them -- although it might help them, it also will probably hurt them and when it's morally right to do that,

right, or something to that effect?

A.   Yes.  I think the morally right is the question.

Q.   Okay.  When is it morally right to provide somebody with a treatment that you also know will hurt them?  It's something like that, right?

A.   Yes, sir.

Q.   Okay.  And in the case of AJ, we had a 31-year-old woman who comes into the hospital who has a bunch of illnesses, and I think at some point she had pneumonia or something, and it was determined that she was probably going to die.  Isn't that the case, if you remember?  And if you don't remember at all, that's okay too because we'll have people come in and talk about it.

A.   At some point it became apparent that she was not going to be able to breathe on her own.

Q.   Okay.  And so there were no issues with that determination.

     The issue came in she was prescribed medication by Dr. Stewart, some opioids -- and I forget all the medications.  They have been listed here.  And then she passed away at some point.

     And so the question then became we know she's going to die, but did the opioids or whatever medication she was given hasten the death and make her die sometime sooner than what she would have died had we not done anything?  Is that the case?

A.   That's close.  We were concerned that the doses and the interval of frequency was excessive to accomplish comfort for

her.

Q.   And so I'm just trying to make sure I understand it fully. It wasn't anything she was given before she came to the hospital with the pneumonia.  It was -- once she was diagnosed and it's determined she is going to die, it's what dosage she's given from that point to the time she died?

A.   Specifically we were interested in the extubation, which is removing her from the ventilator, and medications surrounding that for her comfort.

Q.   Okay.  And so at some point Dr. Stewart came in to the credentials committee to state his case, right?

A.   Yes.

Q.   Okay.  And I would imagine -- and I haven't heard Dr. Stewart testify.  I've seen the writings in this case.  But I would imagine Dr. Stewart's position is going to be, and was then, she was going to die; all I was trying to do was make her more comfortable and nothing I did hastened her death and it was all done in an attempt to make this poor woman comfortable until she died?  Was that his position?

A.   I don't -- I don't know his position.

Q.   And I guess -- okay.  So maybe I can't ask the next question, but I'll try anyway.

     And so do you remember what his position was?

A.   I believe he outlined it to the credentials committee similar to what you stated.

Q.   Okay.  And so what was your -- when you listened to that and then you're trying to determine what is the right thing to do here, what are all the things you're factoring in?

A.   We are factoring in the necessity of the medications and how much would achieve a patient's comfort without hastening a patient's death.

Q.   And so essentially you're quoting the Hippocratic oath, do no harm, the first thing to do is do no harm?

A.   Yes, sir.  I think you can say that.

Q.   And so essentially what it came down to was, even if we believe Dr. Stewart in what he was attempting to do, we're not comfortable that he achieved his goal appropriately?  Or am I wrong?  Am I missing something?

A.   Specifically we were questioning the dosage used, the amount of the dosages, and how quickly they were administered.

Q.   We heard from Ms. Gierke, and I think she said she had never seen that amount of whatever the medicine was given in that short of period of time.  And then she gave us her credentials, and she said, I have never seen that before in my life.  We have that testimony in the record.

Okay.  And I guess we'll hear from physicians who will come in and say, had no medicine been administered, here's how long she might have lived or whatever and whether what he did hastened her life -- her death.

Let me ask you this.  And I know you're a pediatrician,

which you don't deal with palliative care and you're not dealing with end-of-life care. But when you talked to other doctors on the committee, were your decisions easily made, or were they -- were those decisions you made difficult to make?

I just want you to explain it to us, what you were going through in that conversation as you are talking about it.

A. These decisions were difficult.

Q. And you testified that you knew Dr. Stewart but you didn't really have any animus with him or anything like that.

Were there any other people on the committee who might have had animus with him?

I think you said, not really, but was there anybody on the committee who had some animus with him?

A. Not that they ever indicated in the committee meetings.

THE COURT: Okay. Hold on just one second.

I think that's all I have.

My question is everybody sees -- I'm trying to go into the committee to see what the dynamics were in the committee and what was driving the decisions.

I know AMR will argue that whatever happened in the committee doesn't necessarily inure to ARM, and I get that point, but the motives of a committee -- you know, there's been some link with the plaintiffs trying to link a bad motive of the administration to AMR. And to the extent that the credentials committee either rubber stamped it or went along with it, I just

needed to kind of get some understanding of that.

So, Mr. Cullen, you can inquire.  Thank you.

MR. CULLEN:  Judge, I just want to note that AMR referenced a declaration that Dr. Champlin had executed, and we objected to that declaration at the time and would ask that that objection stand.

THE COURT:  Okay.  Let me ask this:  And we are going back to the motions we've had, motions practice before the trial.

Did I receive the affidavit initially?  I don't remember.

MR. JUNG:  You did, Judge.

THE COURT:  And all you're doing -- did you just not want to go through the testimony with the witness now and just have me acknowledge the affidavit or --

MR. JUNG:  Yes, Judge.  Here's what I heard come in through the proof:  During Dr. Champlin's questioning initially by Mr. Cullin and then on cross-examination by me, I heard Dr. Champlin state that the credentials committee on June 1st made the decision without any AMR report.  It was out of their hands.

And then when Mr. Cullen recrossed, I thought I heard him elicit some testimony about, well, were these reports considered as part of some kind of continued decision to consider and hold over Dr. Stewart's head, and he showed him some deposition testimony.

What happened in that case, Judge, in that deposition, he did give that testimony.  At the end of the deposition, he said, you know what; it's been two and a half years; I can't remember; I don't have the minutes in front of me.

This goes back to that discovery dispute.

So all I was trying to establish is this declaration that Dr. Champlin gave his lawyer states -- I'm paraphrasing -- I have had an opportunity to go back and look at the minutes and understand what the timeline is.  I did not have that benefit at the deposition.  Understanding what the timeline is, I can state that the AMR reports were not considered at any point in time when the credentials committee made its decision, and they weren't considered in any continued action.  That's all I was trying to establish, sir.

THE COURT:  Okay.  Mr. Cullin, you can continue.

MR. CULLEN:  Sure.  And I mean no disrespect to Dr. Champlin, but there are shifting versions of this testimony.

THE COURT:  That's for me to weigh.

MR. CULLEN:  That's your job, Judge.  I'd also -- I will point this out with a question, if that's okay.

REDIRECT EXAMINATION

BY MR. CULLEN:

Q.   Dr. Champlin, did you execute an errata sheet for your March 2nd deposition?

A.   If that was the affidavit, yes.

Q.   No.  An errata sheet is where you read your deposition and you change something.

A.   I don't remember.

Q.   Okay.  All right.  And, yeah, there was a lot of back and forth in that deposition, but I want to show you page 81.

I apologize.  If you'll just take a minute and read that page.  That's the very last exchange in the entire deposition.

A.   Okay.

Q.   I promise I'm not picking on you, Dr. Champlin.  But is that -- was Mr. Jung essentially asking what I asked you here?  Your answer was, "I'm not sure how it would change the answer."

A.   Yes.

Q.   One follow-up on the Court's question.  The Court asked you what -- something like what Dr. Stewart's goal was or his position, something like that.

Do you remember that?

A.   Yes.

Q.   Do -- you recall that meeting was transcribed, right?

A.   Yes.

Q.   Okay.

MR. CULLEN:  Plaintiff's 12.  Get the Elmo real quick.  2 or 3.  Okay.

BY MR. CULLEN:

Q.   So this is what Dr. Stewart said to the committee.  And to perhaps clarify, do you remember his comments to the committee?

A.    I don't remember them directly.

Q.    But does this help you recollect what was said?

A.    I don't remember the statement.

Q.    Okay.  Do you have any reason at all to doubt that Dr. Stewart's goal, as a physician and as a human, in palliative care, was to have a patient die with grace, peace, and dignity?

A.    I'm sorry.  Can you ask that again?

Q.    Do you have any reason to doubt that that's his goal?

A.    No.

         MR. CULLEN:  Thank you.  That's all, Judge.

         MR. JUNG:  I feel like you opened up a can of worms with some of those questions.

         THE COURT:  That's okay.

                    RECROSS EXAMINATION

BY MR. JUNG:

Q.    Dr. Champlin, Judge Miller was asking you some questions about double effect and about how patient AJ was at end of life and she was expected to die.

      Do you remember those questions?

A.    Yes.

Q.    You're a pediatrician, correct?

A.    Yes.

Q.    I have an 11-year-old daughter.  She's kind of tomboyish.  She runs around outside a lot, gets nicked up a lot.  She's had to get stitches a couple of times.

Have you had the chance to take care of 11-year-old kids that might need a stitch or two?

A.   Yes.

Q.   Do you sometimes give them pain meds?

A.   Local, local anesthesia.

Q.   Sometimes you recommend that children, your patients, take aspirin if they are experiencing some type of pain.  Fair?

A.   Not aspirin.

Q.   Give me an example of --

A.   Ibuprofen or acetaminophen.

Q.   Okay.  Here's a better way to do it:  So what is a typical dose of ibuprofen that you would order for an 11-year-old child?

A.   It's weight dependent.

       MR. CULLEN:  Objection, Your Honor.

       MR. JUNG:  I'm going to follow up on the Court's questions.

       THE COURT:  What's the objection?

       MR. CULLEN:  That, with respect to Mr. Jung, I think he's highjacked this witness and is trying to turn him into an expert, and that's not his role here.  He obviously is an expert, and we don't dispute that, as a pediatrician, but neither side has designated, listed him as a medical expert.

       THE COURT:  I'll overrule it.  I see where Mr. Jung is going.

       What he's going to try to do is lay it out and see how much

would he give, what is the -- not corollary.  What is analogous amount of medication he would give --

MR. JUNG:  I won't even go that far.

THE COURT:  -- and -- what would happen if you gave too much or something like that.  So...

Yes, sir.

MR. CULLEN:  Just to let the Court know, you're going to get into an abundance of testimony on that from people who that's their disclosed opinions.

THE COURT:  No doubt.  I will discount any testimony as to its tending to show the standard of care for Dr. Stewart, but I don't think that's why this is being elicited so --

MR. JUNG:  You're right, Judge.  I'm not asking any standard of care questions at all.

BY MR. JUNG:

Q.    So, Dr. Champlin, my daughter weighs 80 pounds.  What's a normal dose of ibuprofen for her, approximate milligram dose?

A.    Approximate milligram would be 300 milligrams.

Q.    So if you want to order 300 milligrams of ibuprofen to relieve my daughter's pain or you want to order ibuprofen to relieve my daughter's pain, and that's what your intent is, to relieve her pain, why can't you order 5,000 milligrams of ibuprofen?

MR. CULLEN:  Objection, Your Honor.  The analogy is not apropos.  Different patients, different setting, different

drugs.

MR. JUNG:  It's not the drug, Judge.

MR. CULLEN:  It's very different.

THE COURT:  Here's the deal:  I get the point.  I know that point.  So I will sustain the objection, but I understand the point you're making, and I get that.

MR. JUNG:  Judge, last point.

BY MR. JUNG:

Q.   And that's what we are talking about, Dr. Champlin.  We're talking about double effect.  There are bounds.  It's a scale thing, is it not?

A.   I understand it to be.

MR. JUNG:  Thank you, Judge.

THE COURT:  Okay.  Anything final?

MR. CULLEN:  Nothing further, Your Honor.

THE COURT:  Do -- I mean, is the doctor released from his subpoena?

MR. CULLEN:  Yes.

THE COURT:  Doctor, you're free to go.

(Witness excused.)

[End of excerpt.]

THE COURT:  All right, ladies and gentlemen.  We have gone to 5:05 or 5:04.  I have already told Ms. Gierke she can leave, and so we are going to recess for today.

I will be in early so if we need to take care of anything

before we get started, just send a word back.  And we'll get started tomorrow -- let's be back here at 9:00 o'clock, ready to go.  Okay?  All right.  Let's recess.

(Overnight recess at 5:07 p.m.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Date:  September 6, 2019
/s/ Kathleen Maloney, RPR, FCRR
United States Court Reporter